# PURCHASE AND SALE AGREEMENT

 ORIGINAL

THIS PURCHASE AND SALE AGREEMENT ("Agreement") is made as of this 15th day of January, 2002 ("Agreement Date"), by and between SPORTS SHINKO (WAIKIKI) CORPORATION, a Hawaii corporation, SPORTS SHINKO (MILILANI) CO., LTD., a Hawaii corporation, SPORTS SHINKO (KAUAI) CO., LTD., a Hawaii corporation, on its behalf and as the successor in interest to Sports Shinko (Kauai) Development Co., Ltd., SPORTS SHINKO (PUKALANI) CO., LTD., a Hawaii corporation, PUKALANI STP CO., LTD., a Hawaii corporation, SPORTS SHINKO (HAWAII) CO., LTD., a Hawaii corporation, SURE TRANSPORTATION, INC., a Hawaii corporation (hereinafter collectively referred to as "Seller" or individually as a "Seller"), and KG HOLDINGS, LLC, a Hawaii limited liability company, and its nominees ("Buyer").

In consideration of the mutual covenants and conditions set forth below, and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties agree as follows:

1. **Sale of the Property**.

    1.1 **Property to be Sold**. Seller agrees to sell, and Buyer agrees to purchase, on the terms and conditions set forth in this Agreement, all of Seller's right, title and interest in and to the following described property (collectively, the "Property"), free and clear of liens and encumbrances other than the Permitted Encumbrances (as defined hereinbelow), and excluding any property described in Section 1.2 hereinbelow:

    (a) **Real Property**.

        (i) All of Seller's right, title, and interest in, to and under that certain lease dated September 22, 1966 ("QK Hotel Lease"), by and between Seller and Bishop Trust Company, Limited, Trustee under the Will and of the Estate of Emanuel S. Cunha, Deceased ("Ground Lessor"), more particularly described in Exhibit A-1 attached hereto and made a part of this Agreement demising, among other things, the real property situate at Kekio, Waikiki, Honolulu, City and County of Honolulu, State of Hawaii, upon which Seller operates the hotel commonly known as the Queen Kapiolani Hotel, and all improvements located thereon, together with all easements and rights appurtenant to such land described therein ("QK Hotel").

        (ii) All of Seller's right, title, and interest in, to and under that certain lease dated October 20, 1986 ("OR Hotel Lease"), by and between Seller and Pacific Holiday, Inc. ("OR Lessor"), more particularly described in Exhibit A-2 attached hereto and made a part of this Agreement demising, among other things, the real property situate at Kekio, Waikiki, Honolulu, City and County of Honolulu, State of Hawaii, upon which Seller operates the hotel commonly known as the Ocean Resort Hotel, and all improvements located thereon, together with all easements and rights appurtenant to such land described therein ("OR Hotel").

(iii) Approximately 296.758 acres of land located in Poipu, Island and County of Kauai, State of Hawaii, commonly known as the Kiahuna Golf Club ("Kiahuna Golf Club"), designated as Tax Map Key Nos. (4) 2-8-014-007, (4) 2-8-014-008, (4) 2-8-014-028, (4) 2-8-014-03 1, (4) 2-8-014-032, (4) 2-8-014-033, (4) 2-8-014-034, (4) 2-8-014-035, (4) 2-8-014-036, (4) 2-8-015-077, and more particularly described in Exhibit A-3 attached to and made a part of this Agreement, including all improvements located thereon, together with all easements and rights appurtenant to such land described therein, together with Seller's interest as lessee under that certain Lease of Easement dated April 17, 1991, by Grove Farm Company, Incorporated, and Sports Shinko (Kauai) Co., Ltd., a short form of which is dated April 17, 1991, by Grove Farm Company, Incorporated, and Sports Shinko (Kauai) Co., Ltd., filed as Land Court Document No. 1817514 ("Kiahuna Easement Lease"). (The area demised by the Kiahuna Easement Lease is hereinafter referred to as the "Kiahuna Easement Area.")

