survive any such termination or expiration and shall be binding upon Owner, its successors and assigns, including any successor or assign who becomes the "Owner" after the effective date of any such expiration or termination.

9.6    Termination Fee.

(a)    In the event of termination of this Agreement due to Owner's default and Operator's resultant termination of this Agreement as provided in Section 9.3, or in the event of destruction or condemnation of the Hotel as provided in Article X, Owner shall pay to Operator a Termination Fee equal to the sum of One Million Dollars ($1,000,000).

9.7    Owner shall have the right to terminate the Agreement with no obligation to pay the Termination Fee if the Operator's actual performance for two consecutive years fails to achieve the budgeted Gross Operating Income or the Gross Revenue within a ten (10) percent range, provided, however that the Owner shall not have the right to terminate the Agreement under this paragraph 9.7 for the first five (5) years of the initial term of the Agreement except for a default of Operator other than this paragraph 9.7.

ARTICLE X

DESTRUCTION AND CONDEMNATION

10.1    Substantial Damage.  If the Hotel shall be destroyed or substantially damaged by fire or other casualty, either party may, within sixty (60) days after the occurrence of such event, give notice to the other terminating this Agreement. For purposes of this Section 10.1, the Hotel shall be deemed to have been substantially damaged if either (a) the estimated cost of the restoration shall exceed forty-five percent (45%) of the estimated cost (excluding foundation, footing and excavation cost) of replacing the Hotel by constructing, furnishing and equipping, in accordance with the Legal Requirements and Insurance Requirements then in effect, a new hotel on the Property which shall be substantially the same as the Hotel, as it was immediately prior to such casualty (or, if such casualty shall occur prior to the Opening Date, forty-five percent (45%) of such cost of constructing, furnishing and equipping the Hotel in accordance with the final plans and specifications therefor) or (b) the length of time required for restoration shall be in excess of thirty (30) months from the date of such casualty. The proceeds of any business interruption insurance shall be allocated between the parties as their interests may appear, provided, however, that the amount payable to Operator under this Section 10.1 shall not exceed the amount of the Termination Fee calculated as of the Fiscal Year in which the damage occurs. In the event that Owner does not have the right to terminate this Agreement pursuant to this Section 10.1, Owner shall use the proceeds of any property damage insurance to promptly rebuild the Hotel, and shall pay any costs of rebuilding not covered by insurance out of its own funds. Otherwise, the proceeds of any property insurance may be retained by Owner as its own property, subject, in the event of termination of this Agreement, to the provisions of Section 10.6. If this Agreement is terminated, Owner shall make the payments to Operator as set

26

13.24  Further Assurances.  The parties hereto agree  to execute, acknowledge, deliver and record such  certificates, amendments, instruments and documents, and to  take such other action, as may be necessary to carry out the  intent and purposes of this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this  Agreement as of the date first set forth above.

OWNER:                              SPORTS SHINKO (WAIKIKI) CORPORATION,
                                    dba OCEAN RESORT HOTEL WAIKIKI


                                    By: _Satoshi Kinoshita_____
                                    Name:  Satoshi Kinoshita
                                    Title:  Executive Vice President




OPERATOR:                           RESORT MANAGEMENT SERVICES
                                    (HAWAII), INC.


                                    By: _____
                                    Name:  Yasuo Nishida
                                    Title:  President




39

## RESTATED GOLF COURSE MANAGEMENT AGREEMENT

THIS RESTATED GOLF COURSE MANAGEMENT AGREEMENT (the "Agreement") is made effective as of the 1st day of September, 2000, by and between SPORTS SHINKO (PUKALANI) CO., LTD., a Hawaii corporation, dba PUKALANI GOLF COURSE ("Owner"), and RESORT MANAGEMENT SERVICES (HAWAII), INC., a Hawaii corporation ("Operator").

### RECITALS

This Agreement is made and entered into with the understanding by the parties of the following facts:

A.    Owner owns the Property and Golf Course (hereinafter defined).

B.    Owner and Operator entered into that certain Golf Course Management Agreement dated August 31, 2000 whereby Owner retained Operator to manage, operate and promote the Golf Course.

