# PURCHASE AND SALE AGREEMENT

**THIS PURCHASE AND SALE AGREEMENT** ("Agreement") is made as of this 15th day of January, 2002 ("Agreement Date"), by and between SPORTS SHINKO (WAIKIKI) CORPORATION, a Hawaii corporation, SPORTS SHINKO (MILILANI) CO., LTD., a Hawaii corporation, SPORTS SHINKO (KAUAI) CO., LTD., a Hawaii corporation, on its behalf and as the successor in interest to Sports Shinko (Kauai) Development Co., Ltd., SPORTS SHINKO (PUKALANI) CO., LTD., a Hawaii corporation, PUKALANI STP CO., LTD., a Hawaii corporation, SPORTS SHINKO (HAWAII) CO., LTD., a Hawaii corporation, SURE TRANSPORTATION, INC., a Hawaii corporation (hereinafter collectively referred to as "Seller" or individually as a "Seller"), and KG HOLDINGS, LLC, a Hawaii limited liability company, and its nominees ("Buyer").

In consideration of the mutual covenants and conditions set forth below, and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties agree as follows:

1.    **Sale of the Property**.

1.1    **Property to be Sold**. Seller agrees to sell, and Buyer agrees to purchase, on the terms and conditions set forth in this Agreement, all of Seller's right, title and interest in and to the following described property (collectively, the "Property"), free and clear of liens and encumbrances other than the Permitted Encumbrances (as defined hereinbelow), and excluding any property described in Section 1.2 hereinbelow:

(a)    **Real Property**.

(i)    All of Seller's right, title, and interest in, to and under that certain lease dated September 22, 1966 ("QK Hotel Lease"), by and between Seller and Bishop Trust Company, Limited, Trustee under the Will and of the Estate of Emanuel S. Cunha, Deceased ("Ground Lessor"), more particularly described in <u>Exhibit A-1</u> attached hereto and made a part of this Agreement demising, among other things, the real property situate at Kekio, Waikiki, Honolulu, City and County of Honolulu, State of Hawaii, upon which Seller operates the hotel commonly known as the Queen Kapiolani Hotel, and all improvements located thereon, together with all easements and rights appurtenant to such land described therein ("QK Hotel").

(ii)    All of Seller's right, title, and interest in, to and under that certain lease dated October 20, 1986 ("OR Hotel Lease"), by and between Seller and Pacific Holiday, Inc. ("OR Lessor"), more particularly described in <u>Exhibit A-2</u> attached hereto and made a part of this Agreement demising, among other things, the real property situate at Kekio, Waikiki, Honolulu, City and County of Honolulu, State of Hawaii, upon which Seller operates the hotel commonly known as the Ocean Resort Hotel, and all improvements located thereon, together with all easements and rights appurtenant to such land described therein ("OR Hotel").

EXHIBIT _A_
29 units
S. Kinoshita

003 0597

EXHIBIT _26_

(iii) Approximately 296.758 acres of land located in Poipu, Island and County of Kauai, State of Hawaii, commonly known as the Kiahuna Golf Club ("Kiahuna Golf Club"), designated as Tax Map Key Nos. (4) 2-8-014-007, (4) 2-8-014-008, (4) 2-8-014-028, (4) 2-8-014-03 1, (4) 2-8-014-032, (4) 2-8-014-033, (4) 2-8-014-034, (4) 2-8-014-035, (4) 2-8-014-036, (4) 2-8-015-077, and more particularly described in Exhibit A-3 attached to and made a part of this Agreement, including all improvements located thereon, together with all easements and rights appurtenant to such land described therein, together with Seller's interest as lessee under that certain Lease of Easement dated April 17, 1991, by Grove Farm Company, Incorporated, and Sports Shinko (Kauai) Co., Ltd., a short form of which is dated April 17, 1991, by Grove Farm Company, Incorporated, and Sports Shinko (Kauai) Co., Ltd., filed as Land Court Document No. 1817514 ("Kiahuna Easement Lease"). (The area demised by the Kiahuna Easement Lease is hereinafter referred to as the "Kiahuna Easement Area.")

