<u>**MEMORANDUM IN SUPPORT OF MOTION**</u>

**I.**    <u>**INTRODUCTION**</u>

Because the KG Defendants' counsel did not anticipate the factual and legal

points that formed the basis for the Court's Order Denying Defendants' Motion

For Summary Judgment in CV No. 04-00128 ACK/BMK, filed on March 29, 2006

("Order"),[1] it is respectfully submitted that the Order contains manifest errors of

law and fact.  The errors are summarized below and addressed in detail elsewhere

in this memorandum.

<u>First</u>, the Court appears to misunderstand the plaintiffs' case against the KG

Defendants.  Neither the evidence nor the allegations support the Court's statement

that Toshio transferred property to KG ". . . knowing that the new owners would

pay a total of $3.5 million in termination fees to the management company should

they decide to cancel the management agreements."  Order 10.  There is no such

claim in this case, or evidence to support the Court's statement.

<u>Second</u>, the law of Japan determines the claims a Japan corporation and its

shareholder have after the corporation completes a reorganization under the Japan

Corporate Reorganization Act.  The Order misapplies the law of Japan finding

"that in purchasing SS-Japan from bankruptcy, Goldman Sachs[2] stepped into the

---

[1]    The Order is attached as Exhibit ("ex.") A.

[2]    Order 17, n.9.  The Goldman Sachs subsidiary that acquired the stock from
SS-Japan's corporate reorganization proceeding in April 2004, South Wind Realty

shoes of the receiver for purposes  [these lawsuits].  For this reason, Goldman

Sachs, as owner of SS-Japan and SS-USA, has standing to bring these actions

through the named plaintiffs."  Order 16.  To the contrary, under Japan law,

reorganized SS-Japan is subject to all equitable defenses the KG Defendants have

against pre-reorganization SS-Japan, and Goldman Sachs has no claims.

Third, even if the law of Japan does not apply, the foregoing finding

misapplies U.S. law because the SS-Japan trustee, and reorganized SS-Japan, are

subject to the KG Defendants' equitable defenses based upon Toshio's alleged

misconduct.  That misconduct is the centerpiece of plaintiffs' claims.

Fourth, the finding that "[i]n this case, an issue of fact remains whether

Toshio completely controlled and owned all of the SS entities" is manifestly in

error.  Order 15, n.6; 25-26.  The record is clear and undisputed about Toshio's

complete control of all the Sports Shinko companies, and that Toshio's sons had a

ownership interest which they exercised consistent with Toshio's direction.

Fifth, the finding that KG is "not challenging the validity of the underlying

debt in this case" is manifestly in error.  Order 16, n.7.  This fact was only

conceded for purposes of the KG Defendants' Motion for Summary Judgment in

---

Finance (Cayman) Company ("South Wind").  Discovery provided by plaintiffs
reveals that South Wind no longer owns the stock of SS-Japan.  The stock was
subsequently transferred to other Goldman Sachs subsidiaries in a series of
transactions unknown to U.S. law.

CV 04-00128 ACK-BMK ("Motion for Summary Judgment"), and is very much in dispute in this case.

Sixth, the findings that "Toshio undertook the transfer of SS-Mililani's property without consulting other officers" and that "[p]laintiffs have raised a genuine issue of material fact as to whether Toshio was not acting secretly" are manifestly in error. Order 24, n.18. The record shows, without dispute, that all of the officers of plaintiff SS-USA, and almost all of the officers of SS-Mililani, knew about the sale of SS-Mililani's property, and executed documents to cause the sale to occur.

Seventh, the finding that "[D]efendants have not presented evidence that the transfer of the sewage treatment plant was part of the same conveyance that plaintiffs are now challenging" is manifestly in error. Order 25, n.19. The evidence shows that the sale of the sewage treatment plant was part of a single sales transaction that included golf course and hotel properties, all of which were provided for in a single purchase and sale instrument.

These errors affect the Order in a variety of ways, some of which are more significant than others. If the Order stands and the errors are not rectified, the Order will arguably be law of the case, and may constrain and affect future discovery and motions practice in ways not intended by the Court. The KG Defendants therefore propose that the Court vacate the Order and file an amended

order that denies the Motion for Summary Judgment without prejudice, without elaboration on the law or facts. Alternatively, KG Defendants propose to submit suggested edits to the Order.

## II. THE COURT FUNDAMENTALLY MISUNDERSTANDS THE ALLEGATIONS AGAINST THE KG DEFENDANTS

The Order at page 10 states:

> … Plaintiffs allege, Toshio caused the properties (subject to the management agreements) to be transferred to KG Defendants (and other defendants) for substantially less than fair value, knowing that **the new owners would pay** a total of $3.5 million in termination fees to the management company should they decide to cancel the management agreements. [Second Amended Complaint] at 6-7.

Emphasis added.

