Of Counsel:
ALSTON HUNT FLOYD & ING
Attorneys At Law
A Law Corporation

PAUL ALSTON                 1126-0
BRUCE H. WAKUZAWA           4312-0
GLENN T. MELCHINGER         7135-0
JASON H. KIM                7128-0
American Savings Bank Tower
1001 Bishop Street, 18th Floor
Honolulu, Hawai`i  96813
Telephone:  (808) 524-1800
Facsimile:   (808) 524-4591
Email:  palston@ahfi.com
        bwakuzawa@ahfi.com
        gmelchinger@ahfi.com
        jkim@ahfi.com

Attorneys for Plaintiff
and Third-Party Defendants
the Sports Shinko Companies

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI`I

| | | |
|---|---|---|
| SPORTS SHINKO CO., LTD., | ) | CV 04-00124 BMK |
| | ) | CV 04-00127 BMK |
| Plaintiff, | ) | |
| | ) | CONSOLIDATED CASES |
| vs. | ) | |
| | ) | **PLAINTIFF'S MEMORANDUM** |
| | ) | **IN OPPOSITION TO THE KG** |
| QK HOTEL, LLC, et al., | ) | **PARTIES MOTION FOR** |
| | ) | **PARTIAL SUMMARY** |
| Defendants, | ) | **JUDGMENT, FILED MAY 10,** |
| | ) | **2007;** CERTIFICATE OF |

and                                    )    WORD COUNT; CERTIFICATE
                                       )    OF SERVICE
FRANKLIN K. MUKAI, et al.,             )
                                       )
         Third-Party Plaintiffs,       )    DATE:      October 31, 2007
                                       )    TIME:      2 p.m.
     vs.                               )    JUDGE:     Barry M. Kurren
                                       )
SPORTS SHINKO (USA) CO.,               )
LTD., et al.,                          )
                                       )
         Third-Party                   )
         Defendants,                   )
                                       )
     and                               )
                                       )
SPORTS SHINKO (HAWAII) CO.,            )
LTD., et al.,                          )
                                       )
     Third-Party Defendants/           )
     Counterclaimants,                 )
                                       )
     vs.                               )
                                       )
QK HOTEL, LLC, et al.,                 )
                                       )
     Third-Party Counterclaim          )
     Defendants.                       )
                                       )
AND CONSOLIDATED CASES                 )
_____)

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
THE KG PARTIES' MOTION FOR PARTIAL SUMMARY
JUDGMENT, FILED MAY 10, 2007**

## I.    INTRODUCTION

This case arises out of the sale by Third-Party Defendant / Third-Party Counterclaimant Sports Shinko (Waikiki) Corp.'s ("SSW") sale of two hotels, the Ocean Resort Hotel and the Queen Kapiolani Hotel, to Defendants OR Hotel LLC and QK Hotel LLC in January 2002.  As shown below, Plaintiff Sports Shinko Co. Ltd. ("SS Japan") was a creditor of SSW at the time of the sale.

Defendants KG Parties seek partial summary judgment on the basis that SS Japan and its successors are not creditors of SSW.  As set forth in great detail below, however, there is ample evidence that SS Japan loaned ¥ 10 billion to SSW in 1990 and that substantial amounts of principal and interest on this loan are still owing by SSW.  The KG Parties claim that this transaction was an infusion of equity and not a loan.

Whether the ¥ 10 billion is debt or equity is "primarily directed at ascertaining the intent of the parties."  *Bauer v. Commissioner of Internal Revenue*, 748 F.2d 1365, 1367 (9th Cir.

1985).  That intent, in turn, is "evidenced by the circumstances and conditions of the advance."  *Id.* at 1368.  Based on the circumstances of the loan, a reasonable jury could find, by clear and convincing evidence, that SS Japan and SSW intended to and did form a creditor-debtor relationship.

Despite the sale of this loan to a related company – South Wind Finance (Cayman) Company – after this litigation was commenced, SSW continues to be a debtor on the loan.  The loan was in no way forgiven or cancelled as part of this transaction.  Furthermore, because an UFTA claim is severable from the underlying debt, *see Kathy B. Enterprises, Inc. v. United States,* 779 F.2d 1413, 1414-15 (9th Cir. 1986), SS Japan may maintain this action.  Thus, Defendants' Motion for Partial Summary Judgment ("Motion") must be denied.

## II.    STATEMENT OF FACTS

### A.    THE CREATION AND PURPOSE OF THE LOAN

SS Japan is the ultimate parent company of SSW.  *See* Declaration of Tsugio Fukuda attached to Pl.'s Concise Statement of Facts in Opp'n to KG Parties' Mot. for Summ. J. ("Fukuda Dec.)

at ¶ 4.  SSW purchased the leasehold interest in two Waikiki hotels – the Ocean Resort Hotel Waikiki and Queen Kapiolani Hotel (collectively, the "Hotels") – in June 1990.  Fukuda Dec. at ¶ 5; Ex. 1. The total purchase price was ¥ 15 billion.  Fukuda Dec. at ¶ 6; Ex. 1.

The ¥ 15 billion purchase price was funded in two ways. SS Japan, through intermediate subsidiaries, made a ¥ 5 billion capital investment in SSW.  Fukuda Dec. at ¶ 6; Ex. 2.[1]  SS Japan also loaned ¥ 10 billion to SSW, payable in five years and accruing simple interest at 8 % per year (the "Loan").  Fukuda Dec. at ¶ 6; Ex. 2.  The Loan is evidenced by Exhibit 2, which is a *ringi-sho* memorializing SS Japan's decision to grant the Loan.[2]  Prior to the

---

[1] A *ringi-sho* is a document used within Japanese corporations to memorialize corporate decisions and is similar to a corporate resolution.   Fukuda Dec. at ¶ 6.  A number of the exhibits referenced in this memorandum, including Exhibit 2, are in Japanese.  Certified translations of these documents have been submitted, with an "A" designation corresponding to the exhibit number of the original.

