Of Counsel:
ALSTON HUNT FLOYD & ING
Attorneys At Law
A Law Corporation

PAUL ALSTON              1126-0
BRUCE H. WAKUZAWA        4312-0
GLENN T. MELCHINGER      7135-0
JASON H. KIM             7128-0
American Savings Bank Tower
1001 Bishop Street, 18th Floor
Honolulu, Hawai`i  96813
Telephone:  (808) 524-1800
Facsimile:  (808) 524-4591
Email:  palston@ahfi.com
        bwakuzawa@ahfi.com
        gmelchinger@ahfi.com
        jkim@ahfi.com

Attorneys for Plaintiff
and Third-Party Defendants
the Sports Shinko Companies

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI`I

| | |
|---|---|
| SPORTS SHINKO CO., LTD.,<br><br>      Plaintiff,<br><br>  vs.<br><br>QK HOTEL, LLC, et al.,<br><br>      Defendants,<br><br>  and<br><br>FRANKLIN K. MUKAI, et al.,<br><br>      Third-Party<br>      Plaintiffs,<br><br>  vs.<br><br>SPORTS SHINKO (USA) CO., LTD.,<br>et al.,<br><br>      Third-Party<br>      Defendants, | CV 04-00124 BMK<br>CV 04-00127 BMK<br><br>CONSOLIDATED CASES<br><br>**PLAINTIFF'S SURREPLY MEMORANDUM IN OPPOSITION TO THE KG PARTIES MOTION FOR PARTIAL SUMMARY JUDGMENT, FILED MAY 10, 2007; SECOND DECLARATION OF DOREEN GRIFFITH;** CERTIFICATE OF SERVICE<br><br>DATE:    November 16, 2007<br>TIME:    2:30 p.m.<br>JUDGE:   Barry M. Kurren |

```
                                          )
      and                                 )
                                          )
SPORTS SHINKO (HAWAII) CO.,               )
LTD., et al.,                             )
                                          )
      Third-Party Defendants/             )
      Counterclaimants,                   )
                                          )
      vs.                                 )
                                          )
QK HOTEL, LLC, et al.,                    )
                                          )
      Third-Party Counterclaim            )
      Defendants.                         )
                                          )
AND CONSOLIDATED CASES                    )
_____ )
```

**PLAINTIFF'S SURREPLY MEMORANDUM IN OPPOSITION TO
THE KG PARTIES' MOTION FOR PARTIAL SUMMARY JUDGMENT,
FILED MAY 10, 2007**

**I.  INTRODUCTION**

Plaintiff Sports Shinko Co., Ltd. ("SS Japan") files this surreply memorandum as allowed by the Stipulation entered November 2, 2007 and *Provenz v. Miller*, 95 F.3d 1376, 1381-82 (9th Cir. 1996) (non-moving party must be given an opportunity to respond to new evidence raised in a reply memorandum supporting summary judgment motion).

Defendants KG Parties' Reply Memorandum ("Reply") is in substance an entirely new motion for partial summary judgment, but the new arguments it improperly raises[1] fare no better than the arguments the KG Parties have already been forced to abandon. On May 10, 2007, the KG Parties filed their Motion for Partial Summary Judgment ("Motion"), arguing that there is no genuine issue of material fact that: (1) at the time of the transfer, SS Japan had no enforceable debt against Sports Shinko Waikiki Corp. ("SSW"); and (2) subsequent to the transfer, as part of a corporate reorganization of SS Japan in 2004, the SS Japan /SSW debt was forgiven or cancelled as demonstrated, in part, by a 2004 SSW balance sheet.

In its opposition, filed August 24, 2007, SS Japan proved (1) that there was a debt between SS Japan and SSW as of 2002 (when the properties at issue here were fraudulently transferred) arising from a ¥ 10 billion loan that SS Japan had provided SSW for the purchase of two hotels in 1990 ("Loan"); and

---

[1] L.R. 7.4 ***requires*** the court to disregard arguments raised for the first time in the reply.

(2) that the KG Parties' cancellation argument relied on a subsequently-revised balance sheet. The KG Parties have now shifted course, expressly abandoning their first argument and substantially changing their second argument to focus on carry-over net operating losses ("NOLs") claimed by Sports Shinko (USA) Co. Ltd. ("SS USA"), a parent company of SSW. The KG Parties argue, based upon their *ipse dixit* and with no legal support, that taking those NOLs was fatal to the continued validity of the Loan. The KG Parties even contend that SS USA has either canceled the Loan or committed tax fraud.

