Of Counsel:
ALSTON HUNT FLOYD & ING
Attorneys At Law
A Law Corporation

PAUL ALSTON                1126-0
BRUCE H. WAKUZAWA          4312-0
GLENN T. MELCHINGER        7135-0
JASON H. KIM               7128-0
American Savings Bank Tower
1001 Bishop Street, 18th Floor
Honolulu, Hawai'i 96813
Telephone: (808) 524-1800
Facsimile: (808) 524-4591
Email: palston@ahfi.com
       bwakuzawa@ahfi.com
       gmelchinger@ahfi.com
       jkim@ahfi.com

Attorneys for Plaintiff
and Third-Party Defendants
the Sports Shinko Companies

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| SPORTS SHINKO CO., LTD., <br><br> Plaintiff, <br><br> vs. <br><br> QK HOTEL, LLC, et al., <br><br> Defendants, <br> and <br><br> FRANKLIN K. MUKAI, et al., <br><br> Third-Party Plaintiffs, <br><br> vs. <br><br> SPORTS SHINKO (USA) CO., LTD., et al., | CV 04-00124 BMK <br> CV 04-00127 BMK <br><br> CONSOLIDATED CASES <br><br> **SECOND DECLARATION OF DOREEN GRIFFITH** |

661704 / 6850-5



|  |  |
|---|---|
| Third-Party Defendants, | ) ) ) |
| and | ) ) |
| SPORTS SHINKO (HAWAII) CO., LTD., et al., | ) ) ) ) |
| Third-Party Defendants/ Counterclaimants, | ) ) ) ) |
| vs. | ) ) |
| QK HOTEL, LLC, et al., | ) ) ) |
| Third-Party Counterclaim Defendants. | ) ) ) |
| AND CONSOLIDATED CASES | ) ) ) |

## SECOND DECLARATION OF DOREEN GRIFFITH

1. I am a partner at the Honolulu office of Grant Thornton LLP. I was the person responsible for preparation of consolidated federal tax returns for Sports Shinko (USA), Co. Ltd. ("SS USA") and its subsidiaries for the 2004, 2005, and 2006 tax years and the consolidated Hawaii tax returns for Sports Shinko (Hawaii) Co., Ltd. for those same years. I make this declaration based on personal knowledge, and I am competent to testify to the matters set forth below.

2. The issue of whether SS USA could continue to claim net operating losses accrued prior to the change of control that occurred in 2004 was first raised in November 2004, in connection with a request by the client to analyze certain tax consequences of the change in control. This discussion had little to do with the

intercompany debt between SS USA and its former parent company, Sports Shinko Co., Ltd. ("SS Japan").

3. For these federal income tax purposes, the only relevance of the intercompany debt issue was its effect on the value of the stock of SS USA. It was my understanding at the time, and continues to be my understanding, that the amount of net operating loss carryover SS USA is allowed to claim after the change in control is limited by the fair market value of SS USA's stock immediately prior to the change in control. The discussion of the valuation issue is reflected in the email exchange attached as Exhibit 16 to the KG Parties' Reply Memorandum.

4. The issue of SS USA's valuation arose again in September 2005, when Grant Thornton was preparing SS USA's consolidated income tax returns for 2004.

5. Based on the information Grant Thornton was provided, it was difficult to calculate with precision the fair market value of the SS USA stock at the time of the change in control in February 2004. Typically, a change in control involves the purchase of the stock, in which case the fair market value is apparent. In this case, however, the change in control was indirect as it was a consequence of South Wind's acquisition of SS Japan. Because we were unaware of any allocation of the acquisition price between SS USA and SS Japan's other assets, we had no direct information about the fair market value of the SS USA stock immediately prior to the South Wind acquisition.

6. For preparation of the 2004 income tax return, I, along with various tax professionals working under my direction, estimated the fair market value for SS USA's stock at the relevant time to be $9 million, the face amount of the promissory notes held by various SS USA subsidiaries.

7. I understand fair market value to be defined as the price for something that a buyer and seller willingly agree to pay when neither party is under undue pressure to complete the transaction. Based on my team's experience with corporate acquisitions, intercompany debt is typically excluded from fair market value calculations since such debt is often paid off or eliminated as part of the acquisition.

8. The method of valuing SS USA's stock for income tax purposes based on the value of its assets (i.e. the promissory notes) with no consideration of its intercompany debt was suggested by Grant Thornton and not by anyone associated with SS USA, South Wind, or Goldman Sachs. On September 5, 2005 (and as shown in Exhibit 65), I corresponded with representatives of SS USA on the estimated fair market value for income tax filing purposes. While those associated with SS USA, South Wind, or Goldman Sachs did not specifically approve of or agreed with this method of valuation in this email chain, the President of SS USA signed the 2004 federal tax return.

9. Grant Thornton's valuation of the stock of SS USA did not presume or require that the intercompany debt between SS USA and SS Japan (which was known later to be transferred to South Wind) to be cancelled, forgiven, or converted to

equity. At the time the fair market value was estimated for income tax return preparation purposes, the information supplied to us was limited.

11. I never received any instructions from anyone associated with SS USA, South Wind, or Goldman Sachs to eliminate SS USA's intercompany debt for the purpose of preserving accumulated net operating losses. Furthermore, I am not aware of any deliberate decision by anyone associated with SS USA, South Wind, or Goldman Sachs to eliminate the intercompany debt for this or any other purposes.

11. The communications and calculations regarding estimated fair market value of the SS USA stock was driven solely by the net operating loss limitations and statements required for the filing of the 2004 income tax return. Without this limitation and disclosure, we would not have dealt with estimated fair market value.

12. Based on my knowledge of SS USA's 2004 through 2006 federal income tax returns, I conclude that SS USA did not avoid paying any federal taxes as a result of using the pre-South Wind net operating loss carryovers. In 2004, SS USA had a loss (prior to any net operating loss deductions) of $3,465,428. KG Exhibit 3 at 256 1550, line 28. The 2004 net operating loss allocated to the post-change in ownership period was $2,943,240. This post-change loss was greater than the income for 2005 and 2006 combined. KG Exhibit 11A at GT 037006, line 28 (2005 taxable income of $ 787,621) and KG Exhibit 12A at 261 1152, line 28 (2006 taxable income of $36,562).

13. In other words, even apart from the net operating losses carried over from before the South Wind acquisition, SS USA would not have paid any regular federal income taxes from 2004 through 2006. The older net operating losses were

used first, consistent with the net operating loss ordering rules. Thus, SS USA calculated its taxable income using the oldest available net operating losses even when more recent losses were available to offset any taxable income. I understand that using older net operating losses first is required by the Regulations issued by the Treasury Department.

14. In reviewing SS USA's Form 5472 filed as part of the 2005 federal tax return (Exhibit 68 to my previous declaration at GT 037052), it appears that the debt was incorrectly placed on the form as debt from South Wind to SS USA, instead of as debt from SS USA to South Wind. The debt of $103,676,877 should have been reflected in box 7b. In completing this form, the intent was to show that South Wind had become the creditor as to the debts formerly owed by SS USA and its subsidiaries to SS Japan. I am not aware of any debt owed from South Wind to SS USA in the amount of over $100 million.

*I swear that the foregoing is true under penalties of perjury of the United States of America.*

EXECUTED: Honolulu, Hawai'i, November 8, 2007.

*Doreen Griffith*
DOREEN GRIFFITH