IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI‘I

| | |
|---|---|
| SPORTS SHINKO CO., LTD., | ) CV 04-00124 BMK |
| | ) CV 04-00127 BMK |
| Plaintiff, | ) |
| | ) CONSOLIDATED CASES |
| vs. | ) |
| | ) **MEMORANDUM IN** |
| QK HOTEL, LLC, et al., | ) **SUPPORT OF MOTION** |
| | ) |
| Defendants, | ) |
| | ) |
| and | ) |
| | ) |
| FRANKLIN K. MUKAI, et al., | ) |
| | ) |
| Third-Party Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) |
| SPORTS SHINKO (USA) CO., | ) |
| LTD., et al., | ) |
| | ) |
| Third-Party | ) |
| Defendants, | ) |
| | ) |
| and | ) |
| | ) |
| SPORTS SHINKO (HAWAII) CO., | ) |
| LTD., et al., | ) |
| | ) |
| Third-Party Defendants/ | ) |
| Counterclaimants, | ) |
| | ) |
| vs. | ) |

|                                      |     |
| ------------------------------------ | --- |
|                                      | )   |
| QK HOTEL, LLC, et al.,               | )   |
|                                      | )   |
|     Third-Party Counterclaim | ) |
|     Defendants.  | )   |
|                                      | )   |
| AND CONSOLIDATED CASES               | )   |
|                                      | )   |

**MEMORANDUM IN SUPPORT OF MOTION**

## I.    INTRODUCTION

This motion seeks partial summary judgment regarding a simple but important issue.  Under Haw. Rev. Stat. ("HRS") § 651C-4(a)(1) a transfer is fraudulent if the transferor actually intends to hinder or delay any creditor.  Here, there is indisputable proof that the disloyal management of the Sports Shinko ("SS") transferor companies intended to do precisely that when they caused the transfers to the KG Defendants ("KG") that spawned these cases.

Deciding this issue now will streamline the remaining proceedings.  Once this issue is resolved, the only elements of the Plaintiff/creditors' § 4(a) claim that remain for trial will be whether the Defendant/transferees purchased (1) in good faith, and (2) for

reasonable value.  If either one is untrue, the Plaintiffs have proven

that the transfers violated § 4(a)(1).  HRS § 651C-8.

## II.    UNDISPUTED MATERIAL FACTS

Prior to the disputed transfers, the Sports Shinko

companies were controlled by members of the Kinoshita family.

Ex. "1".  The patriarch, Toshio, was the founder.  He also served as

president and director of the parent company, Sports Shinko Co.,

Ltd. ("SSJ"), and its direct and indirect subsidiaries in Hawai`i that

transferred their properties to KG in early 2002 (the "SS HI

Companies").[1]  *Id.*  His son, Satoshi, was the vice president of the

SS Hawaii Companies.  *Id.*

On January 15, 2002, Satoshi signed a Purchase and

Sale Agreement (the "PSA") under which the SS HI companies

agreed to sell two hotels (the "Hotels"), three golf courses, and a

sewage treatment plant--substantially all of the companies' income

producing assets (the "Assets")--to the Kobayashi Group, LLC

---

[1] The SS HI Companies are Sports Shinko (Hawaii) Co., Ltd., Sports Shinko (Mililani) Co., Ltd. ("SSM"), Sports Shinko (Kauai) Co., Ltd. ("SSK"), Sports Shinko (Pukalani) Co., Ltd. ("SSP"), and Sports Shinko (Waikiki) Corporation ("SSW").

entities (collectively, "KG") for a total of $22 million.[2]  Initially, the

sale was set to close less than two weeks later, on January 28,

2002.  Later, the closing was accelerated to January 25 because the

Kinoshitas learned that SSJ was about to be put into bankruptcy in

Japan.[3]

Shortly after the sale closed, Satoshi explained to the

Japanese bankruptcy trustee why the Assets were sold so

hurriedly:

> Although we were looking to sell for as high a
> price as possible, **concern had surfaced that
> the Hawaii facilities might be attached in
> connection with the bankruptcy of the
> Grenelefe Resort [owned by an SS
> subsidiary]** in Florida.  The President [Toshio]
> explained that **if the facilities were attached,
> no funds would be able to be repatriated to
> Japan,** but that we would be able to repatriate
> funds if the properties were sold, **so it was
> therefore necessary from Sports Shinko's**

---

[2] *See* Ex. "2".  This was the nominal price for all Sports Shinko's
properties.  In actuality, KG paid only about $2.3 million in cash, gave $9
million in *unsecured* promissory notes, and assumed an approximately $10.6
million Bank of Hawai mortgage, without obtaining a release of SSJ's guarantor
obligations.  *Id.*  SSW transferred both the Ocean Resort Hotel Waikiki and
Queen Kapiolani Hotel (the "Hotels") that are at issue in these cases.  The
transfers of the golf course properties are the subject of separate lawsuits in
the Hawai`i Circuit Courts.

