***ATTORNEY-CLIENT PRIVILEGE***                96

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAII

---

SPORTS SHINKO (USA) CO., LTD., a Delaware

Corporation; SPORTS SHINKO (MILILANI)

CO., LTD., a Hawaii corporation, et al.,

      Plaintiff,

 vs.           Case No. 02-1-2766-11 (EEH)

RESORT MANAGEMENT SERVICES

(HAWAII), INC., a Hawaii corporation,

YASUO NISHIDA, SATOSHI KINOSHITA, et al.

      Defendants.

---

## DEPOSITION OF SATOSHI KINOSHITA

(Volume II)

Taken on behalf of the Plaintiff at Alston Hunt Floyd & Ing, 1001 Bishop St., ASB Tower, 18th Floor, Honolulu, Hawaii 96813, commencing at 9:04 a.m., Wednesday, April 20, 2005, pursuant to Notice.

BEFORE:    BARBARA ACOBA, CSR No. 412, RPR

           Notary Public, State of Hawaii

**EXHIBIT 13**

```
 1   APPEARANCES:
 2   For Plaintiff:        GLENN MELCHINGER, Esq.
 3                         ALSTON HUNT FLOYD & ING
 4                         ASB Tower
 5                         1001 Bishop St., 18th Floor
 6                         Honolulu, Hawaii 96813
 7
 8   For Defendant SATOSHI KINOSHITA:
 9                         JOHN KOMEIJI, Esq.
10                         WATANABE ING KAWASHIMA & KOMEIJI
11                         First Hawaiian Center
12                         999 Bishop St., 23rd Floor
13                         Honolulu, Hawaii 96813
14
15
16   Also Present:         STEVEN SILVER - Interpreter
17
18
19
20
21
22
23
24
25
```

1  properties of which we had no plans to sell.

2      Q.   For all six properties, I think for Diamond
3  Head Beach Hotel, Queen Kapiolani, Ocean Resort and then
4  the three golf courses, do you remember what the total
5  for the termination fees was if, for example, you had to
6  pay them all, or Sports Shinko had to pay them all, do
7  you remember the grand total?
8      A.   I believe it was either 3.5 million or
9  4.5 million.

10     Q.   I think it's 3.5.  I think that's right.  So
11 Mr. Fukuda when he said he was going to, if the other
12 listed properties were sold, move those termination fees
13 to Mililani and Queen Kapiolani, what he meant by that,
14 as you understood it, was that that 3.5 million in
15 termination fees would be on only those two properties
16 or shifted into those two agreements with RMS; is that
17 right?
18     A.   Well, I suppose so, however, looking at the big
19 picture, this was all hypothetical and was my
20 understanding that no matter what anybody else said, it
21 would ultimately be the president who would make the
22 call.
23     Q.   As a hypothetical, even as a hypothetical, did
24 you think that seemed reasonable at that time to shift
25 all the termination fees for the other contracts to just

```
 1  BY MR. MELCHINGER:
 2       Q.   So do you know if Mr. Fukuda or Mr. Kinoshita
 3  asked Mr. Nishida to sign these contracts for RMS as
 4  they were, without negotiation, for example?
 5       A.   I do not.
 6       Q.   Mr. Nishida had been an officer at some of the
 7  Sports Shinko entities; is that right?
 8       A.   Yes.
 9       Q.   What was his relationship like, Mr. Nishida's
10  relationship, with the president?
11       A.   Until the time that Mr. Nishida went off on his
12  own, their relationship was one of president/employee.
13       Q.   Did Mr. Nishida ever do work specifically for
14  the president, either in Hawaii or in Japan, sort of as
15  a special executive assistant, for example?
16       A.   A long time ago he used to be the secretary to
17  the president over in Japan.
18       Q.   Do you know when that was, about?
19       A.   Well, let's see, that was when I was still a
20  university student, so between, say, 1980 and 1985.
21       Q.   So, I'm sorry, is that how long or that is
22  that -- well, do you mean for five years he was acting
23  as secretary; is that right?
24       A.   I don't recall exactly as I sit here today, but
25  he did serve as secretary to the president for a few
```