(iv) Approximately 172.099 acres of land located in Mililani, City and County of Honolulu, State of Hawaii, including the property commonly known as the Mililani Golf Club ("Mililani Golf Club"), designated as Tax Map Key Nos. (1) 9-5-001-035 and (1) 9-5-001-076 and more particularly described in Exhibit A-4 attached to and made a part of this Agreement, including all improvements located thereon, together with all easements and rights appurtenant to such land described therein; and

(v) Approximately 195.208 acres of land located in Makaehu, Kohoilo, Aapueo-Nui, District of Kula, Island and County of Maui, State of Hawaii, including the property commonly known as the Pukalani Country Club ("Pukalani Country Club"), designated as Tax Map Key Nos. (2) 2-3-8-5, (2) 2-3-9-4, (2) 2-3-8-36, (2) 2-3-9-39, (2) 2-3-9-40, (2) 2-3-47-126, (2) 2-3-48-125, (2) 2-3-49-88, (2) 2-3-55-68, (2) 2-3-55-69, (2) 2-3-56-95, (2) 2-3-56-96, (2) 2-3-56-97, (2) 2-3-56-98, (2) 2-3-57-121, (2) 2-3-57-124, (2) 2-3-57-138, (2) 2-3-61-114, and more particularly described in Exhibit A-5 attached to and made a part of this Agreement, including all improvements located thereon, together with all easements and rights appurtenant to such land described therein.

The foregoing real property is hereinafter referred to as the "Real Property." The QK Hotel and the OR Hotel are sometimes referred to herein as the "Hotels." The Kiahuna Golf Club, Mililani Golf Club and the Pukalani Country Club are sometimes hereinafter collectively referred to as the "Golf Courses." The QK Hotel Lease and the OR Hotel Lease are sometimes collectively referred to as the "Ground Leases."

(b)     **Personal Property**.  All tangible personal property located on the Real Property used in connection with the ownership, operation or maintenance of the Hotels, Golf Courses and Real Property, including, but not limited to, any and all furniture, fixtures, computers and software programs, equipment, vehicles, inventory, supplies, machinery and those certain items of tangible personal property identified in Exhibit B attached hereto and made a part of this Agreement, subject, however, to normal depletion and/or wear and tear as shall occur in the normal course of business ("Personal Property").

(c) **Permits.** All transferable permits, licenses, approvals, authorizations, declarations and applications granted or issued by any governmental agency to Seller and used in connection with Seller's ownership or occupancy of the Real Property or Seller's operation of the Hotels or Golf Courses or development of the Real Property (the "Permits").

(d) **Agreements, Reports and Plans.** All transferable agreements, development agreements, management agreements, trademarks, trade names, logos, reports, environmental and archeological surveys, studies and reports, plans, architectural, soils and engineering plans, specifications, schematics, surveys, title reports, appraisals, development studies, maps, bonds, deposits, fees, studies, notices and other materials prepared, given, filed or used or to be used in connection with the Property, the Hotels or the Golf Courses (collectively, the "Agreements, Reports and Plans"), and all assignable contracts, if any, entered into by Seller relating to, directly or indirectly, the Property which are approved by Buyer during the due diligence period (the "Assumed Contracts").

(e) **Tradenames.** The following tradenames and logos used by Seller in connection with the ownership or operation of the Hotels: Ocean Resort Hotel and Queen Kapiolani Hotel ('Tradenames").

(f) **STP.** All of the outstanding stock or assets of Pukalani STP Co., Ltd., a Hawaii corporation. For purposes of this Agreement, the term "Real Property" shall include the real property owned by Pukalani STP Co., Ltd., including all of the real property described in Exhibit A-6 attached hereto.

(g) **Experience Rating.** Seller's experience ratings for Hawaii unemployment insurance purposes.

(h) **Books and Records.** All books and records relating to the ownership, operation, use and maintenance of the Real Property, Hotels and Golf Courses; provided, however, that after Closing, Seller shall be provided with reasonable access to, and shall be permitted to make copies of, such books and records, as may be required by Seller for taxation, audit, financial reporting, litigation or other reasonable business purposes.

(i) **Reservations, Accounts, Intangible Property.** All reservations, guest deposits, guest lists, customer lists, security deposits, prepaid rent, credits, refunds, accounts receivable, telephone numbers, fax numbers, internet domain names, and other intangible property used or relating to the ownership, operation, maintenance and use of the Real Property, the Hotels or the Golf Courses.

(j) **Tenant Leases.** All of Seller's interest as lessor under all tenant leases, licenses and other occupancy or use agreements for space in or on the Real Property or any portion thereof.

(k) **Security Deposits.** All security deposits under all tenant leases, licenses and other occupancy or use agreements described in subparagraph 1.1(j).