C.    Owner and Operator now desire to confirm the terms of said Golf Course Management Agreement.

### AGREEMENT

NOW, THEREFORE, in consideration of the premises and of the mutual covenants herein contained, the parties hereto hereby agree as follows:

### ARTICLE I

#### DEFINITIONS

1.1    Definitions.  The following words and phrases as used in this Agreement shall have the following meanings unless the context or use indicates another or different meaning and intent:

(a)    Accounting Period.  Accounting Period shall mean either of the following at the election of Operator, provided such election shall be consistently applied:

(1)    a full calendar month (or partial calendar month if at the beginning or end of the term hereof); or

(2)    each of the three (3) successive periods within a fiscal quarter, consisting of four (4) weeks, four (4) weeks and five (5) weeks, respectively.

EXHIBIT 04
9  4-19-05
S. Kinoshita

(b)     Adjusted Gross Operating Profit.  Adjusted Gross Operating Profit shall have the meaning set forth in Section 7.1(b).

(c)     Affiliate.  An Affiliate of any person or entity shall mean any other person or entity which directly or indirectly, through one or more intermediaries controls, is controlled by, or is under common control with, such person or entity.

(d)     Annual Projection.  Annual Projection shall have the meaning set forth in Section 5.1.

(e)     Annual Statement.  Annual Statement shall have the meaning set forth in Section 5.4.

(f)     Base Management Fee.  Base Management Fee shall have the meaning set forth in Section 7.2.

(g)     Capital Budget.  Capital Budget shall have the meaning set forth in Section 5.1.

(h)     CPI Adjuster.  CPI Adjuster shall mean the percentage by which the CPI, at the time of application of the CPI Adjuster, exceeds the CPI in effect as of the end of the last full calendar month preceding the date of this Agreement.  "CPI" shall mean the Consumer Price Index, United States City Average, All Urban Consumers, All Items, published from time to time by the United States Bureau of Labor Statistics.  If the CPI is discontinued, a comparable index published by any governmental agency or recognized authority shall be used in place thereof, subject to the reasonable approval of Owner and Operator.

(i)     Commencement Date.  Commencement Date shall mean September 1, 2000, subject to the approval of this Agreement by the Liquor Commission of the County of Maui.

(j)     First Class Standards.  First Class Standards shall mean the standards pursuant to which golf courses comparable to the Golf Course, offering the level and type of service available at the Golf Course and whose location, construction, furnishing and equipping is also of like quality to that of the Golf Course are operated.

(k)     Fiscal Year.  Fiscal Year shall mean a calendar year, provided that the first Fiscal Year shall commence on the opening of the Golf Course and end on the next succeeding December 31 and, in the event of early termination of this Agreement, the last Fiscal Year shall end on the date of termination.

requirements of all government, governmental authorities and quasi-governmental authorities (including, without limitation, all appropriate alcoholic beverage control authorities) which now or hereafter may be applicable to the Golf Course (including any portion or department thereof) or the operation or maintenance thereof.

(v)    Lending Rate. Lending Rate shall mean the rate of interest per annum equal to the lesser of: (1) at the rate of two percent (2%) per annum plus prime rate then being charged by Bank of Hawaii or (2) the maximum rate permitted by law, such rate of interest to be adjusted at the end of each month included in any period for which interest is charged hereunder.

(w)    Mortgage. Mortgage shall mean that certain mortgage, if any, described in Exhibit A.

(x)    Operating Accounts. Operating Accounts shall mean the bank accounts for the Golf Course described in Section 4.4.

(y)    Operating Budget. Operating Budget shall have the meaning set forth in Section 5.1.

(z)    Property. Property shall mean the real property described in Exhibit A attached hereto.

(aa)    [Intentionally deleted]

(bb)    Revenue. Revenue shall have the meaning set forth in Section 7.1(c).