(iv) Approximately 172.099 acres of land located in Mililani, City and County of Honolulu, State of Hawaii, including the property commonly known as the Mililani Golf Club ("Mililani Golf Club"), designated as Tax Map Key Nos. (1) 9-5-001-035 and (1) 9-5-001-076 and more particularly described in Exhibit A-4 attached to and made a part of this Agreement, including all improvements located thereon, together with all easements and rights appurtenant to such land described therein; and

(v) Approximately 195.208 acres of land located in Makaehu, Kohoilo, Aapueo-Nui, District of Kula, Island and County of Maui, State of Hawaii, including the property commonly known as the Pukalani Country Club ("Pukalani Country Club"), designated as Tax Map Key Nos. (2) 2-3-8-5, (2) 2-3-9-4, (2) 2-3-8-36, (2) 2-3-9-39, (2) 2-3-9-40, (2) 2-3-47-126, (2) 2-3-48-125, (2) 2-3-49-88, (2) 2-3-55-68, (2) 2-3-55-69, (2) 2-3-56-95, (2) 2-3-56-96, (2) 2-3-56-97, (2) 2-3-56-98, (2) 2-3-57-121, (2) 2-3-57-124, (2) 2-3-57-138, (2) 2-3-61-114, and more particularly described in Exhibit A-5 attached to and made a part of this Agreement, including all improvements located thereon, together with all easements and rights appurtenant to such land described therein.

The foregoing real property is hereinafter referred to as the "Real Property." The QK Hotel and the OR Hotel are sometimes referred to herein as the "Hotels." The Kiahuna Golf Club, Mililani Golf Club and the Pukalani Country Club are sometimes hereinafter collectively referred to as the "Golf Courses." The QK Hotel Lease and the OR Hotel Lease are sometimes collectively referred to as the "Ground Leases."

(b)    **Personal Property**. All tangible personal property located on the Real Property used in connection with the ownership, operation or maintenance of the Hotels, Golf Courses and Real Property, including, but not limited to, any and all furniture, fixtures, computers and software programs, equipment, vehicles, inventory, supplies, machinery and those certain items of tangible personal property identified in Exhibit B attached hereto and made a part of this Agreement, subject, however, to normal depletion and/or wear and tear as shall occur in the normal course of business ("Personal Property").

**003 0598**

(g)    **Pre-Closing Accounts Receivable**.  All pre-closing accounts receivable which relate to services rendered or accommodations provided prior to Closing.

(h)    **Miscellaneous**.  That certain property identified in <u>Exhibit C</u> attached hereto and made a part of this Agreement.

1.3    <u>**Permitted Encumbrances**</u>.  The Property shall be conveyed subject to the following (collectively, "Permitted Encumbrances"):

(a)    All matters disclosed by the Buyer's Title Policy (as defined in Section 6.2) and approved by Buyer; provided, however, that Seller shall not be obligated hereunder to cure any title matter or remove any encumbrance on title disclosed in any title report or title policy prior to Closing, other than (i) that certain mortgage and related financing statements in favor of The Fuji Bank, Ltd. with respect to the OR Hotel and (ii) that certain Second Mortgage in favor of Stacey J. Wong, as Trustee of the Eric A. Knudsen Trust et al. with respect to the Kiahuna Golf Club, and that Buyer's remedy in event that Buyer does not approve of any such matter or encumbrance shall be to terminate this Agreement; and

(b)    Any other matter agreed to in writing by Buyer prior to the Closing.

1.4    <u>**No Assumption of Liabilities**</u>.  Except as expressly provided herein, Buyer shall not assume any obligations or liabilities of Seller relating to the Property other than the Assumed Contracts, the Ground Leases and the Equipment Leases.  Buyer shall not assume any claims, obligations or liabilities under the Assumed Contracts, Ground Leases or Equipment Leases which accrued prior to the Closing Date. For example, Buyer shall not be liable for any rents which accrued under the Ground Leases prior to Closing. Seller shall indemnify, defend and hold harmless Buyer from any claims, liabilities or obligations of Seller which are not expressly assumed by Buyer or which accrued prior to the Closing Date.

2.    <u>**Purchase Price; Deposit**</u>.