While this statement is clearly not a finding of fact[3], it reflects a significant misunderstanding about the plaintiffs' claims. In the Second Amended Complaint,[4] plaintiff contradicts the Court's statement:

> KG MILILANI refused to assume the Management Agreement concerning the Mililani Properties, thereby triggering **DEBTOR's obligation** to pay the Termination Fees to RMS.

Cplt ¶45 (emphasis added).

---

[3]    KG Defendants are mindful of footnote 1 of the Order (at 8), which states "This recitation of the facts is for background purposes only and is not meant to constitute any finding in this case." We understand this footnote to apply only to the "Factual Background" portion of the Order (pp. 7-10).

[4]    KG's Concise Statement of Facts ("KG CSOF") ex. A (hereafter, "Cplt").

KG acquired the debtor's assets, not the debtor itself.[5]  Therefore, there is no allegation - and no support in the record - that any KG party paid, or is obligated to pay, any termination fees to Toshio or anyone else.  This is precisely why this lawsuit makes so little sense, and why, as KG argued at the hearing, Toshio was such a poor conspirator[6] – since plaintiffs allege Toshio conspired to have an insolvent company (Cplt ¶11) pay the termination fee.

The gist of the plaintiffs' allegations against the KG parties is essentially that KG paid too little (Cplt ¶42), and knew or should have known that Toshio and the other insiders were violating the Uniform Fraudulent Transfer Act.[7]  There is no allegation regarding the KG parties paying the termination fee.

Two of the declarations attached to this motion clarify this important point.  No KG-related company paid, or will pay any termination fee, or any other money

---

[5]     Cplt ¶44, KG CSOF ex. S, A12369.

[6]     Transcript of Proceedings, March 20, 2006 ("Tr.") 14-15.  Mr. Alston's rejoinder does not support the notion that KG paid termination fees to Toshio or the other "insiders".  Mr. Alston stated:

> Mr. Marks said that it must be that Toshio and his sons were poor conspirators because they ended up with only the Maui property in satisfaction of their $3-1/2 million claim. I don't believe there's any support for saying that. I think the record is that with respect to the remainder of the $3-1/2 million, there were claims for that that remained unpaid because the bankruptcy overwhelmed them, not because they took that in satisfaction of the debt.  Tr. 30-31.

[7]     Hawaii Revised Statutes ("HRS") Ch. 651C ("HUFTA") (Cplt ¶60).

except what is required to be paid in the Purchase and Sale Agreement.[8]

Moreover, Resort Management Services (Hawaii), Inc., the company that is owed

the termination fees, has released its entitlement to recover termination fees.[9]

In sum, there is no allegation or evidence that any money, in the form of

termination fees or otherwise, was paid by KG to Toshio or others on his behalf.

To the extent the Court's Order was colored by the notion that KG paid

termination fees, or that Goldman Sachs may be obligated to do so in the future,

the KG Defendants respectfully encourages the Court to revisit its Order.[10]

## III. THE ORDER IMPROPERLY AFFORDS SPECIAL POWERS TO SS-JAPAN, SS-USA AND GOLDMAN SACHS

    A. Applying Japanese Law, The Court is Manifestly In Error Concluding That Goldman Sachs or Plaintiffs Acquired Special Rights To Pursue KG From The Bankruptcy Trustee[11]

        1.   The Law of Japan Is Controlling

---

[8]   KG CSOF ex. S. See Declaration of Wayne Tanigawa attached.

[9]   See attached Declaration of Yasuo Nishida.

[10]   The Order (at 23) was also colored by the notion that there were "higher cash offers" for the properties transferred to KG. However, a closer look at the offers reveals that each was flawed in some significant way, as summarized at ex. B hereto.

[11]   The Order is in error stating that "KG Defendants . . . conced[ed] at the hearing that a receiver (or outside creditor) would have standing to bring this suit." KG Defendants' counsel only stated that his clients would not have brought "this motion" if an outside creditor or receiver were suing. KG Defendants did not concede standing, or that such hypothetical plaintiffs would not be subject to equitable defenses. Tr. 23, 28. A complete copy of the transcript is attached as ex. C.

The Motion asked the Court to rule on the application of HUFTA.  The Court rejected the Motion, and in so doing, found "that in purchasing SS-Japan from bankruptcy, Goldman Sachs stepped into the shoes of the receiver for purposes  [these lawsuits].  For this reason, Goldman Sachs, as owner of SS-Japan and SS-USA, has standing to bring these actions through the named plaintiffs." Order 16.

This finding necessarily determines the rights of a Japan corporation and its new shareholder following the corporation's involvement in a corporate reorganization proceeding conducted under Japan law in Osaka District Court. Plaintiffs' Concise Statement of Facts filed February 18, 2006 ("SS CSOF") ex. 31.  Clearly, the nature of a Japan trustee's powers, and the succession of those powers to a reorganized Japan corporation and its shareholder are dependent on the law of Japan.