[2] Formal documentation was also prepared by Defendant Franklin Mukai for SSW relating to this Loan, including a promissory note.  Ex. 3.  It is unknown whether this documentation was executed and, if so, whether it has been maintained.

closing of the purchase of the hotels, Mr. Fukuda of SS Japan and SSW informed Defendant Franklin Mukai of the Loan.  Fukuda Dec. at ¶ 10; Ex. 5.  SS Japan also reported both the existence and the terms of the Loan to Japan's Ministry of Finance.  Ex. 6.

The method of funding the acquisition of the hotels was similar to the method used by SS Japan for all its overseas' acquisitions.  Fukuda Dec. at ¶ 12.  Generally speaking, SS Japan obtained financing from Japanese lenders and, in turn, loaned those funds to local subsidiaries such as SSW formed to purchase and hold the acquired properties.  *Id.*

There were several reasons for financing overseas acquisitions, including the purchase of the Hotels, through loans. *Id.* at ¶ 13.  First, Japanese banks generally did not loan directly to U.S. companies.  *Id.*  Second, SS Japan's lenders and auditors preferred that a portion of the purchase financing by SS Japan be in the form of loans to maintain a healthy balance sheet for SS Japan.  *Id.*  Third, SS Japan understood that structuring a portion of the purchase as a loan would lead to beneficial treatment of repayments under U. S. tax law.  *Id.*

SS Japan and SSW both intended for the Loan to be fully enforceable between the parties and valid according to U.S. tax and accounting standards.  Fukuda Dec. at ¶ 14.  SS Japan and SSW sought and relied upon advice from their attorneys and accountants, including Mukai and Howard Hanada at the accounting firm Grant Thornton, to ensure that the Loan was valid. *Id.*

SS Japan and SSW intended and expected that the Loan would be repaid.  Based on financial projections from the previous owner of the Hotels, SS Japan anticipated that the hotels would generate sufficient free cash flow during the initial five year term of the loan to pay all the interest on the Loan accruing during that period and at least a portion of the principal.  Fukuda Dec. at ¶ 15; Ex. 2 and 2A at p. 2.[3]  However, after the acquisition, the financial performance of the Hotels was worse than expected and the hotels generated substantially less free cash flow than anticipated at the inception of the Loan.  Fukuda Dec. at ¶ 16.

---

[3] The *ringi-sho* states:  "Operating profits excluding depreciation, capital investment and interest payments in the current fiscal year ... are ... a total of $5,815,000, and ... it will be possible to pay an interest rate of 8% on a loan of ¥ 10,000,000,000 (¥ 800,000,000 $5,333,000@150 yen."

### B.    CAPITALIZATION OF A PORTION OF THE LOAN

Between 1993 and 1995, half the Loan (¥ 5 billion) was converted to equity.  In 1993, SS Japan's auditors became concerned that SS Japan's outstanding receivables in the form of intercompany loans were too high.  Fukuda Dec. at ¶ 17.  In addition, in 1994, currency fluctuations led to a foreign currency loss for Sports Shinko (Hawaii) Co. Ltd. ("SSH") (another parent company of SSW) arising from the yen-denominated Loan that could have resulted in negative equity for SSH.  *Id.*  As a result, SS Japan began a process of restructuring and/or capitalizing certain of its intercompany loans, including the Loan.  *Id.*  Thus, in 1993, 1994, and 1995, SS Japan converted a total of ¥ 5 billion of the Loan into equity (held indirectly through various subsidiaries).  *Id.* at ¶ 18; Exs. 8-12.  The corporate minutes and assignment agreements (included in Exs. 9-12) repeatedly and unambiguously refer to the ¥ 10 billion advance (or what remained of it after equitization) to SSW as a loan.

### C.    PAYMENTS TO LA COSTA

Another property indirectly owned by SS Japan, the La Costa Resort and Spa ("La Costa"), required large amounts of cash for maintenance, operations, and repayment of debt.  Fukuda Dec.

at ¶ 25.  Rather than repaying the Loan to SS Japan and then having SS Japan forward the repayment proceeds to La Costa, SSW loaned funds directly to La Costa.  *Id.*

Between 1991 through 1995, SSW (through Ocean Resort Hotel and Queen Kapiolani Hotel) made regular loans to La Costa that totaled over $12 million.  Fukuda Dec. at ¶ 26; Ex. 13. SSW made loans to La Costa as follows:[4]

### 1991

| Date | Amount |
|------|--------|
| December 1 | $ 500,000 |
| December 2 | $ 1,000,000 |
| December 16 | $ 450,000 |
| December 25 | $ 500,000 |

### 1992

| Date | Amount |
|------|--------|
| January 2 | $ 500,000 |
| March 31 | $ 450,000 |
| April 1 | $ 450,000 |
| April 10 | $ 250,000 |
| April 16 | $ 100,000 |

---

[4] Source: Exhibit 13.

| May 22 | $ 500,000 |
| July 13 | $ 500,000 |
| August 14 | $ 300,000 |
| August 15 | $ 500,000 |
| October 21 | $ 600,000 |
| December 4 | $ 300,000 |

## 1993

| Date | Amount |
| --- | --- |
| March 10 | $ 500,000 |
| April 7 | $ 500,000 |
| July 27 | $ 400,000 |
| November 18 | $ 650,000 |

## 1994

| Date | Amount |
| --- | --- |
| February 22 | $ 300,000 |
| April 15 | $ 300,000 |
| August 19 | $ 400,000 |
| September 16 | $ 400,000 |
| November 3 | $ 450,000 |

## 1995

| Date | Amount |
| --- | --- |
| March 30 | $ 100,000 |

| March 30 | $ 300,000 |
| July 15 | $ 500,000 |
| August 15 | $ 300,000 |
| October 30 | $ 200,000 |

These loans were not repaid by La Costa.  Instead, after La Costa was sold in 2001, SSW's obligation under the Loan was reduced by $10 million in consideration for these loans.  Fukuda Dec. at ¶ 28; Exs. 14-16.