The KG Parties have spun elaborate theories about net operating losses and tax fraud while studiously avoiding the critical issue for this Motion: whether they have completely eliminated all **genuine issues of fact** as to whether SS Japan (or its successor in interest, South Wind) and SSW forgave or cancelled the Loan. What the KG Parties also ignore is that tax returns and accounting records are at best circumstantial evidence of intent: they are far from dispositive. *See Kritt v. Kritt*, 190 B.R. 382, 388 (Bankr. 9th Cir. 1995); *Long v. Turner*, 134 F.3d 312, 317 (5th Cir. 1998).

As demonstrated below, the only way the KG Parties can win summary judgment is if the Court (1) improperly gives them the benefit of every inference; and (2) disregards all evidence presented by SS Japan directly contradicting their theory, including declarations that state that the Loan has not been cancelled or forgiven. This is, of course, not the proper practice on summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513 (1986) (clear and convincing standard "by no means authorizes trial on affidavits"

because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge"). Thus, the KG Parties' Motion, as re-framed by their Reply, must be denied.

**II. ARGUMENT**

    **A. There is No Evidence that the Valuation of SS USA is Inconsistent with the Continued Validity of the Intercompany Debt.**

The KG Parties claim that the valuation of SS USA at $9 million, the face value of promissory notes held by its subsidiaries, ***necessarily*** means that the Loan (and other intercompany debt between SS USA's subsidiaries and SS Japan) was cancelled, forgiven, or converted to equity. Reply at 3-7. The KG Parties do not cite any law that supports this claim; rather they rely on the declaration of their purported expert, Roger Epstein ("Epstein Dec."). Mr. Epstein is a tax attorney and is not an expert on valuation.

The Epstein Declaration is the subject of a separate motion to strike. However, even if it were admissible and even if it did establish any basis for Mr. Epstein to testify as a valuation expert, it fails to prove the required link between the SS USA valuation and the alleged cancellation of the Loan. Section 382(b) of the Internal Revenue Code provides that, upon a change in control, a corporation's ability to use pre-change net operating loss is limited by "the value of the old loss corporation," "multiplied by the long-term tax-exempt rate." "Value of old loss corporation" in turn is defined as "the value of the stock of such corporation ... immediately before the ownership change." 26 U.S.C. § 382(e). "Value" is defined as "fair market value." 26 U.S.C. § 382(k)(5).

The Epstein Declaration provides no evidence of the fair market value of SS USA's stock. Rather, Mr. Epstein simply provides the "book value" or balance sheet value of SS USA – its assets minus its liabilities. Epstein Dec. at 9-10, ¶ 6.[2] The fair market value of stock is not determined by the book value. *Davis v. Miller*, 7 P.3d 1223, 1233 (Kan. 2000)("[B]ook value ... is not intended to represent the fair market value of a corporation."); *Nelson v. Jones*, 781 P.2d 964, 970 (Alaska 1989) (expert's testimony on book value of corporation was not relevant to fair market value of that corporation). Rather it is "the price at which such property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell, and both having reasonable knowledge of relevant facts." *Gross v. Commissioner of Internal Revenue*, 272 F.3d 333 (6th Cir. 2001). Valuing the stock of a closely-held corporation "incorporates a number of alternative methods of valuation" and involves a "complex factual inquiry." *Id.*

The Epstein Declaration utterly lacks any explanation of methods for calculating the fair market value of a corporation or any inquiry into factors other than assets and liabilities.

---

[2] Mr. Epstein has not even performed his simplistic value calculation correctly. SS USA is a party to pending lawsuits that were previously before this Court (the dismissals of which are on appeal) and its subsidiaries raise third-party counterclaims in this action. "[U]nadjudicated claims held by a corporation are among its assets and may materially affect the value of the corporation's stock." *Ambassador Hotel Co., Ltd. v. Wei-Chuan Investment*, 189 F.3d 1017, 1030 (9th Cir. 1999). Mr. Epstein's omission of this asset is yet another indication of the lack of proof supporting the KG Parties' tax fraud theory as well as the uselessness of his opinion.

It falls far short of proving any inconsistency between valuing the SS USA stock at $9 million and the validity of the Loan.