[3] *See* Exs. "3", "4" at ¶ 23, and "K-1" at 15.

> **standpoint that all of the facilities be sold
> off immediately.**

Ex. "K-1" at 14 (emphasis added).[4]

Just prior to the time the Assets were sold to KG for $22 million with little cash paid at the closing, two of the golf courses alone were being marketed for a total listed price of $71 million[5] and Satoshi had already signed an offer to sell one of the Assets for $10 million cash.[6]  Three days later, Satoshi agreed to sell that same asset to KG for only $3 million.[7]

Not all of the sales proceeds were going to go to Japan. In 2000, Toshio and Satoshi had formed a company called Resort

---

[4] Indeed, the main SS properties, the La Costa Resort and Spa, had also been sold on November 15, 2001.  Ex. "K-1" at 13.

[5] The Kiahuna Country Club was listed for $42,000,000.00.  Pukalani Country Club was listed for $29,000,000.00.  Ex. "5".

[6] Ex. "6" and "K-1" at 13.

[7] The other buyer, David Resnick, brought suit in January 29, 2002 (Civil No. 02-cv-00062 SPK/BMK) and eventually obtained the property from KG for $9.85 million, which was applied to reduce the debt KG had assumed. Melchinger Decl. at ¶ 19.

Management Services (Hawaii), Inc. ("RMS"). Toshio's former personal secretary, Yasuo Nishida, was RMS's sole shareholder, director and officer. Exs. "8","9" & "13" at 145:13 - 146:2. In August 2000, RMS was given contracts to "manage" the Hotels and golf courses. Ex. "10".

Under these contracts, the SS HI Companies were required to pay termination fees totaling $3.5 million to RMS if-as occurred in the sale to KG–the properties were sold and the buyer chose not to assume the RMS's management agreements. Ex. "10".[8]

RMS was not, however, really Mr. Nishida's company. Under an agreement prepared by Defendant Frank Mukai's law

---

[8] Five days after the KG closing, Satoshi deeded a Maui residence to RMS ostensibly in partial payment of $200,000 of the termination fees allegedly owed to RMS under the Management Agreements. Ex. "11". The SSJ Bankruptcy Trustee recovered that Maui residence in settlement of fraudulent transfer claims against RMS. *Sports Shinko (USA) Co., Ltd. et al. vs. Resort Management Services (Hawaii), Inc.*; Civil No. 02-1-2766-11 (EEH). Melchinger Decl. at ¶ 20.

firm, Satoshi and his two brothers held an option to buy all of RMS's stock from Nishida for only $1,500.  Ex. "9".[9]  Satoshi has admitted that Toshio sought to place assets in RMS to "protect" them from Japanese creditors and the RCC.  Exs. "12" & "13" at 152:5-15.[10]

## III.  ARGUMENT

While intent is normally a question of fact, the Kinoshitas' own admissions provide direct and incontrovertible

---

[9] Defendant Frank Mukai's law firm prepared the Option.  When he did so, he advised the Kinoshitas that it would be "safer" to hold off on exercising the Option until the situation with the Japan lenders and RCC had "settle[d] down a bit."  Ex. "14".  In response, Satoshi told Defendant Mukai that he would "wait for a couple of years" to exercise the Option until SSJ establishes a "peaceful relation with banks and RCC."  Ex. "15".

[10] Satoshi has testified that Defendant Mukai told him his father was "extremely happy" because it "had made it difficult for [the] RCC to lien the Hawaii business facilities, and [he] apparently asked [counsel] to work on establishing some sort of similar arrangement to the RMS arrangement in Japan."  Ex. "13" at 152:10.

evidence that they intended to hinder, delay, or defraud creditors, justifying summary judgment here.[11]

Section 651C-4(a)(1) of the HRS provides that a transfer of property is avoidable if it was made with "actual intent to hinder, delay, or defraud any creditor."  HRS § 651C-4(a)(1).  Actual intent may be shown by direct proof or by circumstantial evidence from which actual intent may be inferred.  *Warfield v. Alaniz*, 453 F. Supp. 2d 1118, 1136 (D. Ariz. 2006).  If fraudulent intent is proved, then a transferee may only escape liability by establishing that it "took in good faith and for a reasonably equivalent value."  HRS § 651C-8(a).[12]