1  years in or around that time frame.  I don't recall how
2  many years it was.
3      Q.   Did you have any discussion with either
4  Mr. Mukai, the president, or Mr. Fukuda about the legal
5  affect the RMS management agreements would have after
6  they were entered?
7      A.   I did receive advice from Mr. Mukai.
8      Q.   What was that advice?
9      A.   I can recall a few things as I sit here today.
10 First of all, with regard to Mr. Nishida, Mr. Mukai
11 advised me that although Mr. Nishida was the president
12 of a small company, he nevertheless was now the
13 president of a separate and independent company and,
14 therefore, he had the full authority that that office
15 carries with it.  And so I was told by Mr. Mukai that I
16 would need to forget the relationship that I once had
17 with Mr. Nishida, that of being me as vice president,
18 him as general manager, and I must now interact with him
19 as the president of a company, which he was, similar to
20 the way that Mr. Kinoshita was the president of our
21 company.
22     Q.   Okay.  Anything else?  I think you said there
23 were a few things.
24     A.   In addition, Mr. Mukai told me that since
25 Resort Management was a separate and independent company

1  subsequent to that, I had a meeting with Mr. Mukai at
2  which time he shared with me what had been discussed
3  between him and the president. And I, in turn here, was
4  reporting that to Mr. Fukuda.
5       Q.  And as you noted, Mr. Mukai made a comment
6  about the affect of establishing the RMS, right, that
7  would make it hard to lien -- hard for RCC to lien the
8  Hawaii properties; is that right?
9       A.  No.  Actually, what Mr. Mukai communicated to
10 me was that president Kinoshita was extremely happy that
11 RMS had been established because it had made it
12 difficult for RCC to lien the Hawaii business
13 facilities, and Mr. Kinoshita apparently asked Mr. Mukai
14 to work on establishing some sort of similar arrangement
15 to the RMS arrangement in Japan.
16      Q.  Was one of the purposes for the management
17 contracts and creating the management companies to make
18 it difficult for RCC to place liens on Hawaii
19 properties?
20      THE INTERPRETER:  I'm sorry, can I have that
21 question one more time.
22      THE WITNESS:  I had no idea about that.  If you
23 look to the next paragraph under the paragraph that you,
24 Mr. Melchinger, have placed an asterisk next to, I go on
25 to write to Mr. Fukuda that if, in fact, it had become

1   A.   I have. Yes.

2   Q.   Okay. It appears to be a request to move the
3   closing date to the 25th; is that what this is, sent to
4   Mr. Hamasaki, Peter Hamasaki, from you?

5   A.   Yes.

6   Q.   Do you remember why you sent this to
7   Mr. Hamasaki?

8   A.   I do.

9   Q.   Could you tell me why.

10  A.   Because I was instructed to do so by the
11  president over the telephone.

12  Q.   Did he tell you anything about why the closing
13  date needed to be moved to the 25th?

14  A.   What I recall was that I was told that the
15  management on the Japan side was in a real bind and the
16  president wanted us to hurry up and send the sales
17  proceeds over to Japan.

18  Q.   Okay. Did he explain why there was a need to
19  hurry? I'm sorry, let me clarify the question.

20       Did the president explain to you why there was
21  a need to accelerate the closing date, other than that?

22  A.   Beginning around November the year 2001, the
23  company on the Japan side was in a real pinch. They
24  were short on funds and in specific terms, for example,
25  cash flow was so bad that Sports Shinko in Japan was not

even able to make the interest payments that it had agreed to make with the some 50 financial institutions, including RCC, that the Japan Sports Shinko company had borrowed money from. And so I, beginning in November, had been told constantly that we needed to hurry up and make the sale and send the proceeds of the sale to Japan. We ended up -- this ended up spilling over into the next year, into 2002, and by then the company was in a real, real bind, and I was told pretty much on a daily basis to expedite this, and I received the instructions directly by telephone -- by telephone directly.

Q. Just to clarify, that was directly from the president by telephone?

A. That's correct.

Q. Was the closing date, then, actually changed to the 25th from the 28th; do you recall?

A. I don't recall.

Q. Do you recall at some point hearing about, from the president, a meeting that he had had with any of the lenders or RCC in early January of 2001?

MR. KOMEIJI: Same objection about relevancy.

MR. MELCHINGER: I'm sorry, not 2001. 2002.

MR. KOMEIJI: Same objection as relevancy. Not reasonably calculated to lead to discovery of admissible evidence.