(l) **Warranties.** All warranties and guarantees running in favor of Seller, to the extent they relate to the Property, which are in effect on the Closing Date and which are assignable in accordance with their terms.

(m) **Sure Transportation.** All of the stock or assets of Sure Transportation, Inc.

(n) **Equipment Leases.** All equipment leases which are approved by Buyer and assignable to Buyer ("Equipment Leases").

1.2. **Excluded Items.** Notwithstanding anything contained in Section 1.1 hereinabove, Buyer understands and agrees that the following are excluded from the Property to be sold, assigned, transferred and conveyed to Buyer hereunder:

(a) **Insurance Policies.** All policies of insurance under which Seller is a named or an additional named insured. Buyer shall be responsible for obtaining its own insurance as of the Closing (as defined in Section 6.3 hereinbelow) and for the period thereafter.

(b) **Utility Service in Seller's Name.** All utility services (such as telephone services) provided to Seller in Seller's name. Seller will arrange for the discontinuance, effective as of the Closing Date (as defined in Section 6.3 hereinbelow), of all such utility services, and Buyer shall be responsible for its own utility services thereafter. Any deposits for utilities made by Seller shall be the property of Seller, and Buyer shall be responsible for any required replacements thereof. Seller shall assign all rights to the telephone numbers, fax numbers and internet domain names used in connection with the operation of the Hotels and Golf Courses.

(c) **Certain Permits, Agreements, Reports and Plans, Equipment Leases.** Any Permits, Agreements, Reports, Plans or Equipment Leases that cannot be assigned to Buyer by law or the terms of thereof.

(d) **Third Party Property.** Any property owned by any tenant, concessionaire, licensee or other occupant (other than Seller) of the Real Property, or by any person other than Seller.

(e) **Intercompany Receivables or Agreements.** Any receivables or indebtedness owed to Seller by any affiliate of Seller, and any agreements among Seller or between Seller and any affiliate of Seller (other than the Ocean Resort Club and Royal Green Club agreements, which shall be assigned to, and assumed by Buyer's nominees taking title to the Hotels and Golf Courses).

(f) **Bank Accounts and Cash on Hand.** All bank accounts and cash on hand of Seller, other than the house bank and petty cash, subject to any applicable proration provisions herein.

(g) **Pre-Closing Accounts Receivable.** All pre-closing accounts receivable which relate to services rendered or accommodations provided prior to Closing.

(h) **Miscellaneous.** That certain property identified in <u>Exhibit C</u> attached hereto and made a part of this Agreement.

1.3 **Permitted Encumbrances.** The Property shall be conveyed subject to the following (collectively, "Permitted Encumbrances"):

(a) All matters disclosed by the Buyer's Title Policy (as defined in Section 6.2) and approved by Buyer; provided, however, that Seller shall not be obligated hereunder to cure any title matter or remove any encumbrance on title disclosed in any title report or title policy prior to Closing, other than (i) that certain mortgage and related financing statements in favor of The Fuji Bank, Ltd. with respect to the OR Hotel and (ii) that certain Second Mortgage in favor of Stacey J. Wong, as Trustee of the Eric A. Knudsen Trust et al. with respect to the Kiahuna Golf Club, and that Buyer's remedy in event that Buyer does not approve of any such matter or encumbrance shall be to terminate this Agreement; and

(b) Any other matter agreed to in writing by Buyer prior to the Closing.

1.4 **No Assumption of Liabilities.** Except as expressly provided herein, Buyer shall not assume any obligations or liabilities of Seller relating to the Property other than the Assumed Contracts, the Ground Leases and the Equipment Leases. Buyer shall not assume any claims, obligations or liabilities under the Assumed Contracts, Ground Leases or Equipment Leases which accrued prior to the Closing Date. For example, Buyer shall not be liable for any rents which accrued under the Ground Leases prior to Closing. Seller shall indemnify, defend and hold harmless Buyer from any claims, liabilities or obligations of Seller which are not expressly assumed by Buyer or which accrued prior to the Closing Date.

2. **Purchase Price; Deposit.**

2.1 **Total Purchase Price.** The total purchase price to be paid by Buyer to Seller for the Property is the sum of TWENTY-TWO MILLION UNITED STATES DOLLARS (U.S.$22,000,000.00) ("Purchase Price").

2.2 **Payment of Purchase Price.** The Purchase Price for the Property shall be payable as follows:

(a) Buyer shall pay the Initial Deposit as set forth in Section 2.3 hereinbelow.