(cc)    Termination Fee. Termination Fee shall have the meaning set forth in Section 9.7.

## ARTICLE II

## NAME OF GOLF COURSE

2.1    Golf Course Name. The name of the Golf Course shall be determined by Owner prior to the Commencement Date. After the selection of such name, all operations of the Golf Course, including all marketing of the Golf Course, shall be under such name.

## ARTICLE III

## TERM

3.1    Original Term. This Agreement shall be effective on the Commencement Date hereof, the original operating term of this Agreement shall commence on the Commencement

4

Date and shall continue until the end of the Fiscal Year in which the 20th anniversary of the Commencement Date occurs, unless this Agreement shall be sooner terminated as herein provided.

    3.2     Extension Terms.  Operator shall not have any right to extend the operating term unless otherwise mutually agreed to in writing by both Operator and Owner..

ARTICLE IV

OPERATION OF THE GOLF COURSE

    4.1     Right to Manage; Standard of Operation.

        (a)     Owner hereby grants to Operator the sole and exclusive right to manage and operate the Golf Course pursuant to the terms of this Agreement, and Operator agrees that, except to the extent excused as hereinafter provided, Operator will, as the agent of Owner, operate the Golf Course during the term of this Agreement in conformity with First Class Standards and in conformity with all of the terms, covenants and conditions herein contained, and shall use the Golf Course solely for the operation of a Golf Course business conforming to First Class Standards, and for other activities which are customary and usual in connection with such operations, including, without limitation, pro shop, driving range and restaurant operations. The parties agree that the agency and authority granted and conferred on Operator herein are powers coupled with an interest in the Golf Course and are irrevocable during the term of this Agreement.  Except as otherwise specifically limited under this Agreement, Operator, as the sole and exclusive agent of Owner, shall (subject to compliance with the terms and covenants contained in this Agreement) have absolute authority, control and discretion in the operation of the Golf Course, including, without limitation, (1) the sole right, authority and power, either by itself or as part of an association, to negotiate and enter into such contracts (including, without limitation, collective bargaining agreements or labor contracts), leases, concession agreements, service agreements, and other agreements, in the name and at the expense of Owner as may be necessary or advisable in connection with the operation of the Golf Course, Owner hereby agreeing to execute any such lease, contract or agreement upon request of Operator, and (2) the sole right, authority and power to determine the terms of admittance, charges for services and commercial space, charges for entertainment, charges for ancillary services, charges for food and beverages (which rights shall specifically allow Operator to charge varying rates to different customers or groups of customers), labor policies (including wage rates, the hiring and discharging of employees, and the installation of employee retirement or other benefit plans), credit policies (including arrangements with credit card organizations) and all phases of advertising, promotion and publicity relating to the Golf Course.  Except as otherwise provided herein, the right of Owner to receive an amount based on the financial returns from the operation of the Golf Course shall not be deemed to give Owner any interest, control or discretion in the operation of the Golf Course which is vested in Operator, as agent for Owner, pursuant to this Agreement.  Owner shall be responsible for and maintain exclusive control of the Golf Course.

5

such Fiscal Year based upon the final determination of Gross Revenue, Adjusted Gross Operating Profit and Ancillary Gross Revenue for such Fiscal Year as reflected in the Annual Statement for such Fiscal Year provided for in Section 5.4, then, by way of year-end adjustment, within fifteen (15) days after the delivery of such Annual Statement to Owner, Operator shall pay to the Owner the amount of such overpayment or Owner shall pay to Operator the amount of such underpayment.

(b)    To the extent assignable, Operator shall assign and transfer to Owner all of Operator's right, title and interest in and to all liquor, restaurant and other licenses and permits, if any, with respect to the Golf Course; provided, however, if Operator has expended any of its own funds in the acquisition of such licenses or permits, Owner shall reimburse Operator therefor.

(c)    Operator shall peacefully vacate and surrender the Golf Course to Owner.