2.1    <u>**Total Purchase Price**</u>.  The total purchase price to be paid by Buyer to Seller for the Property is the sum of TWENTY-TWO MILLION UNITED STATES DOLLARS (U.S.$22,000,000.00) ("Purchase Price").

2.2    <u>**Payment of Purchase Price**</u>.  The Purchase Price for the Property shall be payable as follows:

(a)    Buyer shall pay the Initial Deposit as set forth in Section 2.3 hereinbelow.

(b)    At the Closing, Buyer shall execute and deliver to Title Guaranty Escrow Services, Inc., 235 Queen Street, Honolulu, Hawaii 96813, Attention: Barbara Paulo ("Escrow Agent"), promissory notes payable to each Seller (the amounts thereof to be allocated by mutual agreement of Buyer and Seller) in the aggregate principal

**003  0601**

amount of Nine Million Dollars ($9,000,000.00), in substantially the form attached hereto as Exhibit D (the "Notes"). The Notes shall be unsecured and shall provide for quarterly interest only payments, with the first payment due ninety (90) days after the Closing Date and each payment due on the same day of the first month of each quarter thereafter. Interest shall accrue on the Notes at the rate of six percent (6%) per annum, non-compounded. The maturity date of the Notes shall be ten (10) years after the Closing Date.

(c)    At the Closing, Buyer shall deposit with the Escrow Agent the remainder of the Purchase Price in cash, subject to adjustment in accordance with Section 6.7 below, and/or by way of assumption of the Bank of Hawaii loan secured by certain mortgages on a portion of the Real Property (the "Mortgage Loan"), together with Buyer's portion of the closing costs as provided in Section 6.6 hereinbelow. On the Closing Date, Escrow Agent shall apply the Initial Deposit and interest thereon towards payment of the Purchase Price.

2.3    **Deposit**.

(a)    At the time that escrow is opened pursuant to Section 6.1 hereinbelow, Buyer shall deposit with Escrow Agent the sum of ONE HUNDRED THOUSAND UNITED STATES DOLLARS (U.S. $100,000.00) ("Initial Deposit").

(b)    If Buyer shall not have given Seller notice of its intention to proceed with the acquisition of the Property ("Notice to Proceed") prior to the expiration of the Due Diligence Period described in Section 3.1 hereinbelow, the Initial Deposit shall be returned to Buyer and the parties shall have no further obligations to each other relating to the Property or this Agreement, except for the obligations under Section 17.11 hereinbelow, and such covenants and indemnities which expressly survive the purchase of the Property by Buyer.

(c)    If Seller has timely received the Notice to Proceed from Buyer, then the Initial Deposit shall become nonrefundable and shall be applied against the Purchase Price of the Property upon Closing (as defined in Section 6.3 below); provided, however, that if Closing does not occur because of a default by Buyer under this Agreement, then Seller shall be entitled to retain the Initial Deposit as damages for Buyer's default, pursuant to the provisions of Section 14 below.

(d)    If Buyer shall fail to timely deposit the Initial Deposit with the Escrow Agent, Seller shall have the option to terminate this Agreement upon written notice to the Escrow Agent and the parties hereto shall be released from all further obligations and liabilities under this Agreement, except for the obligations under Section 17.11 hereinbelow.

2.4    **Interest on Deposit**. The Initial Deposit shall be held by the Escrow Agent in an interest-bearing account as directed by Buyer. All interest on the Initial Deposit shall accrue and be paid to the party entitled to the benefit of the Initial Deposit under this Agreement.

**003 0602**

3.    **Due Diligence Review**.

    3.1    **Due Diligence Period**.

        (a)    The "Due Diligence Period" shall commence on the Agreement Date and shall terminate on the Closing Date ("Due Diligence Period").

        (b)    If Buyer shall not have given Seller the Notice to Proceed prior to the expiration of the Due Diligence Period, then: (i) Seller and Buyer shall promptly execute any cancellation documents requested by Escrow Agent, (ii) Escrow Agent shall refund the Initial Deposit to Buyer (less any escrow fees), together with any and all interest accrued thereon, and (iii) the parties shall have no further obligations to each other under this Agreement, except for the obligations under Section 17.11 hereinbelow or otherwise specifically provided herein.

    3.2    **Inspection of Property**.