2.    The Order Misapplies Japan Law

The KG parties recently retained The Honorable Takeo Kosugi,[12] a former Judge in Japan and attorney with extensive experience and expertise as a trustee in significant cases under the Japan Corporate Reorganization Law, as well as representing creditors and others.  As more fully set forth in ex. K1, the law of Japan provides:

---

[12]    Kosugi-sensei's credentials are summarized in his declaration, attached. Kosugi-sensei's opinion on applicable Japan law is attached as ex. K1.

o     The reorganized company is the same entity as it was before reorganization and has the same rights and powers that the company held pre-reorganization;

o     While the corporate reorganization is pending, the trustee has exclusive authority to assert the claims which the debtor company would otherwise be able to assert prior to the commencement of reorganization proceedings;

o     Defenses that could be asserted against the debtor company may be asserted against the trustee, and after the trustee is discharged, against the reorganized company;

o     The issuance of new stock during the reorganization creates no special rights in the shareholder to assert the claims of the reorganized company.

Applying these principles of Japan law to the facts in this case:

o     SS-Japan has no special power to pursue claims against the KG Defendants, and is subject to all affirmative defenses the KG Defendants could assert against pre-reorganization SS-Japan.

o     Goldman Sachs, SS-Japan's shareholder, has no rights or claims against KG.

Pursuant to Rule 44.1 of the Federal Rules of Civil Procedure, the KG Defendants give written notice of the foregoing issues of foreign law, as more fully stated in exhibit K1. A determination of foreign law is appropriate for summary judgment.[13]

Given the manifest errors of law in the construction of the law of Japan in the Order[14], reconsideration is appropriate.

---

[13]     McKesson HBOC, Inc. v. Islamic Republic of Iran, 271 F.3d 1101, 1108 (D.C. Cir. 2001), Kim v. Co-op. Centrale Raiffeisen-Boerenleebank B.A., 364 F.Supp. 2d 346, 349 (S.D.N.Y. 2005).

[14]     Order 15-18.

B.    Applying U.S. Law, The Court is Manifestly In Error Concluding
      That Goldman Sachs or Plaintiffs Acquired Special Rights To Pursue
      <u>KG From The Bankruptcy Trustee</u>

Assuming American bankruptcy law applies here, the Order is nonetheless

erroneous when it suggests that Goldman Sachs, SS-Japan or SS-USA have any

special rights or powers of a bankruptcy trustee.[15]  This is because under U.S. law

(like Japan law), under the circumstances presented in these cases, a trustee would

be subject to defenses based upon the pre-bankruptcy conduct of the bankrupt

company.

A U.S. bankruptcy trustee has the power to pursue the legal and equitable

claims the bankrupt debtor corporation could have brought prior to bankruptcy.  11

U.S.C. §541.  Such claims are property of the bankruptcy estate.  In bringing a

claim under §541, a trustee "stands in the shoes of the debtor" and is "subject to

---

[15]    "The Court finds that in purchasing SS-Japan from bankruptcy, Goldman
Sachs stepped into the shoes of the receiver for purposes of these pre-existing,
consolidated actions.  For this reason, Goldman Sachs, as owner of SS-Japan and
SS-USA, has standing to bring these actions through the named plaintiffs."  Order
17.

While the Order treats Goldman Sachs, the new shareholder of SS-Japan, as
acquiring special rights from the trustee, we are aware of no legal authority to
support this proposition.

Moreover, SS-USA (the plaintiff in three of the five consolidated cases) cannot
succeed to a trustee's (or receiver's) power because no trustee or receiver was ever
appointed for SS-USA.  The Order (at 17) is manifestly in error concluding
otherwise.

the same defenses as could have been asserted by the defendant had the action been instituted by the debtor."[16]

In Lafferty, a debtor corporation was operated as a Ponzi scheme by its shareholders. After the debtor filed for bankruptcy, the Creditors' Committee brought claims against the debtor's officers, directors and advisors. The advisors argued that the claims should be dismissed on the basis of *in pari delicto*. The Court addressed the issue of whether the fraud committed by the bankruptcy debtor's owners must be imputed to the Committee. The Court distinguished the two types of actions which the Committee could bring: i) one type is brought by the trustee as the successor to the debtor's interest included in the estate under §541, and ii) the second type is brought under one or more of the trustee's extraordinary avoiding powers (i.e., powers under §§ 548 or 544(b)).[17]

---

[16]    Official Committee of Unsecured Creditors v. R.F. Lafferty & Co., 267 F.3d 340, 356 (3d Cir. 2001) ("Lafferty"), quoting Hays & Co., v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 885 F.2d 1149, 1154 (3d Cir. 1989), quoting Collier on Bankruptcy ¶ 323.02[4].

[17]    Lafferty, 267 F.3d at 355-56.