**D.   PAYMENTS FROM 1996 THROUGH 2002**

In 1995 – the original maturity date of the Loan – the term of the Loan was extended for another five years.  Fukuda Dec. at ¶ 33; Ex. 17.  For the next several years, SSW made substantial payments on the Loan.  SSW's payments from 1996 through 2000 totaled ¥ 1,765,500,000 (or approximately $ 15,313,301.50).[5] Fukuda Dec. at ¶ 35; Exs. 19-28 & 30-36.

The source of the payments were not only the operating profit of the hotels.  To the contrary, on several occasions, SSW

---

[5] The U.S. dollar conversions are approximations for the convenience of the Court and were determined using the yen to dollar ratio that existed on the date of the payment.  Except as noted, all payments were denominated in yen.  A historical conversion table is available at www.oanda.com.

borrowed funds from other SS Japan subsidiaries to make these payments.  *See* Exs. 24, 26, 27, 32, 33, 36.  The payments were applied to the principal of the Loan, based on the advice of Howard Hanada at Grant Thornton, so that SSW was not required to withhold tax on the interest payments.  Fukuda Dec. at 36, Ex. 18.

In 1996, SSW made principal payments totaling ¥ 260,000,000 ($ 2,388,080) on the Loan as follows:

| Date | Exhibit | Amount | Dollar Conversion |
| --- | --- | --- | --- |
| March 23 | 19 | ¥ 50,000,000 | $ 468,100 |
| June 20 | 20 | ¥ 100,000,000 | $ 926,100 |
| August  29 | 21 | ¥ 50,000,000 | $ 461,700 |
| October 1 | 22 | ¥ 20,000,000 | $ 179,860 |
| December 18 | 23 | ¥ 40,000,000 | $ 352,320 |

In 1997, SSW made payments totaling ¥ 900,000,000 ($ 7,712,960) on the Loan as follows:

| Date | Exhibit | Amount | Dollar Conversion |
| --- | --- | --- | --- |
| June 24 | 24 | ¥ 700,000,000 | $ 6,105,400 |
| August 27 | 25 | ¥ 70,000,000 | $ 588,980 |
| November 26 | 26 | ¥ 100,000,000 | $ 785,900 |
| December 19 | 27 | ¥ 30,000,000 | $ 232,680 |

In 1998, SSW made payments totaling ¥ 200,000,000 ($ 1,561,800) on the Loan as follows:

| Date | Exhibit | Amount | Dollar Conversion |
|------|---------|--------|-------------------|
| June 30 | 28 | ¥ 50,000,000 | $ 357,650 |
| July 17 | 30 | ¥ 50,000,000 | $ 358,600 |
| November 18 | 31 | ¥ 50,000,000 | $ 412,250 |
| December 21 | 32 | ¥ 50,000,000 | $ 433,300 |

In 1999, SSW made payments totaling ¥ 300,000,000 ($ 2,659,500) on the Loan as follows:

| Date | Exhibit | Amount | Dollar Conversion |
|------|---------|--------|-------------------|
| January 19 | 33 | ¥ 200,000,000 | $ 1,756,000 |
| July 26 | 34 | ¥ 50,000,000 | $ 429,700 |
| October 25 | 35 | ¥ 50,000,000 | $ 473,800 |

On June 19, 2000, SSW made a payment on the Loan of ¥ 105,500,000 ($ 990,961.50). Ex. 36.

The Loan was again extended in 2000 for another five year term. Fukuda Dec. at ¶ 56; Ex. 37. In 2001, as described above, SS Japan credited $10 million against the principal of the Loan after the sale of La Costa. And in 2002, when the Hotels were sold to Defendants QK Hotel LLC and OR Hotel LLC, ¥ 39,900,000 of the sales proceeds were credited against the principal of the Loan. Fukuda Dec. at ¶ 59; Ex. 38.

From 1990 through 2002, the consolidated financial statements for one of SSW's parents, SSH, (audited except for 2001 and 2002) showed the remaining principal and accrued interest on the Loan as debt owed by SSW.[6]  Exs. 41-53.  SS Japan calculated the interest accruing on the Loan.  Ex. 58.  SS Japan also reported the Loan in its tax filings in Japan until 2004.[7]  Declaration of Tadashi Yoshida attached to Pl.'s Concise Statement of Facts in Opp'n to KG Parties' Mot. for Summ. J. ("Yoshida Dec."); Exs. 54-56 & 72-76.

Although the interest rate on the Loan was initially set at 8%, it was reduced from time to time to reflect changes in the prevailing interest rates in Japan and SS Japan's business

_____

[6] For several years, SSW prepared its own separate financial statements, in addition to consolidating its financial information into the SSH financial statements.  *See, e.g.,* Ex. 59.  Accrued interest on the Loan was not reflected in the SSW financial statements.  SSW's auditors acknowledged, however, that the financial statements omitted the accrued interest; they said nothing to indicate that the interest was not accruing.  *Id.* at 090 0412; 090 0414 ("As described in note 1, the Company has excluded the accrued interest and foreign currency translation adjustment relating to the note payable from the accompanying financial statements.").  And in fact, the accrual of interest was recognized by SSH's auditors.  Exs. 41-53.

[7] As described below, the Loan was sold to South Wind in 2004.

strategy.  Fukuda Dec. at ¶ 80.  On November 2, 1993, it was
reduced to 6.7%, retroactive to 1993.  Fukuda Dec. at ¶ 77; Ex. 61.
On February 3, 1995, the interest rate was reduced to 5% for 1994.
Ex. 17.  On December 27, 1996, the interest rate was reduced to
3.5% for 1997.  Fukuda Dec. at ¶ 78; Ex. 62.  Finally, no interest
was charged on the Loan for 2001 and 2002.  Fukuda Dec. at ¶ 79;
Ex. 63.