**B.    The KG Parties' Assertion that SS Japan Has Either Cancelled the Loan or Committed Tax Fraud is Illogical**.

In arguing that "[e]ither they [sic] ... committed tax fraud and is a debtor, or it has not committed tax fraud, is not a debtor, and cannot pursue the fraudulent transfer claims against KG," Reply at 2, the KG Parties have set up a false dichotomy, for at least two reasons. First, ***even if*** the tax returns and Form 5472 were interpreted as making any representation about the intercompany debt, statements in a tax return are not binding in litigation, regardless of whether the taxpayer obtained a benefit from those statements.[3] *See Kritt*, 190 B.R. at 388 (claimant was not estopped from claiming that payments from ex-husband were alimony for purposes of bankruptcy proceeding even though she had not listed them as alimony income in her tax returns). Second, the KG Parties' theory does not allow for the possibility that, ***even if*** the valuation of SS USA

---

[3] Although the KG Parties bandy about the term tax fraud, they fail to cite any statutes or cases relevant to that charge. If they had, it would be apparent that their allegations are empty bluster. A violation for attempt to evade income tax (26 U.S.C. § 7201) or for making a materially false statement on a tax return (26 U.S.C. § 7206(1)) requires proof of, among other things, willfulness. *United States v. Bishop*, 291 F.3d 1100, 1106 (9th Cir. 2002). Here, as shown above, the KG Parties have not even proved there was a material error or misstatement on the SS USA tax returns, much less that there was any ***willful*** evasion or misstatement. Furthermore, the valuation of SS USA – the issue on which the tax fraud allegations hinge – was calculated by SS USA's accountants at Grant Thornton. *See* attached Second Declaration of Doreen Griffith ("2nd Griffith Dec.") at ¶ 8. This by itself is sufficient to prove an absence of willfulness. *Bishop*, 291 F.3d at 1107 (good faith reliance on a qualified accountant is a defense to tax fraud).

was inconsistent with the continued validity of the intercompany debt, that valuation was simply the result of error as opposed to a deliberate decision to trade the debt for the tax benefits.

The KG Parties' allegations regarding (1) the 2004 Section 1.351-3 report 5472, KG Ex. 3 at 256 1599, and (2) failure to file a 5472 form in that same year indicating the transfer of the Loan (and other debt) to South Wind have even less merit.[4]  Ms. Griffith has already explained that the section 1.351-3 report for 2004 contained incomplete information and the failure to report the South Wind transaction in 2004 was corrected the next year.  Griffith Dec. at ¶ 9; Ex. 68 at GT 037051-52.  Filing informational tax reports that contain incomplete information or filing them late is not tax fraud.[5]

Because estoppel does not apply and because the KG Parties have not disproved the possibility of error, the false dichotomy they present is not enough to satisfy their burden on summary judgment.

---

[4] The KG Parties seem to believe that SS Japan is claiming that the 5472 report for 2004 showing that SS Japan was no longer a creditor of SS USA was a mistake.  Reply at 8, KG Ex. 3 at 256 1596-97.  To the contrary, that report was correct.  It merely reflected the transfer of the debt formerly held by SS Japan to South Wind.  The error was in not filing a complementary 5472 report in that same year showing that South Wind was the new creditor.

[5] As the KG Parties point out, the 2005 Form 5472 for South Wind contained another error.  It listed South Wind as the debtor rather than the creditor.  This was clearly the result of a mistake – the form was intended to reflect the transfer of the debt formerly held by SS Japan to South Wind.  2nd Griffith Dec. at ¶ 14.  There is no evidence of any debt in excess of $100 million owed to SS USA from South Wind.  Indeed, the existence of such a debt would contradict the KG Parties' theory that SS USA would have zero value for purposes of the NOL carry-over if the intercompany debt were taken into account.  Again, this is far from evidence of any tax fraud.

**C.    There is no Evidence of a "Deliberate and Informed Decision" to Trade the Intercompany Loans for Tax Benefits.**

The KG Parties claim that "[a]fter identifying the [NOL carry-over] problem, Goldman Sachs made a deliberate and informed decision to eliminate all the debt owed by SS USA as a contribution of capital." Reply at 4. They fail, however, to cite to any evidence to support this bold assertion. In fact, even the evidence submitted by the KG Parties shows that there was no such "deliberate and informed" decision.