---

[11]  *See In re Beverly*, 374 B.R. 221, 238-39 (9th Cir. BAP 2007)(reversing and holding as a matter of law that the debtor acted with intent to hinder, delay, or defraud); *United States v. Gerads*, 1993 WL 114411 at *4 (D. Minn. Jan. 15, 1993)("Given Gregory's testimony that the transfers were intended 'to forestall or prevent the loss of the property' to the government..., the Court holds [as a matter of law] that the property was transferred with actual intent to defraud creditors, and that the transfers must be set aside as fraudulent...."); *Ryan v. Kontrick*, 2001 WL 630676 (N.D. Ill. 2001)(in a fraudulent transfer action, summary judgment was granted for the plaintiff when the debtor admitted that "he transferred the bank account to Carolyn to prevent his creditors from attaching the funds.").  *Courtesy copies of all unreported cases will be provided to the Court with the courtesy copies of exhibits.*

[12]  "Good faith" and "reasonably equivalent value" are not at issue in this Motion.  *See DiSandro v. Makahuena Corp.*, 588 F. Supp. 889, 892 (D. Haw. 1984)(A party may move for partial summary judgment to determine issues even if they are not dispositive of an entire claim.)*; Barnes v. United States*, No.

> The focus is on the intent of the transferor. While intent to defraud is the usual rubric, the intended effect of the transfer need only be hindrance of a creditor or delay of a creditor. Any of the three -- intent to hinder, intent to delay, or intent to defraud -- qualifies a transfer for UFTA avoidance, even if adequate consideration is paid by someone other than a good faith transferee for reasonably equivalent value.

*Wolkowitz v. Beverly*, 374 B.R. 221, 235-36 (9th Cir. B.A.P. 2007).

*See also In re Bernard*, 96 F.3d 1279, 1281 (9th Cir. 1996) (interpreting identical language in 11 U.S.C. § 727(a)(2)(A); "[d]enial of discharge ... need not rest on a finding of intent to defraud. Intent to hinder or delay is sufficient.").

**A.    Summary Judgment Should Be Granted Because The Kinoshitas' Own Documents And Testimony Prove of The Transferor's Intent To Hinder or Delay Creditors.**

Summary judgment is proper when there is clear and direct proof of fraudulent intent. *See Ryan*, 2001 WL 630676 (N.D. Ill.), *aff'd,* 295 F.3d 724 (9th Cir. 2002). In *Ryan v Kontrick*, a debtor took his name off of a family bank account but kept depositing his pay checks into the account. *Id.* at *2. The debtor

---

C-97-1361 SC, 1998 WL 879680 *3 (N.D. Cal. Dec. 15, 1998)(*citing Gillette v. Delmore*, 886 F.2d 1194, 1197-99 (9th Cir. 1989)("A party may move for partial summary judgment to dispose of only a single issue of law or fact relevant to a particular claim.").

then filed for bankruptcy.  A creditor filed an adversary proceeding to prevent the discharge of a debt, arguing, in part, that the debtor took his name off of the family bank account to hinder, delay or defraud creditors.  *Id.* at *5.  The bankruptcy court found, as a matter of law, that the debtor acted to hinder, delay, or defraud creditors, relying primarily on the debtor's testimony that "he transferred the bank account to Carolyn to prevent his creditors from attaching the funds."  *Id.*

Similarly, in *In re Schafer*, 294 B.R. 126 (N.D. Cal. 2003), the court granted summary judgment and ruled that the debtor acted with actual intent to hinder, delay or defraud a creditor based, in part, on the fact that the "[debtor] stated plainly in his deposition that his intent was to prevent ... his creditor, from attaching his funds by placing them in a new account and holding money in cashier's checks."  294 B.R. at 130.