***ATTORNEY-CLIENT PRIVILEGE***   195

```
                    C E R T I F I C A T E
STATE OF HAWAII            )
CITY AND COUNTY OF HONOLULU )
```

I, BARBARA ACOBA, Certified Shorthand Reporter and Notary Public, State of Hawaii, do hereby certify:

That on Wednesday, April 20, 2005, at 9:04 a.m., appeared before me SATOSHI KINOSHITA, the witness whose deposition is contained herein; that prior to being examined he was by me duly sworn;

That the deposition was taken down by me in machine shorthand and was thereafter reduced to typewriting under my supervision; that the foregoing represents, to the best of my ability, a true and correct transcript of the proceedings had in the foregoing matter.

I further certify that I am not an attorney for any of the parties hereto, nor in any way concerned with the cause.

Dated this 30th day of April, 2005, in Honolulu, Hawaii.

BARBARA ACOBA, CSR NO. 412
Notary Public, State of Hawaii
My Commission Exp: 10-22-2008

RALPH ROSENBERG COURT REPORTERS
Honolulu, Hawaii   (808) 524-2090

***ATTORNEY-CLIENT PRIVILEGE***                196

```
 1            IN THE CIRCUIT COURT OF THE FIRST CIRCUIT
 2                        STATE OF HAWAII
 3   ------------------------------------------
 4   SPORTS SHINKO (USA) CO., LTD., a Delaware
 5   Corporation; SPORTS SHINKO (MILILANI)
 6   CO., LTD., a Hawaii corporation, et al.,
 7           Plaintiff,
 8       vs.            Case No. 02-1-2766-11 (EEH)
 9   RESORT MANAGEMENT SERVICES
10   (HAWAII), INC., a Hawaii corporation,
11   YASUO NISHIDA, SATOSHI KINOSHITA, et al.
12           Defendants.
13   ------------------------------------------
14
15              DEPOSITION OF SATOSHI KINOSHITA
16                         (Volume III)
17
18   Taken on behalf of the Plaintiff at Alston Hunt Floyd &
19   Ing, 1001 Bishop St., ASB Tower, 18th Floor, Honolulu,
20   Hawaii 96813, commencing at 9:00 a.m., Thursday, April
21   21, 2005, pursuant to Notice.
22
23   BEFORE:    BARBARA ACOBA, CSR No. 412, RPR
24              Notary Public, State of Hawaii
25
```

RALPH ROSENBERG COURT REPORTERS
Honolulu, Hawaii  (808) 524-2090

EXHIBIT____

\*\*\*ATTORNEY-CLIENT PRIVILEGE\*\*\*   197

```
 1   APPEARANCES:
 2   For Plaintiff:         GLENN MELCHINGER, Esq.
 3                          ALSTON HUNT FLOYD & ING
 4                          ASB Tower
 5                          1001 Bishop St., 18th Floor
 6                          Honolulu, Hawaii 96813
 7
 8   For Defendant SATOSHI KINOSHITA:
 9                          JOHN KOMEIJI, Esq.
10                          WATANABE ING KAWASHIMA & KOMEIJI
11                          First Hawaiian Center
12                          999 Bishop St., 23rd Floor
13                          Honolulu, Hawaii 96813
14
15
16   Also Present:          STEVEN SILVER - Interpreter
17
18
19
20
21
22
23
24
25
```

***ATTORNEY-CLIENT PRIVILEGE*** 234

```
 1   relevancy and not reasonably calculated to lead to the
 2   discovery of admissible evidence in this matter.
 3           THE WITNESS:  As far as I recall, there were
 4   three meetings that were held with the KG Group, and
 5   you're asking me about the individuals who were
 6   involved, so let's take them in order.  The first of
 7   those three meetings was a telephone conference between
 8   me and KG, so there was nobody else involved.  The
 9   second meeting I attended with the president of our
10   company.  And the third meeting involved the McCorriston
11   law firm and the attorneys for the KG Group side.
12   BY MR. MELCHINGER:
13       Q.   Do you recall when the meeting -- when you had
14   a meeting with Toshio and somebody from KG, the number
15   two point that you mentioned?
16       A.   It was sometime in late December of 2001.
17       Q.   Where was it?
18       A.   In Tokyo.
19       Q.   So somebody from KG came to Tokyo?
20       A.   Yes.
21       Q.   And the only people present were you and the
22   president and somebody from KG; is that right?
23       A.   I believe so.
24       Q.   The president doesn't speak English very well,
25   right?
```