(b) At the Closing, Buyer shall execute and deliver to Title Guaranty Escrow Services, Inc., 235 Queen Street, Honolulu, Hawaii 96813, Attention: Barbara Paulo ("Escrow Agent"), promissory notes payable to each Seller (the amounts thereof to be allocated by mutual agreement of Buyer and Seller) in the aggregate principal

amount of Nine Million Dollars ($9,000,000.00), in substantially the form attached hereto as Exhibit D (the "Notes"). The Notes shall be unsecured and shall provide for quarterly interest only payments, with the first payment due ninety (90) days after the Closing Date and each payment due on the same day of the first month of each quarter thereafter. Interest shall accrue on the Notes at the rate of six percent (6%) per annum, non-compounded. The maturity date of the Notes shall be ten (10) years after the Closing Date.

        (c)    At the Closing, Buyer shall deposit with the Escrow Agent the remainder of the Purchase Price in cash, subject to adjustment in accordance with Section 6.7 below, and/or by way of assumption of the Bank of Hawaii loan secured by certain mortgages on a portion of the Real Property (the "Mortgage Loan"), together with Buyer's portion of the closing costs as provided in Section 6.6 hereinbelow. On the Closing Date, Escrow Agent shall apply the Initial Deposit and interest thereon towards payment of the Purchase Price.

    2.3    **Deposit**.

        (a)    At the time that escrow is opened pursuant to Section 6.1 hereinbelow, Buyer shall deposit with Escrow Agent the sum of ONE HUNDRED THOUSAND UNITED STATES DOLLARS (U.S. $100,000.00) ("Initial Deposit").

        (b)    If Buyer shall not have given Seller notice of its intention to proceed with the acquisition of the Property ("Notice to Proceed") prior to the expiration of the Due Diligence Period described in Section 3.1 hereinbelow, the Initial Deposit shall be returned to Buyer and the parties shall have no further obligations to each other relating to the Property or this Agreement, except for the obligations under Section 17.11 hereinbelow, and such covenants and indemnities which expressly survive the purchase of the Property by Buyer.

        (c)    If Seller has timely received the Notice to Proceed from Buyer, then the Initial Deposit shall become nonrefundable and shall be applied against the Purchase Price of the Property upon Closing (as defined in Section 6.3 below); provided, however, that if Closing does not occur because of a default by Buyer under this Agreement, then Seller shall be entitled to retain the Initial Deposit as damages for Buyer's default, pursuant to the provisions of Section 14 below.

        (d)    If Buyer shall fail to timely deposit the Initial Deposit with the Escrow Agent, Seller shall have the option to terminate this Agreement upon written notice to the Escrow Agent and the parties hereto shall be released from all further obligations and liabilities under this Agreement, except for the obligations under Section 17.11 hereinbelow.

    2.4    **Interest on Deposit**. The Initial Deposit shall be held by the Escrow Agent in an interest-bearing account as directed by Buyer. All interest on the Initial Deposit shall accrue and be paid to the party entitled to the benefit of the Initial Deposit under this Agreement.

(15) days after such submittal, shall be conclusive. The fees and expenses of the Outside Accountants shall be paid equally by Buyer and Seller.

(4) The foregoing limitation shall not apply to any item which, by its nature, cannot be finally determined within the period specified. Notwithstanding the foregoing, in no event will any adjustments be made after the lapse of six (6) months after the Closing Date.

(5) Upon final acceptance of the Closing Statement (either by expiration of the aforesaid 30-day period with no notice of dispute being delivered or by determination by the Outside Accountants), any net credits in favor of Seller shall be paid in cash by Buyer within ten (10) days of the date of such acceptance, or any net credits in favor of Buyer shall be offset against the balance due under the Note as of such date.

(d) **Allocation of Purchase Price**. The parties shall mutually agree upon an allocation of the Purchase Price and shall report such allocation to the Internal Revenue Service on Form 8594. If the parties fail to so agree in a timely manner, then the allocation shall be conclusively determined by the Outside Accountants in the manner set forth hereinabove and the parties shall file the Form 8594 reports based on such determination.

7. **Condition to Seller's Obligations**. Seller's obligation to sell and convey the Property to Buyer is expressly conditioned upon the following:

7.1 **Performance of Buyer's Covenants**. All covenants and agreements made by Buyer which are to be completed on or before the Closing shall have been performed in all material respects, and the Purchase Price shall have been delivered to Escrow Agent.