(d)    Owner shall indemnify, defend and hold Operator harmless from all costs, expenses, claims, damages and liabilities, including without limitation, counsel fees and disbursements, arising out of, in connection with or resulting from the ownership, operation or use of the Golf Course after the date of termination, including, without limitation, the failure of Owner following the expiration or earlier termination (for whatever cause) of this Agreement to provide all of the services contracted for in connection with the business booked for the Golf Course on or prior to the date of such expiration or termination. The provisions of this subsection (d) shall survive any such termination or expiration and shall be binding upon Owner, its successors and assigns, including any successor or assign who becomes the "Owner" after the effective date of any such expiration or termination.

9.6    [Intentionally deleted]

9.7    Termination Fee.

(a)    In the event of termination of this Agreement due to Owner's default and Operator's resultant termination of this Agreement as provided in Section 9.3, or in the event of destruction or condemnation of the Golf Course as provided in Article X, Owner shall pay to Operator a Termination Fee equal to the sum of Five Hundred Thousand Dollars ($500,000).

9.8    Termination Based on Performance. Owner shall have the right to terminate the Agreement with no obligation to pay the Termination Fee if the Operator's actual performance for two consecutive years fails to achieve the budgeted Gross Operating Income or the Gross Revenue within a ten (10) percent range, provided, however that the Owner shall not have the right to terminate the Agreement under this paragraph 9.8 for the first five (5) years of the initial term of the Agreement except for a default of Operator other than this paragraph 9.8.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first set forth above.

OWNER:                          SPORTS SHINKO (PUKALANI) CO., LTD.,
                                a Hawaii corporation, dba PUKALANI
                                GOLF COURSE


                                By: _Satoshi Kinoshita_
                                    SATOSHI KINOSHITA
                                    Its Executive Vice President


OPERATOR:                       RESORT MANAGEMENT SERVICES
                                (HAWAII), INC., a Hawaii corporation


                                By: _____
                                    Name: _____
                                    Title: _____

39

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first set forth above.

OWNER:                                SPORTS SHINKO (PUKALANI) CO., LTD.,
                                      a Hawaii corporation, dba PUKALANI
                                      GOLF COURSE


                                      By: _____
                                           SATOSHI KINOSHITA
                                           Its


OPERATOR:                             RESORT MANAGEMENT SERVICES
                                      (HAWAII), INC., a Hawaii corporation


                                      By: _____
                                           Name: _Shigeru Tomita_____
                                           Title: _V. P._____

39

**DOMESTIC PROFIT CORPORATION**
**FILING FEE: $25.00**

JKK

# STATE OF HAWAII
**DEPARTMENT OF COMMERCE AND CONSUMER AFFAIRS**
**BUSINESS REGISTRATION DIVISION**
1010 Richards Street
Mailing Address: Annual Filing, P.O. Box 113600, Honolulu, HI. 96811

**RETURN ORIGINAL BY MARC**
**PENALTY FOR LATE FI**

H    R/SYL

DOMESTIC PROFIT CORPORATION ANNUAL REPORT FOR THE YEAR ENDED DECEMBER 31, 2001
CORPORATE NAME AND MAILING ADDRESS:

RESORT MANAGEMENT SERVICES (HAWAII), INC.
360 PUKALANI STREET
PUKALANI HI 96768

If above mailing address has changed, line out and print change to the right.
If address of principal office differs from the above mailing address, state the address of the principal office.   Give
Number, Street, City, State and Zip Code:_____

1. **AUTHORIZED CAPITAL**                              **PAID-IN CAPITAL (NUMBER OF SHARES ISSUED)**

| CLASS | NUMBER | CLASS | NUMBER |
|-------|--------|-------|--------|
| COMMON | 20,000 | COMMON | 1,000 |

To correct the above capital(s), line out and print the correct class and numbers on the right.

2. **NATURE OF BUSINESS:**
   MANAGEMENT SERVICES
   (To correct, line out and print corrections below. If inactive during the period, state INACTIVE.)