        (a)    During the Due Diligence Period, Buyer shall have the right to inspect the Property and review those matters concerning the Property which are reasonably necessary in connection with its purchase of the Property. Seller shall use commercially reasonable efforts to provide access to Buyer and its representatives at all reasonable times between the date of this Agreement and the Closing Date to Seller's representatives, personnel and assets and to all existing books, records, tax returns, work papers, financial reports, maps, leases and other documents and information relating to the Property and the operation and maintenance of the Hotels and the Golf Courses. Seller shall cooperate with and assist Buyer in Buyer's review of such information and use its best efforts to provide and compile such information as Buyer may reasonably request as quickly as reasonably practicable. All review and investigation by Buyer pursuant to this Section 3.2 shall comply with the confidentiality requirements of Section 17.11 hereinbelow.

        (b)    From and after the Agreement Date, Buyer and its consultants, employees, contractors and agents (collectively, "Buyer's agents") may enter the Property during regular business hours for the purpose of conducting such investigations, inspections and tests of the Property which may be reasonably necessary for Buyer's review and investigation of the Property; provided that such access and work shall not unreasonably interfere with the operation of Seller's business on the Real Property.

        (c)    Buyer shall not conduct any drilling, boring or other intrusion tests without Seller's written consent which may be withheld at Seller's sole discretion. Buyer shall give Seller at least twenty-four (24) hours' notice (business day) in advance of any intended inspection or entry. Buyer shall comply with all laws and regulations in connection with its entry or acts upon the Property.

        (d)    In the event that Buyer does not purchase the Property, any damage to the Property caused or made by Buyer or Buyer's agents shall be promptly repaired by Buyer and Buyer shall put the Property back in the same condition as before the inspection or entry.

003  0603

(e)     Buyer hereby agrees to indemnify, defend and hold Seller harmless from and against any and all loss, expense, claims, damage, injury or liability arising out of such inspection, the entry and/or acts upon the Property by Buyer or Buyer's agents. This indemnity provision shall survive the purchase of the Property by Buyer or the termination of this Agreement.

3.3     **No Extension of Due Diligence Period**. No extension of the Due Diligence Period shall be granted except upon Seller's written consent, which may be withheld at Seller's sole discretion.

3.4     **Delivery of Documents**.

(a)     Within five (5) business days after execution of this Agreement by Buyer and Seller, or Seller's receipt of Buyer's request, whichever is later, Seller shall deliver to Buyer such documents and records in Seller's possession relating to the Property as Buyer may reasonably request (collectively, the "Due Diligence Materials"); provided, however, that Seller shall not be required to create or cause the re-creation of documents which are not currently in existence or in Seller's possession, and Seller expressly shall not be responsible for any costs and expenses associated with such documents and reports that Buyer has performed or prepared, including, without limitation, any ALTA survey, Phase I environmental assessment, or ADA surveys obtained by Buyer.  Other than those documents or reports which Seller has expressly agreed to provide herein at Seller's expense, all of such documents and records shall be obtained by Buyer at Buyer's sole expense.

(b)     Within three (3) business days after the execution of this Agreement by Buyer and Seller, Seller shall request Title Guaranty of Hawaii, Incorporated, 235 Queen Street, Honolulu, Hawaii 96813 ("Title Company"), to furnish to Buyer, at Buyer's expense, a status title report covering the Real Property ("Title Report") and a financing statement report listing all of the financing statements filed with respect to the Property.

(c)     Notwithstanding anything stated to the contrary herein, Seller shall not be required to disclose to Buyer (i) any document or information regarding any other negotiations or transactions which relate to the sale of the Property to any other purchaser; (ii) any document or information which Seller is contractually or legally prohibited from disclosing; or (iii) any attorney-client communications between Seller and its legal counsel.

4.      **Seller's Representations**.

4.1     **Representations**. Seller, by Seller's execution of this Agreement, makes the following limited covenants, representations and warranties to Buyer, which covenants, representations and warranties are true and correct as of the date hereof (subject to completion of the schedules to be attached prior to the Closing) will be true and correct as of the Closing Date, and except for subsections (a) and (b), the following covenants, representations and warranties are made to the best of Seller's knowledge with no

**003 ո604**

(b)    **Use Permits and Other Approvals**. Neither Seller, nor Seller's agents or attorneys, makes any representations or warranties about use permits or other approvals.