Under certain narrow circumstances, a bankruptcy trustee operating under U.S. law has extraordinary statutory powers to assert claims free of equitable defenses. See, e.g., 11 U.S.C. §§548 (relating to fraudulent *transfers of the bankrupt debtor's property*), and 544(b) (also giving the trustee power to void certain *transfers of the bankrupt debtor's interest in property* or liens on the bankrupt's property). See In re Personal and Business Ins. Agency, 334 F.3d 239 (3d Cir. 2003) (equitable defense of *in pari delicto* based upon the debtor's conduct is not applicable against a trustee asserting a §548 claim); In re Leasing Consultants, 592 F.2d 103 (2d Cir. 1978) (same, in an action under the predecessor section to §544(b)).

The Court determined that §541 covered the Committee's claims, and ruled that the "explicit language of section 541 directs courts to evaluate defenses as they existed at the commencement of the bankruptcy" and that therefore, the Court was barred from considering the Committee's status as an innocent successor by the "plain language" of §541.  Lafferty, 267 F.3d at 356-357.  The Court therefore held that the *in pari delicto* doctrine barred the Committee's claims against the advisors.[18]

Like the Committee in Lafferty, SS-Japan (and its former trustee) has stepped into the shoes of pre-reorganization SS-Japan, and is subject to the defenses that could be asserted against pre-reorganization SS-Japan.  Thus, assuming that SS-Japan, SS-USA and Goldman Sachs succeed to the powers of the trustee,[19] their claims are subject to KG's equitable defenses.

---

The allegation here, however, is that property was transferred to the KG Defendants by SS-Mililani, plaintiff SS-USA's "grandchild".  Cplt ¶1.  There is no allegation that the bankrupt debtor corporation here -- SS-Japan -- held title to, or had an interest in, the Mililani Property transferred to KG.  Id. at ¶9.  Moreover, SS-USA has not filed bankruptcy, and there is no allegation that SS-USA owned the property.

If, and only if, SS-Mililani (the "transferor") had filed bankruptcy, then SS-Mililani's trustee might have asserted claims against KG pursuant to 11 U.S.C. §§544(b) or 548 free of KG's equitable defenses.  However, that did not occur.

[18]    Accord, Official Committee of Unsecured Creditors of PSA, Inc. v. Edwards, 437 F.3d 1145, 1150 (11th Cir. 2006).

[19]    See n.15, 17, supra.

C.    <u>Scholes</u> and <u>O'Melveny</u> Do Not Support The Court's
      <u>Legal Conclusions</u>

The Court cited <u>Scholes v. Lehmann</u>, 56 F.3d 750 (7th Cir.), cert. denied, 516

U.S. 1028 (1995), for authority that the corporate reorganization of SS-Japan

means that it is effectively "born again," no longer responsible for the alleged

misconduct of its former owners and managers, and cloaked with the perceived

innocence and powers of a receiver.[20]

     <u>Scholes</u>, however, does not address whether, under Federal, Illinois or Japan

law, a post-reorganization corporation is purged of responsibility for its prior

misconduct.  Rather, it analyzes the special powers of a receiver (not a bankruptcy

trustee) appointed to control the affairs of several corporations as well as Douglas,

the sole shareholder of the corporations and "mastermind [of] a Ponzi scheme."

<u>Id.</u>, 56 F.3d at 752, 754.  The receiver's appointment was made at the request of

the Securities and Exchange Commission.  56 F.3d at 752.

     <u>Scholes</u> concerns a fraudulent conveyance suit under Illinois law <u>brought by</u>

<u>the receiver</u>, <u>not a suit pursued by a company after its reorganization proceeding is</u>

<u>complete</u>.  As Judge Posner, writing for the Seventh Circuit, observed,

> "[n]ow that the corporations created and initially controlled by
> Douglas [, a convicted fraudfeasor,] are controlled by a receiver
> whose only object is to maximize the value of the corporations for the
> benefit of their investors and any creditors, we cannot see an objection

---

[20]    Order 17 ("The Court finds that in purchasing SS-Japan from bankruptcy,
Goldman Sachs stepped into the shoes of the receiver . . ."); Tr. 11.

to the receiver's bringing suit to recover corporate assets unlawfully dissipated by Douglas.

Id. at 755. Scholes has nothing to do with any special rights or claims a new

shareholder who acquires a company through a Japan corporate reorganization (as

Goldman Sachs did), or special rights or claims of a reorganized debtor (like

SS-Japan).