The interest rate on the Loan generally tracked the Bank
of Japan's prime rate for long term debt:

| Date | SSW Loan Rate | BOJ Prime Rate[8] |
|------|---------------|-------------------|
| 06/05/90 | 8.0% | 7.6% |
| 11/02/93 | 6.7% | 4.5% |
| 02/06/95 | 5.0% | 4.9% |
| 01/01/97 | 3.5% | 2.5% |
| 01/01/01 | 0.0% | 2.1% |

As of March 10, 2002 – soon after the purchase of the
Hotels by the KG Parties – SS Japan's internal calculations showed

---

[8] Historical BOJ prime rates are taken from Exhibit 71, tables
available on the Bank of Japan's website.  www.boj.or.jp;
Melchinger Dec. at ¶ 4.  These tables are admissible pursuant to
F.R.E. 803 (17) for "[m]arket quotations, tabulations, lists,
directories, or other published compilations, generally used and
relied upon by the public or by persons in particular occupations."

a remaining principal of ¥ 1,958,600,000 and accrued interest of ¥ 4,162,979,304.  Ex. 63.

### E.    ACQUISITION OF THE LOAN BY SOUTH WIND

On December 30, 2004, the Loan, along with other SS Japan intercompany loans, was transferred to South Wind Realty Finance (Cayman) Company ("South Wind").  Exs. 39-40.[9] Although SS Japan transferred the loans, it retained the right to pursue causes of action arising from the loans.  Ex. 40 at 256 0288 ("[T]he Transferor desires to sell its interest in such recovery while retaining the right and obligation, as assignor, to prosecute the Claims ....").

SSW filed its federal tax returns as part of a consolidated group of all of SS Japan's U.S. subsidiaries, under the umbrella of Sports Shinko (USA) Co., Ltd. ("SS USA").  Declaration of Doreen Griffith attached to Pl.'s Concise Statement of Facts in Opp'n to KG Parties' Mot. for Summ. J. ("Griffith Dec.") at ¶ 2.  Because the Loan was transferred to South Wind, SS USA in its 2004 consolidated federal tax return reported that it no longer owed any debt to SS

---

[9] Exhibits 39 and 40 are the same as Exhibit 4 to Defendants' Motion, except for the highlighting.  SS Japan submits these exhibits again for the convenience of the Court.

Japan, including the Loan.  Griffith Dec. at ¶ 9; Ex. 67 at GT 037890-91.  Grant Thornton, which prepared the 2004 tax return, knew that SS Japan no longer owned the intercompany debt but did not know exactly how the debt had been disposed of.  Griffith Dec. at ¶ 9.  Thus, it was reported on behalf of SS USA that SS Japan had transferred its debt to SS USA so as to avoid recognition of taxable income by SS USA.  *Id.;* Ex. 67 at GT 037892.

There is no evidence that any of the parties involved intended the Loan to be forgiven or cancelled as part of the South Wind transaction.  Indeed, SS Japan informed Grant Thornton that the debt continued in existence and never instructed Grant Thornton to write it off.  Ex. 65 at GT 037988 ("South Wind TK has purchased debt and credit from SS USA at acquisition.  Therefore balances of Account Receivable and Account Payable between SS USA and SS Japan have not left."); Declaration of Hungke Lee attached to Pl.'s Concise Statement of Facts in Opp'n to KG Parties' Mot. for Summ. J. ("Lee Dec.") at ¶ 8.  In SS USA's 2005 consolidated federal tax return, SS USA reported that it now owed a large amount of debt to South Wind.  Ex. 68 at GT 037051-52.

In the course of completing the 2004 federal tax return for SS USA, SS USA prepared two sets of financial statements.  Lee

Dec. at ¶ 3.  The first set of financial statements was created

pursuant to a "purchase accounting" method.  Lee Dec. at ¶ 5;

Griffith Dec. at ¶¶ 4-6; Ex. 65 at GT 037987.  Thus, SS USA's

subsidiaries' debt to SS Japan, such as the Loan, were – for

purposes of the financial statements – cancelled out.  Lee Dec. at

¶ 6; Griffith Dec. at ¶ 5; Ex. 65 at GT 037987.  This method of

accounting was inappropriate for tax purposes.  Griffith Dec. at ¶ 6.

Thus, SS USA revised its financial statements to reverse the

cancellations that arose from the consolidation.  Griffith Dec. at

¶ 6; Ex. 65 at GT 037985.

SS Japan produced certain financial information to

Defendants on September 6, 2005, designated as documents

256 0239 through 256 0810 and including the 2004 balance sheet

and trial balance for SSW attached as Exhibit 6 to Defendants'

motion.  Ex. 64 and Declaration of Glenn Melchinger attached to

Pl.'s Concise Statement of Facts in Opp'n to KG Parties' Mot. for

Summ. J. ("Melchinger Dec.") at ¶ 3.  These documents were

received by SS Japan's counsel in mid-August, 2005.  *Id.*  As

demonstrated by this timing, the documents in Defendants'

Exhibit 6 were created before the SS USA financial statements were

revised to reverse the consolidation with SS Japan.  The SSW

-16-

balance sheet actually used for the 2004 SS USA federal tax return shows "total notes payable" of $37,929,117 and "accrued interest on notes payable" of $39,700,996 and the trial balance shows the same figures for "initial funding – SR NP" and "accrued interest – IC NP." Griffith Dec. at ¶ 7; Ex. 66. Thus, the KG Parties have relied on the wrong set of financial statements for its Motion.

The Loan continues to be reflected in South Wind's financial statements. Lee Dec. at ¶ 10; Ex. 77. And SSW's current president confirms that the Loan has not been assigned, forgiven, or otherwise cancelled to this day. Declaration of Steven Douglas Sears attached to Pl.'s Concise Statement of Facts in Opp'n to KG Parties' Mot. for Summ. J. ("Sears Dec.) at ¶ 3.