The limitation on NOL carry-overs as a result of the South Wind acquisition was first discussed in November, 2004. KG Ex. 16. Steven Iwamura believed that "the value of SS USA might have been zero, if one were to take into account all the debt owed by SS-USA to the parent company." *Id.* Doreen Griffith then emailed her associates, tentatively agreeing with Mr. Iwamura but asking her associate to "double check on the Section 382 rules to get comfort with my analysis." *Id.* There is no discussion about the possibility of canceling the debt in order to benefit from the NOLs. To the contrary, Mr. Iwamura accepts that, under his analysis, SS USA will not be able to claim them. *Id.*

The NOL issue is raised again in September 2005, in the course of preparing 2004 tax returns. KG Ex. 15. Again, there is no express statement by anyone indicating any intent to trade the intercompany debt for the NOLs. *Id.* Rather, it is Grant Thornton that suggests valuing SS USA at $9 million: "We have assumed the fair market value of the corporation is $9 million (the value of the Kobayashi Notes)." *Id.* at GT 03796. As Ms. Griffith's Second Declaration confirms, this method of

valuation was suggested by Grant Thornton, with no input from SS Japan, South Wind, or Goldman Sachs. 2nd Griffith Dec. at ¶ 8.

Of equal significance is the fact that the Grant Thornton valuation did not assume or require that the intercompany debts were no longer valid. *Id.* at ¶ 9. And Grant Thornton was never instructed that the debts had been "eliminated" for the purpose of claiming NOLs. *Id.* at ¶ 10. To the contrary, Grant Thornton was specifically informed that the debts were still valid. SS Ex. 65 at GT 037988 ("[B]alances of Account Receivable and Account Payable between SS USA and SS Japan have not left.")

The KG Parties can only establish the parties' intent to cancel the debt by *inferring* that SS Japan and South Wind made a conscious choice to abandon the intercompany debt in favor of the tax benefits from the NOLs from the facts that (1) the income tax returns were signed by SS USA and (2) a year before, there had been a discussion about the relationship between the intercompany debt and the NOLs. But this is far from the only available inference. It could also be reasonably inferred (and is in fact the case) that Grant Thornton conducted an independent analysis of the NOL issue and concluded that there was no conflict between the existence of the intercompany debt and the acceptance of the NOL benefits.

Indeed, the KG Parties' inference is completely unreasonable. SS Japan filed these lawsuits, predicated on the Loan, on February 20, 2004. The KG Parties contend that the Loan and other intercompany debt were cancelled as part of the South Wind acquisition on February 24, 2004. It would make no sense for SS Japan or South Wind to take action that would result in

impairing their lawsuits so soon after filing them. The KG Parties' theory is especially improbable given the trivial financial benefit from the NOLs. *See* 2nd Griffith Dec. at ¶ 12 (carry-over NOLs did not result in any federal tax savings) and Epstein Dec. at 3 (Hawai`i tax savings of about $40,000 combined for 2004 and 2005).

Even if the SS USA tax returns could **only** be interpreted as making a representation that the Loan had been cancelled, the tax returns would nonetheless be insufficient to support summary judgment in the face of contrary evidence, such as the declarations discussed below. Tax filings are, at best, evidence of intent and are not dispositive. *See Kritt*, 190 B.R. at 388 ("characterization of the transaction on their tax returns is merely evidence of their intent regarding the transaction"); *Long*, 134 F.3d at 316 (trial court erred in finding debt discharged based on creditor's filing of 1099A with IRS showing discharge: "[w]hile the issuance of a 1099A form may reflect an intent in some sense to forgive the debt, it does not on its own have the legal effect of releasing or discharging the debt"). As shown below, there is ample contrary evidence of no intent to forgive or cancel the debt.

> **D. This Court May Not Disregard the Declarations Offered by SS Japan in Opposition to Summary Judgment.**

The KG Parties ask this Court to disregard the Declarations of Stephen Sears (for SSW), Tadashi Yoshida (for SS Japan), and HungKe Lee (for South Wind) because they allegedly conflict with the sworn tax returns and are therefore "shams." As shown above, however, there is no conflict between any of their statements and anything that is stated or can even be

fairly implied from the tax returns.  And of the three, only Mr. Sears signed any of the tax returns.