*Ryan* and *In re Schafer* are directly on point.  The Kinoshitas admit that they transferred the Hotels and other Hawai`i assets to prevent their "attachment" in threatened bankruptcy proceedings in Florida.  As Satoshi explained, "concern had

surfaced that the Hawai`i facilities might be attached in connection with the bankruptcy of the Grenelefe Resort [owned by an SS subsidiary] in Florida." Ex. "K-1" at 14 (asset log). Because of this, "it was therefore necessary from Sports Shinko's standpoint that all of the facilities be sold off immediately." *Id.* Further, Toshio expressly instructed Mr. Mukai to assist when he was "considering protecting Hawaii properties from RCC and Japanese banks." Ex. "12". These admissions are sufficient to find intent to hinder, delay, or defraud creditors as a matter of law. *See, e.g., Ryan*, 2001 WL 630676; *In re Schafer,* 294 B.R. 126; *In re Marrama*, 445 F.3d 518, 523 (1st Cir. 2006)(affirming summary judgment granted when debtor admitted that he transferred his home to a spendthrift trust to "protect" it from creditors). *In re Moss*, 258 B.R. 405, 425-26 (Bankr. W.D. Mo. 2001)("Debtor's admission that she transferred her property ... in order to *protect and preserve* it is equivalent to a declaration that she transferred those assets with the actual intent to hinder, delay, or defraud her creditors.")(emphasis added).

**B.    Toshio's Statements About His Intent Are Irrelevant**

KG may argue that Toshio acted to "satisfy the Japan Lenders," not to defraud them.  *See* Ex. "1"; "K-1" at ¶14.  Even accepting this dubious statement as true for purposes of this Motion, it is irrelevant.  *See In re Blastein*, 192 F.3d 88, 97 (3d Cir. 1999); *In re Adeeb,* 787 F.2d 1339, 1342 (9th Cir. 1986)

Section 651C-4(a)(1) of the Uniform Fraudulent Transfer Act:

> does not require proof to set aside a transfer that the debtor intended to defraud the specific creditor bringing the fraudulent transfer claim.  PUFTA[13] deems a transfer fraudulent if the debtor had the 'actual intent to hinder, or delay or defraud *any* creditor....' ... There is no requirement that the debtor intend to hinder all of his creditors.

*In re Blastein*, 192 F.3d 88, 97 (3d Cir. 1999)(emphasis in original). This is true even if the debtor intended to hinder one creditor in order to benefit another.  *Id.* (finding the fact that the debtor "intended to shield the income to pay some of his debts" is irrelevant).  In *In re Adeeb*, the Ninth Circuit rejected the debtor's

---

[13]  This refers to the Pennsylvania Uniform Fraudulent Transfer Act, which is identical to Hawaii's statute in relevant part.

argument that "he lacked actual intent because he intended to

protect some of his creditors." 787 F.2d 1339, 1342 (9th Cir.

1986). Whatever Toshio may claim as his motivation concerning

the Japanese lenders, it is clear that he intended to hinder, delay,

or defraud creditors in the United States by preventing the

properties' attachment in connection with a potential bankruptcy in

Florida. Ex. "1" & "K-1" at 14.[14]

Direct proof of fraud is "rarely available," *In re*

*Agricultural Research & Tech Group Inc.*, 916 F.2d 528, 534 (9th Cir.

1990), but these admissions constitute irrefutable direct evidence

of Toshio's intent to hinder, delay, or defraud creditors. *In re Moss*,

258 Bankr. at 425-26 ("Debtor's admission that she transferred her

property ... in order to protect and preserve it is equivalent to a

declaration that she transferred those assets with the actual intent

---

[14] Furthermore, Toshio's purported motivation to "satisfy the Japan Lenders" does not address his obvious intent to place at least $3.5 million out of creditors' reach by establishing RMS, having the SS Hawaii Companies enter into managements agreements with termination fees ostensibly owed to RMS on sale of the SS Hawaii properties, and creating a secret option agreement that gave Satoshi or Takeshi Kinoshita the "option" to purchase the shares of RMS for a mere $1,500.00. Ex. "9".

to hinder, delay, or defraud her creditors."); *Ryan, supra*; *Schafer,*

*supra*; *In re Marrama, supra*; *In re Moss, supra*; *Gerad, supra*.

## III. CONCLUSION

In summary, the undisputed evidence demonstrates that

the Kinoshitas set up RMS and caused the SS HI Companies to

transfer the Hawai`i properties to hinder or delay creditors by

"protecting" the assets that could not be "attached" or "liened."

Plaintiffs are, therefore, entitled to partial summary judgment on

this issue.

DATED:    Honolulu, Hawai`i, December 19, 2007.


    /s/ Glenn T. Melchinger
PAUL ALSTON
BRUCE H. WAKUZAWA
GLENN T. MELCHINGER
JASON H. KIM

Attorneys for Plaintiffs and
Third-Party Defendants the
SS Companies