***ATTORNEY-CLIENT PRIVILEGE*** 235

1  A.  That's correct.

2  Q.  Was there an interpreter or somebody present at
3  the meeting?

4  A.  Yes.  That's correct.  There was an interpreter
5  present.

6  Q.  Do you remember who that was?

7  A.  It was a gentleman named Mr. Takahashi,
8  T-a-k-a-h-a-s-h-i.

9  Q.  Is that somebody who KG brought with them, or
10 who was Mr. Takahashi affiliated with, if anybody?

11 A.  He was an interpreter that KG had brought with
12 them.

13 Q.  So Mr. Takahashi came from Hawaii, as far as
14 you know?

15 A.  Right.

16 Q.  Do you know if Mr. Takahashi was a KG employee
17 or how did Mr. Takahashi introduce himself?

18 A.  He introduced himself as Takahashi, the
19 interpreter.

20 Q.  From KG was it Wayne Tanigawa who was present;
21 is that right?

22 A.  Yes.

23 Q.  Was there anybody else from KG?

24 A.  No.

25 Q.  Was there anybody else from Sports Shinko,

***ATTORNEY-CLIENT PRIVILEGE***                         240

```
 1    A.    I don't know.
 2    Q.    So it's your understanding that Mr. Mukai spoke
 3  with somebody at KG and KG sent you this letter, Exhibit
 4  50; is that right?
 5    A.    Yes.
 6    Q.    Did you ever talk with Mr. Mukai at any point
 7  in time about what he discussed with KG before they sent
 8  this letter, Exhibit 50?
 9    A.    No.
10    Q.    Do you know what Mr. Mukai's relationship is
11  with either Bert Kobayashi, the developer, or KG?
12    A.    No.
13    Q.    Even today, you don't know; is that right?
14    A.    Right.
15    Q.    Was it your understanding, then, that Mr. Mukai
16  had sort of introduced KG to Sports Shinko; is that
17  right?
18    A.    Yes.
19          MR. MELCHINGER:  I think the translation was --
20  off the record.  I need to clarify.  Actually, could the
21  Translator just retranslate.
22          THE INTERPRETER:  Sure.
23  BY MR. MELCHINGER:
24    Q.    Was it your understanding, then, in 2001,
25  December, that Mr. Mukai had introduced KG to Sports
```

***ATTORNEY-CLIENT PRIVILEGE*** 241

```
 1   Shinko?
 2       A.   Yes.
 3       Q.   Did you ever have any discussion with Mr. Mukai
 4   or anybody else at the McCorriston law firm regarding
 5   how Kobayashi Group came to make the offer that's in
 6   Exhibit 54?
 7       A.   Yes.
 8       Q.   Do you know about when that was, what time?
 9       A.   It would have been at some point in time
10   between December 4th, 2001, and December 11th, but I
11   don't recall exactly when it was.
12       Q.   Was that a telephone conference or personal
13   meeting with Mr. Mukai or who was present and how was
14   the conference held?
15       A.   It was either via the telephone or I may have
16   met with him in person.  I don't recall.
17       Q.   But it was with Mr. Mukai, not Mr. Kawatani or
18   somebody else from the office; is that right?
19       A.   Right.
20       Q.   And what did he tell you during that
21   conference?
22       A.   He said that the Kobayashi Group was interested
23   not just in submitting a letter expressing their
24   interest, but in submitting an offer and he wanted us to
25   provide them with financial information.
```

***ATTORNEY-CLIENT PRIVILEGE***                296

```
                    C E R T I F I C A T E
STATE OF HAWAII            )
CITY AND COUNTY OF HONOLULU )

        I, BARBARA ACOBA, Certified Shorthand
Reporter and Notary Public, State of Hawaii, do
hereby certify:
        That on Thursday, April 21, 2005, at
9:00 a.m., appeared before me SATOSHI KINOSHITA, the
witness whose deposition is contained herein; that
prior to being examined he was by me duly sworn;
        That the deposition was taken down by me
in machine shorthand and was thereafter reduced to
typewriting under my supervision; that the foregoing
represents, to the best of my ability, a true and
correct transcript of the proceedings had in the
foregoing matter.
        I further certify that I am not an attorney
for any of the parties hereto, nor in any way concerned
with the cause.
        Dated this 30th day of April, 2005,
in Honolulu, Hawaii.

                        BARBARA ACOBA, CSR NO. 412
                        Notary Public, State of Hawaii
                        My Commission Exp: 10-22-2008
```

RALPH ROSENBERG COURT REPORTERS
Honolulu, Hawaii  (808) 524-2090