7.2 **No Untrue Representations**. As of the Closing Date, each and every one of the representations and warranties made by Buyer in this Agreement shall be true and correct in all material respects.

7.3 **Consents**. All consents necessary for the transfer of the Property, including, without limitation, the consent of Ground Lessors, if required under the Ground Leases, and the consent of the lessor under the Kiahuna Easement Lease, if required thereunder, shall have been obtained. Seller shall use its reasonable good faith efforts to obtain all such consents, but shall not be obligated to pay or expend any money as a condition to obtaining any such consent (other than payment of such lessors' reasonable attorney's fees relating to the assignment of such leases if required under the terms thereof). Provided that Seller has used its reasonable good faith efforts as aforesaid, the inability to obtain any such consents shall not constitute a default by Seller under this Agreement.

8. **Condition to Buyer's Obligations**. Buyer's obligation to purchase the Property from Seller is expressly conditioned upon the following:

8.1 **Notice to Proceed**. Buyer shall have elected to proceed with the purchase of the Property by delivering to Seller the Notice to Proceed within five (5) business days after the expiration of the Due Diligence Period.

IN WITNESS WHEREOF, Seller and Buyer have executed this Agreement as of the date first above written.

Seller:   SPORTS SHINKO (WAIKIKI) CORPORATION

By _Satoshi Kinoshita_
Name: _Satoshi Kinoshita_
Title: _Vice President_

SPORTS SHINKO (KAUAI) CO., LTD.

By _Satoshi Kinoshita_
Name: _Satoshi Kinoshita_
Title: _Vice President_

SPORTS SHINKO (MILILANI) CO., LTD.

By _Satoshi Kinoshita_
Name: _Satoshi Kinoshita_
Title: _Vice President_

SPORTS SHINKO (PUKALANI) CO., LTD.

By _Satoshi Kinoshita_
Name: _Satoshi Kinoshita_
Title: _Vice President_

PUKALANI STP CO., LTD.

By _Satoshi Kinoshita_
Name: _Satoshi Kinoshita_
Title: _Vice President_

SPORTS SHINKO (HAWAII) CO., LTD.

By _Satoshi Kinoshita_
Name: _Satoshi Kinoshita_
Title: _Executive Vice President_

SURE TRANSPORTATION, INC.

By _Satoshi Kinoshita_
Name: _Satoshi Kinoshita_
Title: _Vice President_

Buyer:        KG HOLDINGS, LLC

By: _Wayne Tanigawa_
Name: _Wayne Tanigawa_
Title: _Manager_

## Schedule 4.1(g)

### Conformance with Law

1. Unfinished ADA compliance tasks at the Queen Kapiolani Hotel as described on Attachment 1 to Schedule 5.4(c).

2. Unfinished ADA compliance tasks at the Ocean Resort Hotel Waikiki as described on Attachment 2 to Schedule 5.4(c).

3. Possible non-compliance and/or lack of building permits for certain improvements made to Queen Kapiolani Hotel, including matters described in Buyer's letter to Seller dated March 1, 2002.

4. Possible non-compliance and/or violations at Pukalani Wastewater Treatment Plant described in correspondence from State of Hawaii Department of Health dated December 4, 2001 and January 18, 2002, and from County of Maui Department of Fire Control dated October 17, 2001 and December 19, 2001; installation of double wall vaulted tank.

### End of Schedule 4.1(g)

Sch 4.1(g) - P&S Agt.wpd

A 12493

Schedule 5.4(c)

## Condition of Property

1. Unfinished ADA compliance tasks at the Queen Kapiolani Hotel as described on Attachment 1 of this Schedule 5.4(c).

2. Unfinished ADA compliance tasks at the Ocean Resort Hotel Waikiki as described on Attachment 2 of this Schedule 5.4(c).

3. Possible non-compliance and/or lack of building permits for certain improvements made to Queen Kapiolani Hotel, including matters described in Buyer's letter to Seller dated March 1, 2002.

4. Possible non-compliance and/or violations at Pukalani Wastewater Treatment Plant described in correspondence from State of Hawaii Department of Health dated December 4, 2001 and January 18, 2002, and from County of Maui Department of Fire Control dated October 17, 2001 and December 19, 2001; installation of double wall vaulted tank.

**End of Schedule 5.4(c)**