3. Street address of the registered office in Hawaii and the name of the registered agent at that address.
   (See reverse for instructions.) (If any change, line out and print change on the right.)

4. **OFFICERS/DIRECTORS:**    (List all officers and directors. To correct, line out and print corrections on the right. See reverse for instructions.)

| OFFICE HELD/<br>DIRECTOR CODE | NAME IN FULL | ADDRESS (INCLUDE CITY, STATE & ZIP CODE) | |
|---|---|---|---|
| P/S/T/D | NISHIDA,YASUO | 160 HOAUNA ST | WAILUKU HI 96793 |
| V | TOMITA,SHIGERU | 6175 MAKANIOLU PL | HON HI 96821 |

2002 MAR 27 A

DEPARTMENT OF
COMMERCE AND
CONSUMER AFFAIRS
STATE OF HAWAII

RECEIVED
BUSINESS REGISTRATION
DIVISION

03/30/200202064

2002 FEB 25 P 55

DEPARTMENT OF
COMMERCE AND
CONSUMER AFFAIRS
STATE OF HAWAII

RECEIVED
BUSINESS REGISTRATION
DIVISION

☑ **NO CHANGES:** **Do not check this box if changes have been made above. (Checking this box means there are no changes reported. The Department will not be held responsible for any changes made to this report.)**

# CERTIFICATION

I certify under the penalties of Section 414-20, Hawaii Revised Statutes, that I have read the above, the information is true and correct, and I am authorized to sign this report.

DATE: 2/22/02

_Jann Lule_

_Yasuo Nishida_
**Print Name**

Signature of authorized officer, attorney-in-fact
for an officer, or receiver or trustee
(if the corporation is in the hands of a receiver or trustee)

**FILE NO. 0119737D1**
**Rev. 1/2002**

**File this original**

B17
B22

2001



***ATTORNEY-CLIENT PRIVILEGE***                    1

```
 1              IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

 2                          STATE OF HAWAII

 3     -------------------------------------------

 4     SPORTS SHINKO (USA) CO., LTD., a Delaware

 5     Corporation; SPORTS SHINKO (MILILANI)

 6     CO., LTD., a Hawaii corporation, et al.,

 7              Plaintiff,

 8          vs.                Case No. 02-1-2766-11 (EEH)

 9     RESORT MANAGEMENT SERVICES

10     (HAWAII), INC., a Hawaii corporation,

11     YASUO NISHIDA, SATOSHI KINOSHITA, et al.

12              Defendants.

13     -------------------------------------------

14

15              DEPOSITION OF SATOSHI KINOSHITA

16                        (Volume I)

17

18     Taken on behalf of the Plaintiff at Alston Hunt Floyd &

19     Ing, 1001 Bishop St., ASB Tower, 18th Floor, Honolulu,

20     Hawaii 96813, commencing at 9:08 a.m., Tuesday, April

21     19, 2005, pursuant to Notice.

22

23     BEFORE:    BARBARA ACOBA, CSR No. 412, RPR

24               Notary Public, State of Hawaii

25
```

***ATTORNEY-CLIENT PRIVILEGE***                    2

```
 1    APPEARANCES:

 2    For Plaintiff:          GLENN MELCHINGER, Esq.

 3                            ALSTON HUNT FLOYD & ING

 4                            ASB Tower

 5                            1001 Bishop St., 18th Floor

 6                            Honolulu, Hawaii 96813

 7

 8    For Defendant SATOSHI KINOSHITA:

 9                            JOHN KOMEIJI, Esq.

10                            WATANABE ING KAWASHIMA & KOMEIJI

11                            First Hawaiian Center

12                            999 Bishop St., 23rd Floor

13                            Honolulu, Hawaii 96813

14

15

16    Also Present:           STEVEN SILVER - Interpreter

17

18

19

20

21

22

23

24

25
```

1    A.    It mentions here in the event of a sale.

2    Q.    Were there any other situations that you could

3 think of under which this termination fee would be paid

4 by Sports Shinko?