(c)    **Condition of Property**.   Except for structural problems of which Seller has actual knowledge, and believes, in good faith, to be material, and which are described in Schedule 5.4(c) or in any due diligence materials provided by Seller to Buyer, Seller makes no representation regarding the physical or mechanical condition of any portion of the Property, including, but not limited to the roofs, exterior walls, or structural components of the Property and the heating, air conditioning, plumbing, ventilation, elevator, utility, sprinkler and other mechanical and electrical systems, apparatus and appliances located on or about the Real Property.

(d)    **Leasehold Real Property**. The Kiahuna Easement Area and Real Property on which the QK Hotel and OR Hotel are located are leasehold real property. Buyer has reviewed and understands all of the terms of the Kiahuna Easement Lease and Ground Leases and agrees that, after Closing, Buyer shall perform all obligations under the Kiahuna Easement Lease and Ground Leases required to be performed by the lessee thereunder accruing after the Closing, and shall defend, indemnify and hold Seller harmless from and against any claims, damages, losses or liability arising from Buyer's failure to do so after Closing. Buyer acknowledges that Seller has made no representations whatsoever about the availability of the leased fee interest for purchase.

6.    **Escrow and Closing**.

6.1    **Opening of Escrow**. Not later than three (3) business days after the execution by Buyer and Seller of this Agreement, the parties shall open an escrow with Escrow Agent by depositing with Escrow Agent a fully executed copy of this Agreement. Escrow Agent shall prepare and submit to Seller and Buyer for approval escrow instructions, incorporating this Agreement as a part thereof, and containing such other standard and usual provisions as may be requested by Escrow Agent and approved by Seller and Buyer in writing; provided, however, that no escrow instruction shall modify or amend any provision of this Agreement. If there is a conflict between any such escrow instructions and the provisions of this Agreement, the provisions of this Agreement shall control.

6.2    **Title Policy**. Buyer's obligations hereunder shall be conditioned upon Buyer having obtained, at Buyer's sole expense, on or before the Closing Date a binding commitment for title insurance to be issued at Closing by the Title Company (defined below), which commitment shall be for a policy on American Land Title Association Owner's Policy, or the equivalent, with extended coverage containing such endorsements as reasonably required by Buyer, in the amount of the Purchase Price, against loss or damage by reason of defects in Seller's title as of the Closing Date and containing no exceptions other than the Permitted Exceptions ("Buyer's Title Policy").

6.3    **Closing**. Closing of the purchase of the Property ("Closing") shall occur on January 25, 2002 ("Closing Date"), subject to the satisfaction of the conditions

003 0609

contained herein. The execution and delivery of the Transfer Documents (as defined below) shall take place at 10:00 a.m. Hawaii Standard Time on January 24, 2002 at the offices of the Escrow Agent in Honolulu, Hawaii (the "Pre-Closing"), or at such other time or place as the parties may mutually stipulate. Recordation of the applicable Transfer Documents shall occur on the Closing Date. This is a firm closing date and time is of the essence. No extensions shall be permitted except by written agreement of Seller and Buyer or except as required to obtain any necessary consents. Escrow Agent shall close escrow when (a) the Title Company is prepared to issue Buyer's Title Policy, (b) Escrow Agent has received all necessary documents and funds as set forth in this Agreement, and (c) all other conditions to Closing set forth herein have been satisfied or have been waived by the party intended to be benefited thereby.

6.4    **Closing Deliveries**.