The only other case cited in the Order suggesting Goldman Sachs and/or

SS-Japan succeed to special powers of the trustee is F.D.I.C. v. O'Melveny &

Myers, 61 F.3d 17, 19 (9th Cir. 1995), but O'Melveny provides no support.[21]  To

the contrary, it sets forth the distinction between a trustee or receiver, who is

"thrust" into the debtor's shoes and a buyer, like Goldman Sachs, who "voluntarily

steps" into those shoes:

> A receiver, like a bankruptcy trustee and unlike a normal successor in interest, does not voluntarily step into the shoes of the [debtor]; it is thrust into those shoes.  It was neither a party to the original inequitable conduct nor is it in a position to take action prior to assuming the [the company's] assets to cure any associated defects or force the [company] to pay for incurable defects.  This places the receiver in stark contrast to the normal successor in interest who

---

[21]     The Order (at 17) also cites 37 Am. Jur. 2d Fraudulent Conveyances and Transfers § 131 for this proposition, but it too is inapposite.  That authority discusses the rights of assignees and "persons claiming under creditors" to assert a fraudulent transfer claim.  According to the Complaints on record, these plaintiffs are the creditors, and are not claiming under the creditor or the creditor's assignee. See, e.g., Cplt ¶7.  Neither the discussion nor the cases cited in the American Jurisprudence article address any special powers of a company post-reorganization, or special power of one who acquires stock in a corporate reorganization proceeding.

voluntarily purchases [a company] and can adjust the purchase price
for the diminished value of the [company's] assets due to their
associated equitable defenses.  In such cases, the [company] receives
less consideration for its assets because of its inequitable conduct,
thus bearing the cost of its own wrong."

Id., 61 F.3d at 19 (emphasis added).  This passage from O'Melveny states

the applicable analysis in this case.  Instead, the Order (at 18) relied upon dicta that

addresses the special powers of a receiver.

In sum, neither Scholes nor O'Melveny concern a trustee's powers under

bankruptcy law, and are therefore not applicable here.  Although both courts

ultimately ruled that *in pari delicto* did not apply to bar the actions, both cases

involve receivers (not bankruptcy trustees), and the cases involved interpretations

of the laws of Indiana and California, respectively, which may have different

standards for asserting defenses against receivers.[22]

---

[22]    Although both cases were decided on a matter of state law, the outcomes
may have been affected by the fact that the cases were initiated by federal
regulatory agencies, which in turn may have peculiar powers or standards not
applicable here.

The O'Melveny court observed that generally, a receiver under California law is
subject to such equitable defenses, but cited Camerer v. California Sav. &
Commercial Bank, 48 P.2d 39 (Cal. 1935) as authority for an exception to the rule.
Camerer involved the superintendent of banks acting as receiver of a failed bank. It
might well be that California law gives a superintendent of banks, acting as a
receiver, powers that neither a conventional receiver nor a conventional trustee
would have.  In any event, such cases do not establish a general exception to the
general rule delineating a receiver's powers.

## IV.    THE "SOLE OWNER RULE" SHOULD BE APPLIED AS A MATTER OF LAW

Twice in the Order, the Court indicated there are questions of fact about Toshio's ownership of the Sports Shinko entities.[23]  It is respectfully submitted that there are no questions of fact, and there is no dispute that Toshio and his sons controlled all the stock of all the SS Companies – and that the sons exercised no independent authority whatsoever, and instead followed Toshio's dictates.

### A.    Toshio and His Sons Had Complete Ownership of SS-Japan

The table below illustrates the stock ownership of SS-Japan, as set forth in the Stipulation in Lieu of Exhibits B, C, D and E to the Motion, filed February 28, 2006 ("Stipulation in Lieu").  Ownership of SS-Japan was concentrated exclusively in Toshio and his three sons as follows:



---

[23]    Order 15, n.6 and 25-26.

Without dispute, the SS-J stock was owned either directly by Toshio, or indirectly by Toshio through his son's ownership of Kinoshita Construction Company. The third shareholder, Misaki Country Club, was wholly owned by SS-Japan, so its ownership interest did not dilute Toshio's.[24]

B.    Toshio Alone Controlled The SS Companies, Notwithstanding His Sons' Ownership Interest

The record contains undisputed evidence that Toshio exerted complete control of the affairs of the Sports Shinko companies, notwithstanding his sons' ownership interests. In his deposition, eldest son Satoshi testified as follows:

> [I]n Japan it's not considered very polite to object to or question the instructions you receive from the president of a company. And in the case of our company, [Toshio] was essentially like a sole shareholder. He wielded complete authority, so it was even more the case in our particular company.
>
> And in addition to that, when I joined the company in 1991, I was told by [Toshio] that given the fact that I was his child, that if I didn't listen to him, then none of the other employees and officers of the company would want to listen to him. So, no, I didn't question [Toshio] about the reasons behind what he was instructing me to do.
>
> * * *
>
> Q:    … What's the scope of your authority versus [Toshio's] authority?

---

[24]    Toshio owned 58⅓% of the stock of SS-Japan. Stipulation in Lieu, ¶2.a. Kinoshita Construction owned 33⅓% of SS-Japan's stock. Id., ¶2.b. One hundred percent of the stock of Kinoshita Construction was owned by Toshio's sons, Satoshi (50%), Toshiya (25%) and Takeshi (25%). Id., ¶3. Misaki Country Club owned 8⅓% of the SS-Japan stock. Id., ¶2.c. However, Misaki Country Club itself was 100% owned by SS-Japan. Id., ¶4.