## III.  STANDARD FOR GRANT OF SUMMARY JUDGEMENT

On a motion under F.R.C.P. Rule 56, the Court must construe all evidence and reasonable inferences drawn from the evidence in the light most favorable to the nonmoving party. *T.W. Electrical Service, Inc. v. Pacific Electrical Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987). Accordingly, if "reasonable minds could differ as to the import of the evidence," summary judgment will be denied. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51, 106 S.Ct. 2505, 2512 (1986).

Where the plaintiff is required to prove the elements of its claim by "clear and convincing" evidence, "the trial judge's summary judgment inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant." *Suzuki Motor Corp. v. Consumers Union of U.S., Inc.*, 330 F.3d 1110, 1132 (9th Cir. 2003) (*en banc*), *quoting Anderson*, 477 U.S. at 255-56, 106 S. Ct. 2514 (reversing trial court's grant of summary judgment for defendant where plaintiff was required to prove malice by clear and convincing evidence). Even under this standard, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 106 S. Ct. at 2511. And even though the clear and convincing standard must be taken into account, "[i]t by no means authorizes trial on affidavits" because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge." *Id.* at 255, 106 S. Ct. at 2513.

## IV.  ARGUMENT

### A.  THERE IS AMPLE EVIDENCE FROM WHICH A JURY COULD FIND, BY CLEAR AND CONVINCING EVIDENCE, THAT SS JAPAN IS A CREDITOR OF SSW.

A plaintiff bringing a claim under "UFTA" must be a "creditor" of the party that made the transfer in violation of UFTA. H.R.S. § 651 C-7.  "Creditor" is defined as "a person who has a claim against a debtor."  H.R.S. § 651C-1. "Claim," in turn, is defined broadly as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."  *Id.*

Here, there is ample evidence from which a jury could conclude by clear and convincing evidence that SS Japan has a "claim" against SSW by virtue of the Loan extended to SSW in 1990 to purchase the Hotels that remained unpaid when the Hotels were sold.

Whether an advance of funds to a corporation is debt or equity is "primarily directed at ascertaining the intent of the parties."  *Bauer v. Commissioner of Internal Revenue*, 748 F.2d 1365, 1367 (9th Cir. 1985) (holding Tax Court was "clearly erroneous" in characterizing advances to corporation by its

shareholders as equity instead of debt).[10]  That intent, in turn, is "evidenced by the circumstances and conditions of the advance." *Id.* at 1368.  Although courts have looked to a number of factors to distinguish debt from equity for purposes of the Internal Revenue Code, "[n]o one factor is controlling or decisive, and the court must look to the particular circumstances of each case."  *Id.  See also Submicron Systems Corp. v. KB Mezzanine Fund II, L.P.*, 432 F.3d 448, 456 (3rd Cir. 2006) (in bankruptcy context, "overarching inquiry" as to debt or equity is "a court's attempt to discern whether the parties called an instrument one thing when in fact they intended it as something else").

---

[10] Whether an advance is debt or equity has most often been litigated in the context of the Internal Revenue Code.  The definition of a "debt" under the code is substantially more stringent than the broad definition of "claim" under UFTA.  The classic definition of "debt" for tax purposes comes from *Gilbert v. Commissioner*, 248 F.2d 399, 402 (2nd Cir. 1957), in which a debt is defined as "an unqualified obligation to pay a sum certain at a reasonably close fixed maturity date along with a fixed percentage of interest payable regardless of the debtor's income or lack thereof."  This is substantially more restrictive than the definition of "claim" in H.R.S. § 651C-1.  Therefore, if the Internal Revenue Code criteria establish that there was debt, that is *a fortiori* sufficient to establish that SS Japan has a "claim" against SSW for purposes of UFTA.

Here, there is more than enough evidence of SS Japan and SSW's intent to create a *bona fide* creditor-debtor relation to raise a genuine issue of material fact:

- SS Japan memorialized the Loan through a duly-executed *ringi-sho*, the Japanese equivalent of a corporate resolution (Fukuda Dec. at ¶ 8; Ex. 2);

- SS Japan reported the Loan as a loan to Japan's Ministry of Finance (Ex. 6);

- SS Japan had valid business reasons for financing most of the purchase price of the Hotels through a loan rather than equity (Fukuda Dec. at ¶ 13);

- Both SS Japan and SSW intended for the Loan to be valid according to United States tax and accounting standards and relied on advice from their attorneys and accountants (Fukuda Dec. at ¶ 14);

- SS Japan intended and expected that all the interest on the Loan, and at least a portion of the principal, would be paid at the end of the Loan's term (Fukuda Dec. at 15; Ex. 2 at p. 2);

- SSW executed corporate consents and assignment agreements in 1994 and 1995 that acknowledged the Loan (or what was left of it after portions of the Loan were capitalized) (Ex. 11 at 117 1448-50 and Ex. 12 at 022 0232 and 022 0234);

- SSW made substantial, regular loans to La Costa in lieu of payments on the Loan from 1991 through 1995, totaling over $12 million (Ex. 13; Fukuda Dec. at ¶¶ 25-26);

-21-

- •    SSW made substantial, regular payments on the Loan from 1996 through 2000, totaling over $15 million (Exs. 19-28 & 30-36);

- •    SSW did not make these payments solely from operating profits; in some cases, it was required to borrow funds from others (Exs. 24, 26, 27, 32, 33 & 36);

- •    The consolidated and audited[11] financial statements for SSH consistently showed the Loan as a debt from 1990 through 2002 (Exs. 41-53);

- •    SS Japan kept records of accrued interest on the Loan (Ex. 54);

- •    SS Japan reported the Loan in its tax filings in Japan (Exs. 54-56; 72-74); and

- •    The interest rate on the Loan was consistent with market rates in Japan (Exs. 61, 11, 62, 63, 71).