Furthermore, the Ninth Circuit imposes a high standard for disregarding an affidavit as a sham: even in the face of a declaration that "flatly contradicts" other testimony, the court may only disregard it if is actually a "sham," *i.e.* if it finds that the inconsistency was not the result of "an honest discrepancy, a mistake, or the result of newly-discovered evidence."  *Kennedy v. Allied Mutual Insurance Co.*, 952 F.2d 262, 266-67 (9th Cir. 1991).  Here, any perceived inconsistency between the declarations and the tax returns may simply be the result of error in the tax returns.  Thus, this Court cannot disregard the declarations.

### 1. Sears Declaration (SSW)

As to the Sears Declaration, the KG Parties make the strange claim that a debtor is incompetent to testify as to whether the debt has been forgiven or canceled.  Although a debtor may not unilaterally cancel a debt, the debtor would certainly be expected to know whether such cancellation had occurred.  The KG Parties also complain that Mr. Sears does not say that SSW carries the debt on its books.  For a debt to be valid, however, there is no requirement that it be accounted for in any particular way.  *See Long*, 134 F.3d at 317-18.

Finally, the KG Parties emphasize the fact that he (and the other declarants) uses the phrase "assigned, forgiven, or otherwise cancelled" but does not use the word "transferred."  This is an unimportant distinction.  "Transfer" is synonymous with "assign."  *See* Roget's New Millenium Thesaurus, First Edition.  Furthermore, the effect of transferring a debt to

equity is, except for accounting purposes, the same as canceling it: the debt is no longer payable.  In fact, Mr. Sears' failure to distinguish between "transfer" and equivalent terms parallels that of the KG Parties' alleged tax expert.  *See* Epstein Dec. at 3 (using "elimination," as opposed to "transfer," to describe alleged disposition of debt by SS Japan), and at 8 (using "extinguished" instead of "transferred").  The KG Parties' own counsel, in the same brief in which he nitpicks Mr. Sears' word choice, is not even consistent in the usage of "transfer" as opposed to equivalent terms.  Reply at 1 (debt was "extinguished") and at 4 (debt was "eliminated").

### 2.   **Yoshida Declaration (SS Japan)**

The KG Parties ask this Court to disregard Mr. Yoshida's declaration based on the vague statement that accounting standards differ between countries.  While that may generally be true, the KG Parties have presented no specific evidence that a debt according to Japanese accounting standards is not a debt according to American accounting standards.  The KG Parties' statement that "what controls .. are U.S. tax returns and books of account maintained consistent with U.S. law" is not supported by any precedent.  Reply at 13.  There is also no precedent for requiring Mr. Yoshida to specifically reference U.S. law in his declaration.  Again, the critical issue is intent and there is no reason to believe that U.S. accounting standards are more probative of intent than those of other countries.

### 3.   **Lee Declaration (South Wind)**

Most egregiously of all, the KG Parties transparently distort the meaning of Mr. Lee's declaration.  In connection with his discussion of purchase accounting, Mr. Lee does state that the loans "were" reduced to zero on SS USA's books but also

states that the SS USA financial statements were later restated to reflect the outstanding intercompany loans. Lee Dec. at ¶¶ 6 & 9. Again, the KG Parties confuse **accounting** conventions with the **legal** issue of whether the Loan was actually forgiven. *See Long*, 134 F.3d at 317 (fact that creditor wrote off debt on its books did not constitute a discharge of indebtedness: it was merely the result of "an accounting practice or convention").

The KG Parties ask this Court to interpret the declarations in as narrow and strained a way as possible. They also argue that the declarations are "contradicted by the balance sheets recently produced by SS" as well as other documentary evidence. Reply at 12. It is clear that the KG Parties' argument relies – contrary to the standards governing summary judgment – on this Court drawing inferences in their favor and judging the credibility of the declarants. *See Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513; *Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999) (affidavit that directly asserts a material fact in dispute bars summary judgment even if it is contradicted by unsworn statements in business records). This Court should decline the KG Parties' invitation to conduct a trial on the papers and leave the issue of whether the Loan was canceled to the jury.

### III. CONCLUSION

For the foregoing reasons, this Court should deny the KG Parties' Motion.

DATED:    Honolulu, Hawai`i, November 9, 2007.

```
                              /s/ Jason H. Kim
                              PAUL ALSTON
                              BRUCE H. WAKUZAWA
                              GLENN T. MELCHINGER
                              JASON H. KIM
                              Attorneys for Plaintiff
                              and Third-Party Defendants
                              the Sports Shinko Companies
```