5    A.    That, I don't know.

6    Q.    There are some amounts of dollars listed, again

7 in parentheses.  Number six, does it say here for hotels

8 it would be a million dollars and for golf courses it

9 would be $500,000; is that right?

10    A.    Yes.

11    Q.    You understand that these were the amounts of

12 the termination fees; is that right?

13    A.    Yes.

14    Q.    And these are amounts for each hotel, for

15 example, or for any golf course that was sold, the

16 owner, a Sports Shinko subsidiary, would pay to the

17 management company, that would be required under this

18 contract; that's what your understanding is of this?

19    A.    Yes.

20    Q.    Was Mr. Nishida around at the time the Resort

21 Management Services Company was created?  What was his

22 role?  Who was he?  What did he do for Sports Shinko?

23    A.    Mr. Nishida was the general manager of the

24 Pukulani Country Club and he was also responsible for

25 the other two golf courses.  That is, there were

1    assistant general managers at the other two golf

2    courses, but Mr. Nishida was the general manager of

3    those other two golf courses as well.

4        Q.   And Mr. Nishida had been at Pukulani for many

5    years, this is about August of 2000, by that time?

6        A.   Well, Mr. Nishida had been in Hawaii for a long

7    time and if you put it all together, he had spent quite

8    a bit of time at Pukulani, but at the time this document

9    was prepared, he had gone to Pukulani and been there

10   about two or three years.

11       Q.   Did he speak good English?  I mean, did he have

12   good English abilities as well?

13       A.   Yes.

14       Q.   And he was -- within the Sports Shinko

15   companies, he was the person most familiar with the

16   management of and the operations of the golf courses in

17   particular; is that right?

18           MR. KOMEIJI:  In Hawaii?

19           MR. MELCHINGER:  I'm sorry, yes, in Hawaii.

20           THE WITNESS:  Yes.

21           MR. KOMEIJI:  Break whenever you want.

22           MR. MELCHINGER:  Oh, yeah.

23           (Off the record at 3:18 p.m.)

24           (Back on the record at 3:28 p.m.)

25

1    things like that.

2             MR. MELCHINGER:  Let me show you, let's mark

3    this Exhibit 5.

4             (Exhibit 5 marked for identification.)

5    BY MR. MELCHINGER:

6        Q.   Have you seen that document before?

7        A.   Yes.

8        Q.   Is that the management agreement between Sports

9    Shinko Mililani and Resort Management Services Hawaii

10   for management of the Mililani Golf Course?

11       A.   Yes.

12       Q.   And that's your signature on page 39?

13       A.   Yes.

14       Q.   Do you recognize Mr. Nishida's signature on

15   that page?

16       A.   Yes.

17       Q.   Okay.

18            MR. KOMEIJI:  Just for the record, he took

19   maybe about a minute or two to flip through it, so we're

20   just relying on you -- I'm not questioning you, but

21   we're just relying on you --

22            MR. MELCHINGER:  My understanding these are

23   from the McCorriston files.

24            MR. KOMEIJI:  I'm not questioning you, but just

25   so the record is clear, he just sort of flipped through

1    it and flipped through each page.  He didn't read it.

2    That is his signature, and we're relying on you that is

3    a full and complete copy.

4            MR. MELCHINGER:  I understand.  I would have to

5    confirm whether they're from his files or from the

6    McCorriston files to be exact.  But either way.

7            MR. KOMEIJI:  Yeah.

8            MR. MELCHINGER:  Could we mark that as Exhibit

9    6, please.

10           (Exhibit 6 marked for identification.)

11           MR. KOMEIJI:  I would just, as he's flipping

12   through it, make the same -- incorporate the same --

13           MR. MELCHINGER:  For all of these for the next

14   several, I understand.  I know, my statement is the

15   same.

16           MR. KOMEIJI:  Yes.  And like I said, I'm not

17   trying to question you, we're just saying we don't

18   really know.

19           MR. MELCHINGER:  I don't expect he remembers

20   every word, but these are as kept in the McCorriston

21   files with his signatures.