(a)    At the Closing, Seller shall deliver to Buyer the following (collectively, "Transfer Documents"):

(i)    Warranty deeds, in form and substance acceptable to both parties, executed by Seller in recordable form and conveying to Buyer's nominees all of Seller's right, title and interest in and to the Real Property (other than the Ground Leases) subject only to the Permitted Encumbrances (the "Deeds");

(ii)    Assignments of lease, in form and substance acceptable to both parties, executed by Seller in recordable form and conveying to Buyer's nominees all of Seller's right, title and interest in and to the Kiahuna Easement Area, the Ground Leases, subject only to the Permitted Encumbrances, together with the consent of the lessor under the Kiahuna Easement Lease and each of the Ground Leases, as provided in Section 7.3 hereinbelow (the "Assignment of Lease");

(iii)    Bills of sale, in form and substance acceptable to both parties, executed by Seller and conveying to Buyer's nominees good and marketable title to the Personal Property;

(iv)    Subject to Section 1.2(c) hereinabove, assignments of permits and agreements, in form and substance acceptable to both parties, executed by Seller and assigning to Buyer's nominees all of Seller's right, title and interest in, to and under the Permits, Agreements, Reports and Plans, Assumed Contracts, and Equipment Leases;

(v)    Assignments of tradenames, in form and substance acceptable to both parties, executed by Seller, and assigning to Buyer's nominees all of Seller's right, title and interest in, to and under the Tradenames;

(vi)    Subject to Section 1.2(c) hereinabove, all consents from third parties required for the transfer of any of the Property from Seller to Buyer's nominees, in form and substance acceptable to Buyer;

**003 0610**

(15) days after such submittal, shall be conclusive. The fees and expenses of the Outside Accountants shall be paid equally by Buyer and Seller.

(4)    The foregoing limitation shall not apply to any item which, by its nature, cannot be finally determined within the period specified. Notwithstanding the foregoing, in no event will any adjustments be made after the lapse of six (6) months after the Closing Date.

(5)    Upon final acceptance of the Closing Statement (either by expiration of the aforesaid 30-day period with no notice of dispute being delivered or by determination by the Outside Accountants), any net credits in favor of Seller shall be paid in cash by Buyer within ten (10) days of the date of such acceptance, or any net credits in favor of Buyer shall be offset against the balance due under the Note as of such date.

(d)    **Allocation of Purchase Price**. The parties shall mutually agree upon an allocation of the Purchase Price and shall report such allocation to the Internal Revenue Service on Form 8594. If the parties fail to so agree in a timely manner, then the allocation shall be conclusively determined by the Outside Accountants in the manner set forth hereinabove and the parties shall file the Form 8594 reports based on such determination.

7.    **Condition to Seller's Obligations**. Seller's obligation to sell and convey the Property to Buyer is expressly conditioned upon the following:

7.1    **Performance of Buyer's Covenants**. All covenants and agreements made by Buyer which are to be completed on or before the Closing shall have been performed in all material respects, and the Purchase Price shall have been delivered to Escrow Agent.

7.2    **No Untrue Representations**. As of the Closing Date, each and every one of the representations and warranties made by Buyer in this Agreement shall be true and correct in all material respects.

7.3    **Consents**. All consents necessary for the transfer of the Property, including, without limitation, the consent of Ground Lessors, if required under the Ground Leases, and the consent of the lessor under the Kiahuna Easement Lease, if required thereunder, shall have been obtained. Seller shall use its reasonable good faith efforts to obtain all such consents, but shall not be obligated to pay or expend any money as a condition to obtaining any such consent (other than payment of such lessors' reasonable attorney's fees relating to the assignment of such leases if required under the terms thereof). Provided that Seller has used its reasonable good faith efforts as aforesaid, the inability to obtain any such consents shall not constitute a default by Seller under this Agreement.

8.    **Condition to Buyer's Obligations**. Buyer's obligation to purchase the Property from Seller is expressly conditioned upon the following:

8.1    **Notice to Proceed**. Buyer shall have elected to proceed with the purchase of the Property by delivering to Seller the Notice to Proceed within five (5) business days after the expiration of the Due Diligence Period.

**003 0615**

IN WITNESS WHEREOF, Seller and Buyer have executed this Agreement as of the date first above written.

Seller:                                  SPORTS SHINKO (WAIKIKI) CORPORATION

By _Satoshi Kinoshita_
Name: _Satoshi Kinoshita_
Title: _Vice President_

SPORTS SHINKO (KAUAI) CO., LTD.

By _Satoshi Kinoshita_
Name: _Satoshi Kinoshita_
Title: _Vice President_

SPORTS SHINKO (MILILANI) CO., LTD.

By _Satoshi Kinoshita_
Name: _Satoshi Kinoshita_
Title: _Vice President_

SPORTS SHINKO (PUKALANI) CO., LTD.