A:    I had virtually zero in the way of authority.  I would consult with the general managers of the various golf courses and hotel properties and then look to [Toshio] to make decisions.

Q:    So back to my original question, so the scope of [Toshio's] decision making authority was almost plenary; is that right?

A:    Yes.  He had - - yes, virtually plenary authority.

KG CSOF ex. Q 29-30, 45.

Moreover, the exhibits <u>offered by Plaintiffs</u> in opposition to the Motion

further bolster Toshio's absolute control of the SS companies.  For example,

- SS- Japan's International Business Division "operated under the supervision <u>and direction</u>" of Toshio.  Declaration of Tsugio Fukuda filed February 18, 2006 ("Fukuda decl.") 3, ¶ 6 (emphasis added).

- Shareholders and presidents of the new companies to be formed will be "appointed in accordance with instructions from [Toshio]."  SS CSOF ex. 7.

- Satoshi "did whatever [Toshio] instructed …"  SS CSOF ex. 9, Deposition of Satoshi Kinoshita ("Satoshi dep.") at 225.

- Satoshi testified that an offer for a Hawaii property was rejected because "[Toshio] commented the [offer] figure was too low and it ended there."  SS CSOF ex. 13, Satoshi dep. 221.

- Satoshi's memo to Mukai, describing Toshio's "most concern" about the independence of the new company, and noting Toshio "will fly to sign contract" when it's ready.  SS CSOF ex. 17 at 1.

- SS real estate broker Colliers Monroe Friedlander ("CMF") was told to stop marketing SS's Hawaii golf courses on Toshio's instruction.  SS CSOF ex. 21, Satoshi dep. 230.

- Fukuda told Satoshi that Toshio was extremely displeased with CMF.  SS CSOF ex. 22, Satoshi dep. 230.

- CMF's marketing the golf courses ceased upon Toshio's order.  SS CSOF ex. 22, Satoshi dep. 230.

- Satoshi signed the Purchase and Sale Agreement with KG because he was instructed to do so by Toshio.  SS CSOF ex. 26, Satoshi dep. 166-67.

There is no conflicting evidence in the record to rebut the voluminous evidence that SS-Japan was majority owned by Toshio, and absolutely controlled by him, notwithstanding his sons' stock interest through Kinoshita Construction.

C.     SS-Japan, And Therefore Toshio, Owned 100% of SS-USA

The Court correctly found that SS-Japan owned 89% of the stock of SS-USA.  Order 15, n.6 and 26.  However, the Court ostensibly understood that the owners of the remaining 11% of the stock somehow diluted Toshio's (and his sons') complete ownership of SS-USA.  That is not so.  The other 11% of the SS-USA stock was all owned by wholly owned corporate subsidiaries of SS-Japan.[25]

D.     SS-USA, and Therefore Toshio, Owned 100% of SS-Hawaii, etc.

There is no dispute that SS-USA owned all the stock of SS-Hawaii, and that SS-Hawaii, directly or indirectly owned 100% of the stock of each of SS-Hawaii's subsidiaries, as the Court found in the Order at 8.

_____

[25]     See attached Declaration of Satoshi Kinoshita.  See also KG CSOF ex. F at 30 and Tr. 5-6:

> THE COURT: But at the time that these alleged fraudulent transactions took place, who owned the balance of SS-USA?
>
> MR. ALSTON:  At that time, as I understand it, there were other companies that were controlled by Mr. Kinoshita. I don't have the specific names in my mind at this point, but I can provide that to you if you would need it.
>
> THE COURT: Are they companies owned by Toshio?
>
> MR. ALSTON: Yes, Your Honor, or the Kinoshita family.

E.     There is No Dispute that Toshio Approved The Sale of the Hawaii
       <u>Assets To KG</u>

The record shows, without dispute, that Toshio "exerted operational control"

over the sale of the Hawaii assets to KG.[26]

F.     <u>Toshio's Control is Sufficient to Invoke the Sole Owner Rule As a
       Matter of Law</u>

The Court therefore made a manifest error applying the law to the

undisputed facts when it stated that "a genuine issue of fact exists as to the

underlying issue of whether Toshio was a 'sole owner' for purposes of the [sole

owner] rule."  Order 26.  As the Court recognized, application of the "sole owner

rule" would impute knowledge of the alleged bad conduct of SS's former owners

and managers to the corporation.[27]

The Court cited <u>Official Comm. of Unsecured Creditors of Color Tile, Inc.

v. Coopers & Lybrand, LLP</u>, 322 F.3d 147, 165 (2nd Cir. 2003) ("<u>Color Tile</u>") as

authority for the "sole owner rule".  Order 25.  In <u>Color Tile</u>, the Second Circuit

affirmed the District Court's grant of a Rule 12(b)(6) motion based in part on the