The existence of a reasonable expectation of repayment at the initiation of the loan is especially probative of the parties' intent. *Wagner Electric Corp. v. United States*, 1975 WL 3594 at * 13 (Cl. Ct. 1975) (feasibility studies based on cash flow projections and profit estimates supported the existence of debt: "the existence of a reasonable expectation of repayment is also the earmark of a debt"). Here, SS Japan projected that SSW would be able to repay a

---

[11] The Sports Shinko Hawaii financial statements were not audited in 2001 and 2002. Those financial statements are compilations.

substantial portion of the Loan within the first five year term.
Fukuda Dec. at ¶ 15; Ex. 2.  Although that expectation was not
borne out and the loan was reduced and extended on several
occasions, subsequent economic developments that make
repayment difficult are not probative of intent at the time of
inception of the debt.  *See Bordo Products Co. v. United States,* 476
F.2d 1312, 1325 (Cl. Ct. 1973) (actions of creditor in waiving
interest and forbearing on demand for payment was consistent with
treating advances as debt: "intent at the time the advances were
made is an important consideration, and subsequent unexpected
economic developments may explain the fact of forbearance").

The KG Parties' argue that the ¥ 10 billion advance is not
a debt or "claim" because SS Japan has not produced a fully
executed promissory note for the Loan.  In the absence of a
promissory note, the KG Parties argue that the intercompany debts
"were mere bookkeeping entries that tracked amounts being shifted
among commonly owned companies."  KG Parties' Mem. in Supp. at
3.  The KG Parties' argument does not justify summary judgment
for several reasons.

First, although SS Japan has not located an executed
promissory note, there is ample clear and contemporaneous

documentary evidence showing the existence and validity of the Loan, including but not limited to the executed *ringi-sho*, (Ex. 2), the subsequent consents and assignment agreements from SSW acknowledging the Loan (Ex. 11 at 117 1448-50 and Ex. 12 at 022 0232 and 022 0234), and the long history of payments by SSW extending over ten years on the Loan (either indirectly to La Costa or directly to SS Japan) by SSW (Exs. 13, 19-28, & 29-36).[12]

Second, neither the Loan nor the repayments on the Loan were mere "accounting entries."  The original seller of the hotels received ¥ 10 billion in cash pursuant to the Loan.  Fukuda Dec. at ¶ 6; Ex. 1.  And SSW paid close to $30 million in cash as repayments on the Loan.

Third, even applying the stringent standards of the Internal Revenue Code (or comparable state tax laws), courts have found enforceable debt based on open accounts supported by no formal documentation, even when no interest is charged and no regular repayments are made.  *See, e.g. Wagner Electric Corp.*, 1975 WL 3594 at * 16 (Cl. Ct. 1975) (finding debt where corporation

---

[12]The incumbent management of SS Japan was replaced by a Trustee appointed by the Osaka District Court in early 2002.  The records of SS Japan were in disarray and many documents were destroyed.  Melchinger Dec. at ¶ 6.

assisted subsidiary through open account credit); *George E. Warren Corp. v. United States,* 141 F. Supp. 935, 938-39 (Cl. Ct. 1956) (finding debt where corporation advanced funds to a related corporation under common ownership on open account, even in the absence of written instruments of indebtedness and interest); *Bennet Glass & Paint Co. v. State Tax Commission,* 100 P.2d 567, 569-70 (Utah 1940) (fact that advancements of credit by parent were not evidenced by notes did not preclude treating them as debt where advances were carried on the books of the parent as "accounts receivable"). *See also Submicron Systems Corp.* 432 F.3d at 458 (finding debt even though creditor failed to issue notes for certain fundings).

Whether an advance to a corporation is debt or equity is a highly fact-specific issue that requires careful analysis of all the surrounding circumstances. "In the final analysis, each case must be reviewed with an eye to its unique factual flavor, and as a composite of many diverse external elements pointing in the end to what is essentially a subjective conclusion." *Bordo Products Co. v. United States,* 476 F.2d at 1321 (internal quotation omitted). This general principle, combined with the ample evidence of the parties' intent produced by SS Japan, shows that the issue of whether SS

Japan has a "claim" against SSW is not susceptible to summary disposition.  *See Tigrett v. United Stats,* 358 F. Supp. 2d 672, 677 (W.D. Tenn. 2004) (denying cross motions for summary judgment on issue of whether advance was bona fide debt: "[b]ecause the Court must weigh the evidence in order to determine whether the underlying transaction constituted a capital contribution or a loan, such a determination is not appropriate for summary judgment."). The complex and sensitive balancing of all the facts and circumstances regarding the Loan should be left to the jury.  Thus, Defendants' motion for partial summary judgment should be denied.

### B.    EVEN UNDER THE STANDARDS OF THE INTERNAL REVENUE CODE, THERE IS AMPLE EVIDENCE THAT THE LOAN IS A "DEBT."

As explained in footnote 10, the standard for a "claim" under UFTA is quite different and broader than the standard for a "debt" under the Internal Revenue Code.  But even under the stringent Internal Revenue Code test, there is a genuine issue of material fact as to whether the Loan qualifies as a debt.

The Ninth Circuit in *Bauer v. Commissioner of Internal Revenue*, 748 F.2d 1365, 1368 (9th Cir. 1985) identified eleven factors to distinguish debt from equity.  Considering these factors

in their totality, a reasonable jury could find by clear and
convincing evidence that the Loan was a debt.

     1.   *Names given to the certificates evidencing the debt.*

     Here, although there is no executed promissory note, the
Loan is consistently referred to as a loan in the contemporaneous
business records of SS Japan.  Exs. 2, 5, & 6.  SSW also refers to
the Loan as a loan in its 1994 and 1995 consents and assignment
agreements relating to the capitalization of a portion of the Loan.
Ex. 11 at 117 1448-50 and Ex. 12 at 022 0232 and 022 0234.  This
factor supports debt or is neutral at worst.