22           THE WITNESS:  Yes.

23   BY MR. MELCHINGER:

24       Q.   Okay.  And is that your signature on page 39 of

25   this document marked Exhibit 6?

1       A.    Yes.

2       Q.    Okay.   This next one, unfortunately, didn't get

3  stapled, but has a clip on it because I think it was too

4  thick.   But same question.

5            MR. MELCHINGER:   And call it Exhibit 7.

6            (Exhibit 7 marked for identification.)

7  BY MR. MELCHINGER:

8       Q.    And page 39, is that your signature there?

9       A.    Yes.

10      Q.    And do you recognize Mr. Nishida's signature on

11  that page?

12      A.    Yes.

13      Q.    I think I forgot to ask on Exhibit 6, on page

14  39, whether you recognize Mr. Nishida's signature?

15      A.    Yes.

16            MR. MELCHINGER:   Okay.   This one is going to be

17  Exhibit 8.

18            (Exhibit 8 marked for identification.)

19  BY MR. MELCHINGER:

20      Q.    Again, same questions.   Do you recognize this

21  document?

22      A.    Yes.

23      Q.    Okay.   Do you recognize your signature on page

24  39, on Exhibit 8?

25      A.    Yes.

***ATTORNEY-CLIENT PRIVILEGE***          81

1        Q.    And do you see Mr. Nishida's signature on that

2    page?

3        A.    Yes.

4              MR. MELCHINGER:  That will be number 9.

5              (Exhibit 9 marked for identification.)

6    BY MR. MELCHINGER:

7        Q.    Do you recognize this document that is marked

8    number 9?

9        A.    Yes.

10       Q.    There are two page 39s, here.  I guess it was

11   signed in counter parts.  Do you recognize your

12   signature on the first page 39?

13       A.    Yes.

14       Q.    And on the next page 39, do you see -- whose

15   signature do you see there?

16       A.    That's Shigeru Tomita's signature.

17       Q.    Do you recall why he was signing instead of

18   Mr. Nishida for the golf course management agreement?

19       A.    No, I do not.

20             MR. MELCHINGER:  Mark that Exhibit 10.

21             (Exhibit 10 marked for identification.)

22   BY MR. MELCHINGER:

23       Q.    Have you ever seen this document before?  It's

24   been marked Exhibit 10 to your deposition.

25       A.    Yes.

```
 1                    C E R T I F I C A T E

 2   STATE OF HAWAII                    )

 3   CITY AND COUNTY OF HONOLULU        )

 4            I, BARBARA ACOBA, Certified Shorthand

 5   Reporter and Notary Public, State of Hawaii, do

 6   hereby certify:

 7            That on Tuesday, April 19, 2005, at

 8   9:08 a.m., appeared before me SATOSHI KINOSHITA, the

 9   witness whose deposition is contained herein; that

10   prior to being examined he was by me duly sworn;

11            That the deposition was taken down by me

12   in machine shorthand and was thereafter reduced to

13   typewriting under my supervision; that the foregoing

14   represents, to the best of my ability, a true and

15   correct transcript of the proceedings had in the

16   foregoing matter.

17            I further certify that I am not an attorney

18   for any of the parties hereto, nor in any way concerned

19   with the cause.

20            Dated this 30th day of April, 2005,

21   in Honolulu, Hawaii.

22

23                         BARBARA ACOBA, CSR NO. 412

24                         Notary Public, State of Hawaii

25                         My Commission Exp: 10-22-2008
```

(Notary Seal: BARBARA ACOBA, NOTARY PUBLIC, STATE OF HAWAII)

***ATTORNEY-CLIENT PRIVILEGE***                96

1              IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

2                        STATE OF HAWAII

3       ------------------------------------------

4       SPORTS SHINKO (USA) CO., LTD., a Delaware

5       Corporation; SPORTS SHINKO (MILILANI)

6       CO., LTD., a Hawaii corporation, et al.,

7                  Plaintiff,

8           vs.              Case No. 02-1-2766-11 (EEH)