By _Satoshi Kinoshita_
Name: _Satoshi Kinoshita_
Title: _Vice President_

PUKALANI STP CO., LTD.

By _Satoshi Kinoshita_
Name: _Satoshi Kinoshita_
Title: _Vice President_

SPORTS SHINKO (HAWAII) CO., LTD.

By _Satoshi Kinoshita_
Name: _Satoshi Kinoshita_
Title: _Executive Vice President_

SURE TRANSPORTATION, INC.

By _Satoshi Kinoshita_

Name: _Satoshi Kinoshita_

Title: _Vice President_

Buyer:                              KG HOLDINGS, LLC

By: _Wayne Tanigawa_

Name: _Wayne Tanigawa_

Title: _Manager_

***ATTORNEY-CLIENT PRIVILEGE***                96

1              IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

2                        STATE OF HAWAII

3      - - - - - - - - - - - - - - - - - - - - - - - - - - -

4      SPORTS SHINKO (USA) CO., LTD., a Delaware

5      Corporation; SPORTS SHINKO (MILILANI)

6      CO., LTD., a Hawaii corporation, et al.,

7                Plaintiff,

8           vs.              Case No. 02-1-2766-11 (EEH)

9      RESORT MANAGEMENT SERVICES

10     (HAWAII), INC., a Hawaii corporation,

11     YASUO NISHIDA, SATOSHI KINOSHITA, et al.

12               Defendants.

13     - - - - - - - - - - - - - - - - - - - - - - - - - - -

14

15              DEPOSITION OF SATOSHI KINOSHITA

16                      (Volume II)

17

18     Taken on behalf of the Plaintiff at Alston Hunt Floyd &

19     Ing, 1001 Bishop St., ASB Tower, 18th Floor, Honolulu,

20     Hawaii 96813, commencing at 9:04 a.m., Wednesday, April

21     20, 2005, pursuant to Notice.

22

23     BEFORE:   BARBARA ACOBA, CSR No. 412, RPR

24               Notary Public, State of Hawaii

25

```
 1    APPEARANCES:

 2    For Plaintiff:        GLENN MELCHINGER, Esq.

 3                          ALSTON HUNT FLOYD & ING

 4                          ASB Tower

 5                          1001 Bishop St., 18th Floor

 6                          Honolulu, Hawaii 96813

 7

 8    For Defendant SATOSHI KINOSHITA:

 9                          JOHN KOMEIJI, Esq.

10                          WATANABE ING KAWASHIMA & KOMEIJI

11                          First Hawaiian Center

12                          999 Bishop St., 23rd Floor

13                          Honolulu, Hawaii 96813

14

15

16    Also Present:         STEVEN SILVER - Interpreter

17

18

19

20

21

22

23

24

25
```

1      Q.   Do you remember roughly what the terms of that

2   offer were?

3      A.   I believe their's was an offer for about

4   $20 million to purchase all of the hotels and golf

5   courses.

6      Q.   Including Mililani and Queen Kapiolani; is that

7   right?

8      A.   Yes.

9      Q.   Do you know how -- well, let me back up.  With

10  any of the buyers, do you know how the issue of the

11  management contracts was discussed, if at all?  And I'm

12  using a different word, but again, management agreements

13  with RMS.

14     A.   I believe I discussed that issue with Dowling

15  and Dowling responded that it would continue the

16  management contract.  Their reply was positive and I

17  also believe that the response from the Kobayashi Group

18  was also positive, that they would continue the

19  arrangement.

20     Q.   When you say "continue," do you mean that the

21  relationship with RMS they would agree to continue or

22  would they terminate the agreement and enter a new

23  agreement?  I mean, would they continue the relationship

24  or the contract, the management agreement?

25     A.   Since they were using the expression "assume,"

***ATTORNEY-CLIENT PRIVILEGE***        165

1    I believe that their intention was to continue with

2    those contracts intact without terminating them.

3        Q.    As we know, eventually KG and Sports Shinko

4    agreed or entered a purchase agreement, right?

5        A.    Yes.

6        Q.    The agreement basically was to transfer all the

7    properties, including Mililani and Queen Kapiolani, to

8    various affiliates of KG's; is that right?