---

[26]     KG CSOF ex. Q at 166-67, 262 (establishing, without rebuttal, that the
definitive agreement to sell the Hawaii properties to KG was signed at Toshio's
explicit direction after Toshio reviewed the terms of the definitive agreement.)  <u>But
see</u> Order at 8 ("Plaintiff admits that Toshio had authority over the Sports Shinko
entities, but denies that he 'exerted operational control' over the companies.")
Plaintiffs' counsel's denial, without more, does not create a question of fact under
Rule 56.  <u>British Airways Bd. v. Boeing Co.</u>, 585 F.2d 946, 952 (9th Cir. 1978)
(cited, Order 11, n.2.)

[27]     Order 25, citing <u>In re Mediators</u>, 105 F.3d 822, 827 (2d Cir. 1997).

"sole owner rule", thereby imputing knowledge of fraudulent conduct to the corporate debtor, and denying the creditor committee's claims against a third party.

The "sole owner" in <u>Color Tile</u> was not a monolithic "sole" entity. Rather, the "sole owner" was "a portfolio company of the 'Investcorp Group,' an affiliation of investment entities engaged in the business of acquiring control of companies by investing its own funds as well as the funds of its wealthy foreign investors." <u>Id</u>., 322 F.3d at 152-53.

It makes no difference whether Toshio was acting for himself or for Sports Shinko, since the facts show that the Sports Shinko enterprise was, in every respect, "his" company. Compare Order 24-25 ("[d]efendants have not presented evidence that Toshio was acting for the Sports Shinko entities' benefit" and therefore declining to impute knowledge to the Sports Shinko companies.)

This misses the point of the sole owner rule, which is a basic rule of logic. The rule "imputes the agent's knowledge to the principal notwithstanding the agent's self-dealing because the party that should have been informed was the agent itself albeit in its capacity as principal." <u>In re Mediators</u>, 105 F.3d at 827. Whether the corporation is benefited when it has a "sole owner" is irrelevant.

## V.    <u>KG DISPUTES THE UNDERLYING DEBTS IN THIS CASE</u>

The Order states:  "Defendants are not challenging the validity of the underlying debt in this case." <u>Id.</u> at 16, n.7.  The KG Defendants state the contrary

in their Reply Memorandum filed March 9, 2006 ("KG Reply"), noting that plaintiffs have been unable to even identify the promissory notes they are suing upon, or make original promissory notes available for inspection.[28]

The KG Defendants admitted that all the allegations in the plaintiffs' five complaints are true "for the purposes of this motion only." KG CSOF i. As stated at the March 20, 2006 argument, the Motion is essentially a Rule 12(b)(6) motion to dismiss that was filed as a motion for summary judgment because certain evidence outside the complaint made the Motion more compelling. Tr. 16. The centerpiece of the Motion was the plaintiffs' five complaints. KG CSOF i; KG Reply 3, 10.

By admitting the allegations of the complaints for the purposes of the Motion, the KG Defendants were simply adhering to the precepts of Rule 12(b) of the Federal Rules of Civil Procedure, which provides that a Rule 12(b)(6) motion that presents matters outside the pleadings "shall be treated as one for summary judgment and disposed of as provided in Rule 56[.]"

Therefore, the KG Defendants agree that they are not challenging the validity of the underlying debt for the purpose of this Motion, but vigorously disagree that they "are not challenging the validity of the underlying debt in this case", as the Order states.

---

[28]    See KG Reply 8, n.12 and Marks declaration attached to KG Reply ¶ 5.

**VI.    THE PLAINTIFF'S OFFICERS ALL ACTED TO EFFECTUATE THE SALE OF THE MILILANI PROPERTY.  THE TRANSACTION WAS NOT "SECRET"**

The Order states that there is a genuine issue of material fact whether Toshio acted secretly with respect to the sale to KG.  Order 24 and n.18.  The Court refers to the Declaration of Tsugio Fukuda dated February 17, 2006 ("Fukuda decl.") 2, 8 and ¶ 22 as authority.

KG Defendants' ex. V, submitted with its Reply memorandum, shows that Fukuda signed the documents required to authorize SS-Mililani to transfer the Mililani Property to KG.  All Fukuda states in his declaration is that he "had little to do with the decision to sell the Hawaii properties," "was not invited to meet with the KG representatives from Hawai'i, and [Toshio and Satoshi] handled most of that transaction alone, without consulting me or others."  Fukuda decl. ¶ 22 (emphasis added).  He does not allege the sale was kept secret from him.

More important, exhibit V proves that Fukuda approved the sale to KG.  It is not material whether Fukuda was involved "with the decision to sell" when he indisputably was aware of, and acted to effectuate the sale itself.