     2.   *Presence or absence of a maturity date.*

     The Loan had a set maturity date.  Ex. 2.  That date was
extended on two occasions.  Exs.17 and 37.   Thus, the Loan had a
fixed maturity date at all times.  Even the absence of a fixed
maturity date and fixed payments does not strongly favor equity.
*See Indmar Products Co., Inc. v. Commissioner of Internal Revenue*,
444 F.3d 771, 781 (6th Cir. 2006).  This factor supports debt or is
neutral at worst.

     3.   *Source of payments.*

     The payments on the Loan were not made solely from
profit.   On numerous occasions, SSW incurred debt to make the

requested payments.  Exs. 24, 26, 27, 32, 33 & 36.  The fact that payments were made from a source other than profits supports debt.  *See Indmar Products Co., Inc.,* 444 F.3d at 782 (finding advances to be debt where debtor took on additional debt to make payments).  This factor supports debt.

4.    *Right to Enforce Payment of Principal and Interest.*

As set forth above, there is ample evidence that both SS Japan and SSW intended the loan to be a binding legal obligation. This factor supports debt.

5.    *Participation in Management.*

SS Japan did participate in SSW's management.  This factor supports equity, but not strongly.  "The validity of loans even to a controlled corporation is well established."  *Bordo Products Co. v. United States*, 476 F.2d 1312, 1322-23 (Ct. Cl. 1973).

6.    *Status Equal to or Inferior to Other Creditors.*

SS Japan's Loan to SSW was not subordinated to debt from any other creditors.  This factor supports debt.

7.    *Intent of the Parties.*

SS Japan and SSW intended the Loan to be considered debt.  Fukuda Dec. at ¶ 14.  *See Bordo Products Co.*, 476 F.2d at 1324 (even if self-serving, declarations of the parties' subjective

intent "are relevant and will be considered").  This factor supports debt.

8.    *"Thin" or Inadequate Capitalization.*

At the time of the inception of the Loan, the debt to equity ratio was 2:1.  Fukuda Dec. at ¶ 6; Ex. 2.  This is a more than adequate debt-to-equity ratio.  *Bauer*, 748 F.2d at 1369 (debtor was adequately capitalized when its debt to equity ratio ranged from over 2 to 1 to 8 to 1).  This factor supports debt.

9.    *Identity of Interest Between Creditor and Stockholder.*

Here, SS Japan was both the creditor on the Loan and an indirect stockholder of SSW.  However, SS Japan was not a direct stockholder in SSW.  Thus, this factor is neutral.

10.    *Payment of Interest Only Out of "Dividend" Money.*

As set forth above under factor 3, SSW did not limit the source of its payments to operating profit.  This factor supports debt.

11.    *Ability of the Corporation to Obtain Loans from Outside Lending Institutions.*

There is no evidence on this factor in either direction. This factor is neutral.

As the court emphasized in *Bauer*, "the objective of the inquiry is not to count factors, but to evaluate them." *Bauer*, 748 F.2d at 1368. Given that numerous factors support a finding that the Loan is debt and no factors weigh strongly in favor of treating the Loan as equity, summary judgment on this issue is plainly not appropriate here, even assuming the standards from the Internal Revenue Code apply to the issue of whether the plaintiff has a "claim" under UFTA. The KG Parties' motion for partial summary judgment should be denied.

### C. THE LOAN WAS NOT CANCELLED IN 2004.

The KG Parties argue that the Loan was cancelled in 2004. As purported evidence for their contention, the KG Parties cite: (1) certain reports included in SS USA's 2004 tax return (KG Parties' Ex. 3); and (2) a 2004 financial statement and trial balance for SSW (KG Parties' Ex. 6). The KG Parties' argument is based on a complete misunderstanding of those documents.

First, the Form 5472 filed with the 2004 tax return showing no debt to SS Japan reflects nothing more than the fact that SS Japan sold all the SS USA debt (including the Loan) to South Wind in 2004. KG Parties' Ex. 3 at 256 1596-97. This transaction is reflected in the Loan Purchase Agreement attached

-30-

as KG Parties' Exhibit 4.  Similarly, the "Transferor Shareholder's Statement of Tax-Free Incorporation Transfer Pursuant to Reg. § 1.351-3" reports a transfer of accounts receivable to SS USA.  The transaction was reported in this way because SS USA's accountants did not know the full details of the South Wind transaction and it was necessary  to report some information so as to avoid recognition of taxable income by SS USA.  Griffith Dec. at ¶ 9.  Nothing in either KG Parties' Exhibit 3 or 4 show that the Loan simply disappeared or was forgiven.

Indeed, there is ample evidence that the parties involved – SS Japan, SSW, and South Wind – intended the Loan to fully survive the South Wind transaction.  South Wind and SS Japan informed Grant Thornton that the debt continued in existence and never instructed Grant Thornton to write it off.  Lee Dec. at ¶ 8; Ex. 65 at GT 037988 ("South Wind TK has purchased debt and credit from SS USA at acquisition.  Therefore balances of Account Receivable and Account Payable between SS USA and SS Japan have not left.").  Consequently, in SS USA's 2005 consolidated federal tax return, SS USA reported that it now owed a large amount of debt to South Wind.  Ex. 68 at GT 037051-52.  The Loan continues to be reflected in South Wind's financial statements and

SSW's current President confirms that there has been no assignment, forgiveness, or cancellation of the Loan to this day. Lee Dec. at ¶ 10; Ex. 77 at 260 1457 and 260 1441); Sears Dec. at ¶ 3.