9       RESORT MANAGEMENT SERVICES

10      (HAWAII), INC., a Hawaii corporation,

11      YASUO NISHIDA, SATOSHI KINOSHITA, et al.

12                 Defendants.

13      ------------------------------------------

14

15              DEPOSITION OF SATOSHI KINOSHITA

16                       (Volume II)

17

18      Taken on behalf of the Plaintiff at Alston Hunt Floyd &

19      Ing, 1001 Bishop St., ASB Tower, 18th Floor, Honolulu,

20      Hawaii 96813, commencing at 9:04 a.m., Wednesday, April

21      20, 2005, pursuant to Notice.

22

23      BEFORE:    BARBARA ACOBA, CSR No. 412, RPR

24                 Notary Public, State of Hawaii

25

***ATTORNEY-CLIENT PRIVILEGE***              97

```
 1    APPEARANCES:

 2    For Plaintiff:        GLENN MELCHINGER, Esq.

 3                          ALSTON HUNT FLOYD & ING

 4                          ASB Tower

 5                          1001 Bishop St., 18th Floor

 6                          Honolulu, Hawaii 96813

 7

 8    For Defendant SATOSHI KINOSHITA:

 9                          JOHN KOMEIJI, Esq.

10                          WATANABE ING KAWASHIMA & KOMEIJI

11                          First Hawaiian Center

12                          999 Bishop St., 23rd Floor

13                          Honolulu, Hawaii 96813

14

15

16    Also Present:         STEVEN SILVER - Interpreter

17

18

19

20

21

22

23

24

25
```

***ATTORNEY-CLIENT PRIVILEGE***        145

BY MR. MELCHINGER:

Q.   So do you know if Mr. Fukuda or Mr. Kinoshita asked Mr. Nishida to sign these contracts for RMS as they were, without negotiation, for example?

A.   I do not.

Q.   Mr. Nishida had been an officer at some of the Sports Shinko entities; is that right?

A.   Yes.

Q.   What was his relationship like, Mr. Nishida's relationship, with the president?

A.   Until the time that Mr. Nishida went off on his own, their relationship was one of president/employee.

Q.   Did Mr. Nishida ever do work specifically for the president, either in Hawaii or in Japan, sort of as a special executive assistant, for example?

A.   A long time ago he used to be the secretary to the president over in Japan.

Q.   Do you know when that was, about?

A.   Well, let's see, that was when I was still a university student, so between, say, 1980 and 1985.

Q.   So, I'm sorry, is that how long or that is that -- well, do you mean for five years he was acting as secretary; is that right?

A.   I don't recall exactly as I sit here today, but he did serve as secretary to the president for a few

***ATTORNEY-CLIENT PRIVILEGE***                195

```
1                      C E R T I F I C A T E

2    STATE OF HAWAII                    )

3    CITY AND COUNTY OF HONOLULU        )

4              I, BARBARA ACOBA, Certified Shorthand

5    Reporter and Notary Public, State of Hawaii, do

6    hereby certify:

7              That on Wednesday, April 20, 2005, at

8    9:04 a.m., appeared before me SATOSHI KINOSHITA, the

9    witness whose deposition is contained herein; that

10   prior to being examined he was by me duly sworn;

11             That the deposition was taken down by me

12   in machine shorthand and was thereafter reduced to

13   typewriting under my supervision; that the foregoing

14   represents, to the best of my ability, a true and

15   correct transcript of the proceedings had in the

16   foregoing matter.

17             I further certify that I am not an attorney

18   for any of the parties hereto, nor in any way concerned

19   with the cause.

20             Dated this 30th day of April, 2005,

21   in Honolulu, Hawaii.

22                      _____

23                      BARBARA ACOBA, CSR NO. 412

24                      Notary Public, State of Hawaii

25                      My Commission Exp: 10-22-2008
```

RALPH ROSENBERG COURT REPORTERS
Honolulu, Hawaii  (808) 524-2090