9        A.    Yes.

10       Q.    The contract between Sports Shinko and KG, the

11   purchase and sale agreement, that was dated around

12   January 15th of 2002; is that right?

13       A.    Yes.

14       Q.    And do you know -- do you remember when about

15   that sale closed or when the scheduled closing was?

16       A.    The golf courses I believe closed on the 28th.

17   Ocean Resort Hotel, if I'm not mistaken, closed on the

18   31st.  And the Queen Kapiolani Hotel closing was not

19   until considerably later, I believe sometime in March.

20       Q.    And I think my question was not specific

21   enough, sorry.  The scheduled closing under the

22   agreement was what date?  I think you're talking about

23   the actual dates that things closed.

24       A.    I believe the closing was scheduled for

25   January 28th, if I'm not mistaken.

*** ATTORNEY-CLIENT PRIVILEGE ***                166

1              (Exhibit 29 marked for identification.)

2    BY MR. MELCHINGER:

3        Q.    Showing you what's been marked as Exhibit 29 to

4    your deposition, and wonder if you recognize this

5    document?

6        A.    I do.

7        Q.    Okay.  And what is this document, please?

8        A.    This is the purchase and sale agreement between

9    Sports Shinko and the KG Group for the hotel and the

10   golf courses.

11            MR. KOMEIJI:  Again, we rely upon you that this

12   is a complete set.  Again, no inferences are being

13   drawn, I just put that for the record.

14            MR. MELCHINGER:  I understand.  And I'll

15   represent for the record that this is taken from the

16   McCorriston's files, again, that were produced to us in

17   response to a Rule 2004 exam in the Section 304

18   proceeding in the Bankruptcy Court.

19   BY MR. MELCHINGER:

20       Q.    On pages 27 and 28, is that your signature that

21   appears on those pages?

22       A.    Yes.

23       Q.    And you're signing on behalf of all the Sports

24   Shinko companies that are party to this agreement; is

25   that right?

1      A.    Yes.   I was instructed to sign by the

2    president.

3      Q.    Now, this was on the 15th and the closing was

4    scheduled, I think you said, for the 28th in the

5    agreement.   Between -- well, during that 13-day period

6    or so, what do you recall about the negotiations with

7    KG, if anything, to assume the management agreements

8    with RMS?

9      A.    Well, RMS was a separate and independent

10   third-party entity, if you will, and so all that I did

11   was that I recommended that if it was okay with the

12   other side, that we'd like to see them continue to use

13   RMS as RMS had been managing Sports Shinko's hotels and

14   golf courses.

15     Q.    How involved were you with the negotiations

16   with KG on that issue, the assumption of the RMS

17   management agreements?

18     A.    To the best of my recollection, that did not

19   take place during the roughly 13 days between the date

20   of the signing of the contract and the date of the

21   closing, but took place prior to that.

22           (Exhibit 30 marked for identification.)

23   BY MR. MELCHINGER:

24     Q.    Show you what's been marked Exhibit 30 to your

25   deposition.   Tell me if you've seen that before, please.

1                    C E R T I F I C A T E

2    STATE OF HAWAII                    )

3    CITY AND COUNTY OF HONOLULU    )

4              I, BARBARA ACOBA, Certified Shorthand

5    Reporter and Notary Public, State of Hawaii, do

6    hereby certify:

7              That on Wednesday, April 20, 2005, at

8    9:04 a.m., appeared before me SATOSHI KINOSHITA, the

9    witness whose deposition is contained herein; that

10   prior to being examined he was by me duly sworn;

11             That the deposition was taken down by me

12   in machine shorthand and was thereafter reduced to

13   typewriting under my supervision; that the foregoing

14   represents, to the best of my ability, a true and

15   correct transcript of the proceedings had in the

16   foregoing matter.

17             I further certify that I am not an attorney

18   for any of the parties hereto, nor in any way concerned

19   with the cause.

20             Dated this 30th day of April, 2005,

21   in Honolulu, Hawaii.

22             _____

23             BARBARA ACOBA, CSR NO. 412

24             Notary Public, State of Hawaii

25             My Commission Exp: 10-22-2008