The Order states "Toshio undertook the transfer of SS-Mililani's property without consulting other officers."  Order 24.  The record shows this is in error.  Without dispute, all of the officers of plaintiff SS-USA (including Fukuda), all but

one director of SS-USA, and nearly all of the officers and directors of SS-Mililani, approved the sale.[29]

Hence, there is no support in the record for the Court's assertion that the sale was kept secret from Fukuda or otherwise.  To the contrary, the record shows the opposite is true.  For this reason, Toshio's knowledge should be imputed to the plaintiffs and to the debtor company.  See Restatement (Second) of Agency § 282 (1958).

**VII.  THE SALE OF THE SEWAGE TREATMENT PLANT WAS PART OF THE SAME TRANSACTION AS THE SALE OF THE OTHER HAWAII PROPERTIES TO KG**

The Order states:  "… the Defendants have not presented evidence that the transfer of the sewage treatment plant was part of the same conveyance that Plaintiffs are now challenging."  Order 25, n.19.  This is a manifest error of fact.

Exhibit S to KG CSOF and ex. 26 to SS CSOF are excerpts of the Purchase and Sale Agreement.  This is the definitive agreement between the SS entities and the KG entities for the sale of SS's Hawaii assets.  It states a single purchase price for the purchase and sale of three golf courses, two hotels, some development lands adjacent to two of the golf courses, a sewage treatment plant and various other minor items.[30]

---

[29]    See KG CSOF ex. I, ex. V to KG Reply and ex. D hereto.

[30]    See KG CSOF ex. S, A12368-70; A12372; SS CSOF ex. 26, 003 0597-003 598; 003 01615.

The Purchase and Sale Agreement provided that the single "bulk" purchase price would be allocated among the separate properties that were sold.[31]  This allocation was later agreed upon.[32]

Allocation of the purchase price between the properties was necessary in order to determine the conveyance taxes owed for each property conveyed.  The conveyances could not be completed without paying the conveyance tax, HRS Ch. 247.  The properties were necessarily transferred by separate deeds and assignment of lease documents, in part, due to the need to separately allocate the conveyance taxes.  Moreover, separate conveyances were necessary because each fee property was owned by a separate SS company and the leasehold properties were leased from different lessors.[33]

There is no conveyance tax certificate for the sale of the sewage treatment plant found within SS CSOF ex. 29 only because KG acquired stock, not real estate, in the STP part of the acquisition.  KG CSOF ex. S A12370.  No conveyance tax is owed for a stock sale.  HRS §247-1.

In addition, the single sale transaction was conditioned on all "the property" (defined at KG CSOF ex. S at A012368-71) being conveyed.  None of the transfers

---

[31]    KG CSOF ex. S, A12386; SS CSOF ex. 26, 003 0615.

[32]    KG CSOF ex. T; SS CSOF ex. 16.

[33]    KG CSOF ex. S, A12368-70; SS CSOF ex. 26, 003 0597 – 003 0598; 003 0609 (identifying leasehold properties); SS CSOF ex. 29 (identifying the transferor and transferee entities).

24

could have occurred separately.  SS CSOF ex. 26 at 003 0610.

For these reasons, the record shows, without dispute, that the sale of the sewage treatment plant was part of the same transaction as the sale of the selected real properties SS has elected to sue upon.  The individual transfers were recorded separately and the prices allocated of legal necessity.  That doesn't turn a single purchase and sale agreement into multiple transactions.  The plaintiffs' tactical decision to "cherry pick" the transaction by filing five separate lawsuits to rescind the sale of the valuable properties as though each was a stand-alone transaction, (and by inaction, to ratify the $10 sale of the sewage treatment plant) does not create multiple transactions.

The evidence in the record shows, without dispute, that the sale of the sewage treatment plant was "part of the same conveyance that Plaintiffs are now challenging", and the Order is manifestly in error finding otherwise (at 25, n.19).

## VIII.  **CONCLUSION**

For the foregoing reasons, the KG Defendants ask the Court to reconsider the Order, vacate it, and issue an amended order denying the KG Defendants' Motion for Summary Judgment without discussion of the facts or law. Alternatively, the KG Defendants seek leave to submit specific edits to the Order for the Court's consideration.

The KG Defendants also request, pursuant to Rule 56(d) of the Federal Rules of Civil Procedure, that the Court "ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted" so the parties can focus the next round of discovery.

DATED:    Honolulu, Hawaii, April 12, 2006.


/s/ Robert A. Marks
WARREN PRICE, III
ROBERT A. MARKS

Attorneys for Defendants
KG HOLDINGS, LLC, KIAHUNA GOLF CLUB, LLC, KG KAUAI DEVELOPMENT, LLC, PUKALANI GOLF CLUB, LLC, KG MAUI DEVELOPMENT, LLC, MILILANI GOLF CLUB, LLC, QK HOTEL, LLC and OR HOTEL, LLC