Second, KG relies on the wrong documents to prove that the debt disappeared in 2004.  The SSW balance sheet and trial balance submitted as the KG Parties' Exhibit 6 came from a purchase accounting[13] financial statement consolidating SS Japan and SS USA that was subsequently and properly revised.  Lee Dec. at ¶¶ 4-8; Griffith Dec. at ¶¶ 4-6; Ex. 65 at GT 037985-87.[14] Consolidation of a creditor and a debtor's balance sheets results in the appearance that the loan has been canceled.  Lee Dec. at ¶ 6; Griffith Dec. at ¶ 5.  As revised, the final SSW balance sheet shows "total notes payable" of $37,929,117 and "accrued interest on notes payable" of $39,700,996 and the trial balance shows the same

---

[13] Purchase accounting is different than tax accounting and is used when stock of a corporation is purchased.  Griffith Dec. at ¶ 5.

[14] Counsel for SS Japan produced these documents to the KG Parties on September 6, 2005 and received the documents from SS Japan in mid-August 2005.  Melchinger Dec. at ¶ 3.  The financial statement was revised to reverse the purchase accounting adjustments on September 8, 2005.  Ex. 65 at GT 037985.  *See also* Lee Dec. at ¶ 4.

figures for "initial funding – SR NP" and "accrued interest – IC NP." Griffith Dec. at ¶ 7; Ex. 66.

There is overwhelming evidence that there was no cancellation of the Loan in 2004 arising from the South Wind transaction. At the very least, a reasonable jury could interpret the evidence this way. Thus, the KG Parties' motion for partial summary judgment should be denied.

### D.    SS JAPAN HAS STANDING TO PURSUE ITS UFTA CLAIM, DESPITE THE TRANSFER OF THE LOAN TO SOUTH WIND.

In the December 30, 2004 Supplement to Loan Purchase Agreement, SS Japan reserved its claims arising from its debts to SS USA and its subsidiaries, including the UFTA claims that were then pending in this Court. Ex. 40 at 256 0288 ("[T]he Transferor desires to sell its interest in such recovery while retaining the right and obligation, as assignor, to prosecute the Claims ....").

This reservation is sufficient to establish SS Japan's standing because an UFTA claim is severable from the debt which gives rise to the claim. *See Kathy B. Enterprises, Inc. v. United States*, 779 F.2d 1413, 1414-15 (9th Cir. 1986) (IRS could pursue state fraudulent transfer claim against transferee despite discharge

of debt in bankruptcy); *National Union Fire Insurance Co. of Pittsburgh, P.A. v. Grusky*, 763 So. 2d 1206, 1208 (Fla. App. Ct. 2000) (rejecting argument that creditor lacked standing to sue transferor under UFTA where underlying debt was discharged in bankruptcy); *Loblaw, Inc. v. Wylie*, 375 N.Y.S.2d 706, 710 (N.Y. App. Div. 1975) (creditor could maintain fraudulent conveyance claim against transferee despite settlement with underlying debtor).  The KG Parties have presented no authority to the contrary.

This rule makes perfect sense.  The UFTA plaintiff is injured at the time of the transfer because property that would have been available to satisfy the debt is gone.  A subsequent sale of, or discharge of, the underlying debt does not erase that injury; indeed the fraudulent conveyance may be the very reason the creditor is required to sell the debt in mitigation of damages or the debtor files for bankruptcy.

If - despite these authorities – this Court finds that the UFTA claim must follow the debt, partial summary judgment would nonetheless be improper because the KG Parties' objection is not

one of substantive law but rather raises the procedural issue of whether SS Japan is the real party in interest.

If necessary, South Wind should be deemed to be the assignee of both the SSW Loan and the related UFTA claim.  UFTA claims are assignable, even if the assignment occurs after the fraudulent transfer.  *See Rose Group, L.L.C. v. Miller*, 64 P.3d 573, 575 (Okla. Ct. App. 2003) (plaintiff who obtained assignment of 1993 judgments in 2001 could bring UFTA claim based on conduct occurring after efforts to collect the original judgments:  "when Assignee acquired the judgment by assignment, it became a creditor entitled to statutory creditors' remedies in its own right"); *Eli's, Inc. v. Lemen*, 591 N.W.2d 542, 550-53 (Neb. 1999) (assignment to UFTA plaintiff that occurred after alleged fraudulent transfer was valid); *Michal v. Adair*, 152 P.2d 490, 493 (Cal. App. Ct. 1944) (fraudulent conveyance claim may be assigned and "[w]hether such conveyance occurred prior or subsequent to the judgment does not affect the right of action of the assignee").  *See also TMJ Hawaii, Inc. v. Nippon Trust Bank*, 113 Hawai`i 373,

384,155 P.3d 444 (2007) (fraud claims may be assigned if they allege injuries to property as opposed to personal injuries).

As the assignor (and holder of the Loan at the time these lawsuits were initiated), SS Japan may maintain this action in its own name so long as the assignee, South Wind, ratifies the action. F.R.C.P. 17(a) ("No action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed ... for ratification of commencement of the action by ... the real party in interest.").  In the Supplement to Loan Purchase Agreement, South Wind has unambiguously ratified this action and agreed to be bound by its outcome.  Ex. 40 at 256 0289.[15]

Thus, this case may not be dismissed because SS Japan is not the real party in interest.  If any further measures to prove ratification and satisfy Rule 17 are necessary, SS Japan and South Wind are entitled to "a reasonable time ... after objection"  to

---

[15] In relevant part, the agreement states that "[t]he Transferee recognizes and agrees that it will be bound by the results obtained by the Transferor in its efforts to pursue the Claims and the Transferee waives any right to independently pursue any overlapping or duplicative action with respect to the Claims."

-36-

comply prior to dismissal.  Thus, the KG Parties' motion for partial summary judgment should be denied.

## V.    CONCLUSION

For the foregoing reasons, this Court should deny the KG Parties' Motion.

DATED:    Honolulu, Hawai`i, August 24, 2007.


/s/ Jason H. Kim
PAUL ALSTON
BRUCE H. WAKUZAWA
GLENN T. MELCHINGER
JASON H. KIM
Attorneys for Plaintiff
and Third-Party Defendants
the Sports Shinko Companies