IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| SPORTS SHINKO CO., LTD., | )    CV 04-00124 BMK |
|         Plaintiff, | )    CV 04-00127 BMK |
| vs. | )    CONSOLIDATED CASES |
| QK HOTEL, LLC, et al., | )    **MEMORANDUM IN** |
|         Defendants, | )    **SUPPORT OF MOTION** |
|         and | ) |
| FRANKLIN K. MUKAI, et al., | ) |
|         Third-Party Plaintiffs, | ) |
| vs. | ) |
| SPORTS SHINKO (USA) CO., LTD., et al., | ) |
|         Third-Party Defendants, | ) |
|         and | ) |
| SPORTS SHINKO (HAWAII) CO., LTD., et al., | ) |
|         Third-Party Defendants/ Counterclaimants, | ) |
| vs. | ) |

|                                      |   |
|--------------------------------------|---|
| QK HOTEL, LLC, et al.,               | ) |
|                                      | ) |
|                                      | ) |
|     Third-Party Counterclaim | ) |
|     Defendants.  | ) |
|                                      | ) |
| AND CONSOLIDATED CASES               | ) |
|                                      | ) |

2

# TABLE OF CONTENTS

**Page**

I.   UNDISPUTED MATERIAL FACTS. . . . . . . . . . . . . . . . . . . . 1

    A.   Mukai Served As An Attorney And Director Of Sport Shinko (Waikiki) Corporation ("SSW") And The Other Sports Shinko Hawaii Companies. . . . . . . . . . . . . . . 1

    B.   Mukai Forms Two Management Companies In Response To Threats From The RCC. . . . . . . . . . . . . . . . . . . . . 2

    C.   A New Management Company Is Formed To Avoid Scrutiny By The RCC. . . . . . . . . . . . . . . . . . . . . . . . 3

    D.   Mukai Drafts The Management Agreements With $3.5 Million in Termination Fees. . . . . . . . . . . . . . . . 5

    E.   Toshio Further Enlists Mukai To "Protect" The Hawaii Properties From The RCC And Creditors. . . . . . 6

    F.   Mukai Introduces KG To The SS Hawaii Companies But Does Nothing To Ensure That The KG Sale Represented The Highest Reasonably Attainable Price For the Properties. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

II.  ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    A.   Mukai Breached His Fiduciary Duties As A Director By Completely Failing To Take Any Action To (1) Halt The Kinoshitas' Scheme For Delaying, Hindering, Or Defrauding Creditors And (2) Ensure That The KG Offer Was The Best Deal For The SS Hawaii Companies. . . . . . . . . . . . . . . . . . . . . . . . 11

B.    Mukai Breached His Duties As An Attorney
By Assisting The Kinoshitas In their
Fraudulent Scheme To Avoid The RCC And
Other Creditors. . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

1.    An Attorney-Client Relationship
Existed Between Mukai And The
SS Hawaii Companies, Including SSW. . . . . . . .  18

2.    Mukai Breached His Duty To Warn The
Kinoshitas Against Defrauding The RCC
And Creditors And To Refrain From
Furthering The Scheme. . . . . . . . . . . . . . . . . . . .  19

III.    CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Page*

*Avianca, Inc. v. Corriea*, 705 F. Supp. 666. . . . . . . . . . . . . . .  17, 18

*McKnight v. Gingras*, 966 F. Supp. 801 (E.D. Wis. 1997). . . . . . .  18

*RTC Mortgage Trust 1994 N-1 v.*
*Fidelity National Title Insurance Co.,*
58 F. Supp. 2d 503 (D. N.J. 1999). . . . . . . . . . . . . . . . . . . . . . . . .  18

## STATE CASES

*Barr v. Wackman*, 36 N.Y.2d 371, 329 N.E.2d 180 (1975). . .  12, 16

*Camarda v. Danziger, Bangser & Weiss,*
167 A.D.2d 152, 561 N.Y.S.2d 233 (1990). . . . . . . . . . . . . . . . .  21

*Collins v. Greenstein*, 61 Haw. 26, 595 P.2d 275 (1979). . . . . . .  17

*Finley v. Home Insurance Co.,*
90 Hawai`i 25, 975 P.2d 1145 (1998). . . . . . . . . . . . . . . . . .  19, 21

*Francis v. United Jersey Bank*, 87 N.J. 15,
432 A.2d 814 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12, 15, 16

*Page*

*Honda v. Board of Trustees of the Employees'*
*Retirement System of the State of Hawai`i,*
108 Hawai`i 338, 120 P.3d 237 (2005). . . . . . . . . . . . . . . . . . . . . 11

*McDevitt v. Guenther*, 2007 WL 2121241
(D. Hawai`i 2007)(citing *Boskoff v. Yano*, 57 F.
Supp. 2d 994, 998 (D. Hawai`i 1998)). . . . . . . . . . . . . . . . . . . . . 17

*Senn v. Northwest Underwriters, Inc.,*
875 P.2d 637 (Wash. App. 1994). . . . . . . . . . . . . 12, 13, 14, 15, 16

**DOCKETED CASES**

*Sports Shinko (USA) Co., Ltd. et al.*
*v. Resort Management Services (Hawaii), Inc.;*
Civil No. 02-1-2766-11 (EEH). . . . . . . . . . . . . . . . . . . . . . . . . . 11

**STATE STATUTES**

Haw. Rev. Stat. § 414-221. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Haw. Rev. Stat. § 415-35(a). . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

## MEMORANDUM IN SUPPORT OF MOTION

## I.    UNDISPUTED MATERIAL FACTS

### A.    Mukai Served As An Attorney And Director Of Sport Shinko (Waikiki) Corporation ("SSW") And The Other Sports Shinko Hawaii Companies.

Since 1984, Defendant Franklin Mukai served as the attorney for subsidiaries of Sports Shinko Co., Ltd. ("SSJ") in Hawaii.[1]  Ex. "1" to Concise Statement of Facts.[2]  He also served as a director, and in some instances as the assistant secretary, of the SS Hawaii Companies from 1989 until January 2, 2002.  Ex. "2".

The SS Hawaii Companies were managed by members of the Kinoshita family.  Ex. "2".  The patriarch, Toshio, was the founder.  He also served as president and director of SSJ and the

---

[1] Sports Shinko (Hawaii) Co., Ltd., Sports Shinko (Mililani) Co., Ltd. ("SSM"), Sports Shinko (Kauai) Co., Ltd. ("SSK"), Sports Shinko (Pukalani) Co., Ltd. ("SSP"), and Sports Shinko (Waikiki) Corporation ("SSW") are collectively referred to as the "**SS Hawaii Companies**."  The properties involved in this action are the Queen Kapiolani Hotel and the Ocean Resort Hotel ("Hotels"), which were owned by SSW.

[2] All Exhibit references are to the Exhibits attached to the Concise Statement of Fact filed contemporaneously herewith.

SS Hawaii Companies.  *Id.*  His son, Satoshi, was the vice president and director of the SS Hawaii Companies.  *Id.*

**B.    Mukai Forms Two Management Companies In Response To Threats From The RCC.**

By January 2000, SSJ was in severe financial trouble and having difficulty with its Japan lenders.  Ex. "3" at ¶ 21.  The Resolution and Collection Corporation ("RCC"), a quasi-governmental entity assigned to clean up Japan's savings and loan crisis, was pressuring SSJ for repayment and even provisionally attaching Satoshi's property.  Ex. "5" at 2*; cf. Id.* at ¶¶ 21 & 23.

On August 3, 2000, Mukai incorporated and formed two management companies, installing his legal secretary as the sole officer and director of the corporations.  Ex. "4" at 259 0012 & 0016; Ex. "9" at 69.  Satoshi was made the sole shareholder of the companies.  Ex. "5" at 1.  This was done because Satoshi had no loans from banks in Japan and the United States and if he were the shareholder of the management companies, "it would immediately come to the attention of the [RCC]."  Ex. "5" at 2.  However, Mukai also prepared two side option agreements, giving Toshio the right to

purchase all of the shares of the management companies from Satoshi for $1,000 each.  Ex. "4" at 259 0023 - 0028.

The Kinoshitas soon realized there were concerns with having Satoshi directly own the shares of the management companies as the Kinoshita name would appear in the public record.  Ex. "6" at 70.  Therefore, on August 28, 2000, within three weeks of their formation, Mukai dissolved the corporations. Ex. "7".

**C.    A New Management Company Is Formed To Avoid Scrutiny By The RCC.**

A new management company, Resort Management Services (Hawaii), Inc. ("RMS"), was formed in a manner giving the appearance of independence from the Kinoshitas.  The RMS stock was solely owned by Mr. Yasuo Nishida, Toshio Kinoshita's former personal secretary.  Exs. "6" at 145-46; "8".  Nishida was also an officer of several SS Hawaii Companies.  Ex. "2".  However, RMS was just a ruse because Toshio's sons had an option to purchase all the RMS stock for only $1,500.00 (the "Option").  Ex. "8".

Once again, Mukai and his firm were at the center of this Option ploy.  Mukai's firm drafted the Option at Satoshi's request. Ex. "9" at 206-07.  Mukai was never clear about whom he was representing in drafting the Option - "[T]here was really [sic] no thoughts."  *Id.* at 207.  Unaware of the identify of his actual client, Mukai cannot recall formulating any opinion as to whether the Option strategy should or should not have been pursued.  *Id.* at 205-206.

In fact, Mukai knew that the Option would raise concerns with the RCC and Japanese lenders if discovered.  In an August 8, 2000 email, Satoshi told Mukai that he would not exercise the option for some years, until the situation with the Japan lenders and RCC had "settled down."  Ex. "10". Furthermore, Mukai knew that Toshio wanted to form RMS to make it "extremely difficult for [the] RCC to attach the facilities in the Hawaii region."  Ex. "11".  Satoshi has testified that Mukai informed him that Toshio was "extremely happy that RMS had been established because it had made it difficult for RCC to lien the Hawaii business facilities."  Ex. "6" at 152.

Despite knowing about the Kinoshitas' intent to hinder, delay or defraud the RCC and their obvious efforts to create the false appearance that RMS was independent from the Kinoshitas, Mukai cannot recall ever having a concern about potential fraudulent transfer issues over any action or plan of action by the Kinoshitas.  Ex. "9" at 232.  He cannot recall even looking into whether any action or plan of action by the Kinoshitas raised fraudulent transfer issues.  *Id.*

### D.    Mukai Drafts The Management Agreements With $3.5 Million in Termination Fees.

After RMS was set up, Mukai prepared management agreements for the SS Hawaii Companies ("RMS Agreements"). Exs. "12" & "9" at 63.  Under the RMS Agreements, if the SS Hawaii Companies' properties (the "Hawaii Properties") were sold and the purchaser did not assume the RMS Agreements, the SS Hawaii Companies had to pay a total of $3.5 million in "termination fees" to RMS.  Ex. "12".  However, since Toshio's sons had the Option, the $3.5 million would effectively go to his sons.  Ex. "8" at 001 1585. Although he was both a director and attorney for the SS Hawaii

Companies, Mukai did no analysis of whether they should enter into the RMS agreements.  He did not even give it "any thought." Ex. "9" at 113-114.

### E.  Toshio Further Enlists Mukai To "Protect" The Hawaii Properties From The RCC And Creditors.

In late November 2001, Satoshi requested Mukai's help in implementing Toshio's plan to "protect" the Hawaii Properties from the Japan lenders and the RCC.  Ex. "13" at "K-C".  In a November 26, 2001 letter, Satoshi told Mukai that Toshio needed a "new company to be free from Japanese banks and [sic] RCC."  *Id.* Satoshi enclosed Toshio's plan with the goal "protecting Hawaii Properties from RCC and Japanese banks."  *Id.*  One of the options, Plan B, was for the "management company [to] purchase assets of Sport Shinko Hawaii."  *Id.*  The "most favorable factor" for that option was "that the management company will be free from RCC and Japanese banks."  *Id.* at 2.

Despite being told that Toshio was attempting to protect assets from the RCC and creditors, neither Mukai nor anyone from his firm told Toshio or Satoshi that it would not be a good idea to

proceed with either Plan A or B. Ex. "9" at 285. To the contrary

Mukai helped to further the plan by sending it to Grant Thornton

("GT"), the SS Hawaii Companies' CPA, for analysis.[3]  *Id.*  Mukai

asked GT to investigate the tax consequences if the SS Hawaii

Companies transferred all of their Hawai`i properties to RMS or

other entities. Ex. "9" at 285; "14".

### F. Mukai Introduces KG To The SS Hawaii Companies But Does Nothing To Ensure That The KG Sale Represented The Highest Reasonably Attainable Price For the Properties.

In early December 2001, Mukai introduced Wayne

Tanigawa ("Tanigawa") of KG to the SS Hawaii Companies. Less

than two weeks later, on December 11, 2001, KG offered to

purchase the Hotels, three golf courses, and a sewage treatment

plant--substantially all of the companies' income producing assets--

for only $22 million.[4]

---

[3] Mukai later testified that "we sent this over to Grant Thornton for analysis ... or they had it." Ex. "9" at 285.

[4] *See* Ex. "15". This was the nominal price for all Sports Shinko's properties transferred to KG. Ultimately, in the Purchase and Sale Agreement ("**PSA**") between SS and KG, KG paid only about $2.3 million in cash, gave $9 million in unsecured promissory notes, and assumed an approximate $10.6 million

(continued...)

Mukai had served as a director of the SS Hawaii Companies from 1989 until he suddenly resigned on January 2, 2002.[5]  He claims that he resigned because the statutory requirement that at least one director be a Hawai`i resident was amended.  Ex. "1" at 10; Ex. "9" at 42.  However, the law had changed two and one-half years earlier on July 2, 1999.  Ex. "18" (amendments to Haw. Rev. Stat. § 415-35(a)).  According to Satoshi, Mukai said he wanted to resign so that the Hawaii Properties could be sold in a "clean fashion."[6]  Ex. "19".

-----

[4](...continued)
Bank of Hawai mortgage, without obtaining a release of the SSJ's guarantor obligations Sports Shinko ("SS") entities.  *See* Ex. "16".  As previously mentioned, SSW transferred the Hotels which are at issue in these cases.  The transfers of the golf course properties are the subject of separate lawsuits in the Hawai`i Circuit Courts.

[5] Mukai was concerned that he would not be allowed to resign on the date the PSA was to be signed.  He emailed Mr. Tsugio Fukuda to confirm whether his resignation had been accepted.  Ex. "17".

[6] This is consistent with Mukai's feeble attempt to excuse his failure to do any evaluation of the KG offer on grounds that he was not a director when the KG sale closed - "[I] was not a director at the time of the SS-KG Transfers."  Ex. "20".  This excuse is meritless.  Mukai was a director when KG's December 11 offer was made, and he still did nothing for the following three weeks before he resigned on January 2, 2002.

Mukai further claims that prior to resigning as a director, he was unaware of the December 11, 2001 KG offer.  Ex. "9" at 36. Even assuming that Mukai's claim is true, his purported ignorance was self-imposed.  He never asked whether an offer had been made, despite having multiple meetings and telephone conferences[7] with Satoshi and Tanigawa in December 2001.  Ex. "9" at 23.  Because he kept himself ignorant, Mukai did nothing to ensure that the sale

---

[7] *See* Ex. "21" (2001 billing entries for Dec. 10 (Conf w/Mr. Kinoshita; Telecon Wayne Tanigwa); Dec. 17 (Telecon Mr. Toshio Kinoshita; Conf. Satoshi Kinoshita); Dec 18 (Telecon Satoshi Kinoshita); Dec. 20 (Telecon Satoshi Kinoshita), Dec. 21 (Conf Satoshi Kinoshita, Wayne Tanigawa)).  Mukai spent substantial time in SS-KG meetings and telephone conferences and billed five Sports Shinko Hawaii Companies for the same tasks.  *Id.*  For example, while the December 10 entry for SSP is only .55 hours, Mukai billed four other SS Hawaii companies for the same task on the same day.  Compare Ex. "21" at pages 082, 1047, 082 1637, 082 1397, 082 1936, and 082 1137.  When all five invoices are totaled, Mukai spent 5.40 hours on Dec. 10 in a conference with Toshio and a telephone conference with Tanigawa.  The time entries also include the description "review structure"; Mukai cannot recall what that means.  Ex. "9" at 243.  The notion that in all of these lengthy meetings and telephone conferences about the sale of the Hawaii Properties that no one mentioned that KG had made an offer is preposterous.

to KG resulted in the highest reasonably attainable price for the properties.[8]  Ex. "9" at 20; Ex. "20".

Had Mukai informed himself about the KG offer, he could, and should, have objected.  Before the sale to KG, two of the golf courses alone were being marketed at a total listed price of $71 million.[9]  As a director, Mukai completely failed to do any analysis of the purchase offers for the SS Hawaii Companies' properties.  Ex. "9" at 28, 31-32.

The SS Hawaii Companies accepted the KG offer and entered a Purchase and Sale Agreement ("PSA") on January 15, 2002.  Ex. "16".  Closing was set for January 28, 2002, but it was further accelerated to January 25 when the Kinoshitas learned that the RCC would place SSJ into involuntary bankruptcy on January 28.[10]  The Kinoshitas were also concerned that the Hawaii

---

[8] In fact, Mukai did nothing as a director of the SS Hawaii Companies, other than signing written consents and approvals. Ex. "9" at 35-36.

[9] The Kiahuna Country Club was listed for $42,000,000.00. Pukalani Country Club was listed for $29,000,000.00.  Ex. "22".

[10] *See* Exs. "3" at ¶ 23; Ex. "K-1" at 15; and Ex. "23".

Properties "might be attached in connection with the bankruptcy of the Grenelefe Resort [owned by an SS subsidiary] in Florida." Ex. "K-1" at 14.

Five days after the KG closing, Satoshi deeded a Maui residence to RMS in partial payment of $200,000 of the termination fees allegedly owed under the RMS management agreements. Ex. "24".  The SSJ bankruptcy trustee recovered the residence in settlement of fraudulent transfer claims against RMS.

## II.    ARGUMENT

### A.    Mukai Breached His Fiduciary Duties As A Director By Completely Failing To Take Any Action To (1) Halt The Kinoshitas' Scheme For Delaying, Hindering, Or Defrauding Creditors And (2) Ensure That The KG Offer Was The Best Deal For The SS Hawaii Companies.

"It is axiomatic that a corporation's directors and officers assume fiduciary duties."  *Honda v. Board of Trustees of the Employees' Retirement System of the State of Hawai`i*, 108 Hawai`i

338, 343, 120 P.3d 237, 242 (2005).  A director must discharge his duties in "good faith;... [w]ith the care an ordinarily prudent person in a like position would exercise under similar circumstances; and ...[i]n a manner the director reasonably believes to be in the best interests of the corporation."  Haw. Rev. Stat. § 414-221.

A director's duties include continually being kept informed of the company's affairs.  *Senn v. Northwest Underwriters, Inc.*, 875 P.2d 637, 640 (Wash. App. 1994).  A director must act in the best interests of the corporation and may not simply rubber-stamp the decisions of other directors:  A director "does not exempt himself from liability by failing to do more than passively rubber-stamp the decisions of the active managers." *Barr v. Wackman*, 36 N.Y. 2d 371, 381, 329 N.E. 2d 180, 188 (1975).  If a director discovers "an illegal course of action, a director has a duty to object and, if the corporation does not correct the conduct, to resign." *Francis v. United Jersey Bank*, 432 A.2d 814, 823 (1982).

In *Senn*, a corporation was placed into receivership when it became insolvent.  *Senn*, 875 P.2d at 638.  The receiver

discovered financial irregularities and sued an officer/director,

*inter alia*, for breach of fiduciary duties.  *Id.* at 638-39.

In response to a motion for summary judgment, the

officer/director contended that an issue of fact existed because she

was unaware of and did not participate in the scheme that caused

the financial irregularities.  *Id.* at 639-40.  The Court held that her

professed lack of knowledge and participation was irrelevant.

"[O]fficers and directors have an affirmative duty to be aware of the

affairs of the companies they serve and ... they can be held liable

for activities of other officers and directors which they reasonably

should know about."  *Id.* at 640.

> [B]ecause directors are bound to exercise
> ordinary care, they cannot set up as a defense
> lack of the knowledge needed to exercise the
> requisite degree of care ... The logic of this
> proposition is irrefutable.  Once cannot
> discharge a duty by remaining ignorant of
> what that duty entails.  Just as ignorance of
> the law is no excuse for the violation of the
> law, **ignorance of the affairs of a business to
> which one owes a duty of diligence, care
> and skill does not excuse a director from
> liability for her colleagues' fraud or
> malfeasance.**

*Id.* (emphasis added), *quoting, Francis*, 432 A.2d at 822.

Rather than creating a defense, the director's lack of awareness

established her breach of fiduciary duty.  875 P.2d at 641.

In the present case, Mukai admits that he did *nothing* to

fulfill his duties as a director of the SS Hawaii Companies; he

simply signed consents when needed.  Ex. "9" at 35-36.  He knew

about the Kinoshitas' efforts to delay, hinder or defraud the RCC

and other creditors, but he did nothing to object or try to halt the

Kinoshitas' plans.  *See* pages 2-11, *infra.*  He cannot recall even

having a concern or looking into the possibility that the Kinoshitas'

plans raised fraudulent transfer issues.  Ex. "9" at 232.

Worse, Mukai actually implemented the scheme.  He

formed the initial management companies, he drafted the

management agreements, he prepared the Option, and he enlisted

GT to assist with Toshio's plan to "protect" the Hawaii Properties

from the RCC and creditors.  Ex. "4" at 259 0012 & 0016; Ex. "9" at

63, 206 & 285, Ex. "14".  He apparently told Satoshi and Toshio

that the formation of RMS made it difficult for the RCC and

creditors to attach SS's Hawaii Properties.  Ex. "6" at 152; Ex. "11".

14

Furthermore, when the SS Hawaii Companies were marketing the properties, Mukai did not evaluate any of the offers and did nothing to ensure that the KG offer was in the best interests of the SS Hawaii Companies.  Ex. "20"; Ex. "9" at 20, 28. Mukai should have been especially diligent in evaluating the KG offer since he introduced KG to the SS Hawaii Companies. However, he claims that while he was a director, he did not even know that KG made an offer until January 2, 2002, and never bothered to ask or followup.  Ex. "9" at 36.  Rather than excusing him, his inaction establishes the breach of duty.  *Senn*, 875 P.2d at 641.

Mukai's "defense" to his complete inaction is that he was an "accommodation" director, *i.e.*, someone needed to fulfill the Hawaii residency requirement.  Ex. "9" at 29 & 39.  This provides no excuse for abdicating his duties.  The duty of ordinary care is imposed on all directors, including so-called "accommodation directors."  *See Francis*, 432 A.2d at 823 ("[D]ummy, figurehead and accommodation directors are anachronisms with no place in New

Jersey law."[11]).  *See also Barr*, 329 N.E. 2d at 188 ("accommodation"

directors not exempted from liability).  "[A]ll directors are

responsible for managing the business and affairs of the

corporation."  *Francis*, 432 A.2d at 823-24.

That SSW and the other SS Hawaii Companies were not

publically traded but were closely-held is irrelevant.  "Even in a

small corporation, a director is held to the standard of that degree

of care that an ordinarily prudent director would use under the

circumstances."  *Id.* at 824.  *Senn, supra*, involved a corporation

solely owned by the husband of the defendant director.  The Court

still found as a matter of law that the director breached her

fiduciary duty in failing to take "reasonable steps to stop the

continuing course of [wrongful] conduct."  875 P.2d at 642.

Similarly, Mukai breached his fiduciary duties since he knew about

the Kinoshitas' scheme to hinder, delay, or defraud creditors and

_____

[11] The same is true under Hawai`i Law.  Section 414-221 of
the Haw. Rev. Stat. imposes the same duty on all directors and
makes no exceptions for "accommodation" directors.

did nothing to stop them.  To the contrary, he helped to implement
the scheme.

### B.    Mukai Breached His Duties As An Attorney By Assisting The Kinoshitas In their Fraudulent Scheme To Avoid The RCC And Other Creditors.

To establish legal malpractice, a plaintiff must show:
(1) the existence of an attorney-client relationship, (2) the existence
of the attorney's duty, (3) breach of that duty, and (4) damages
flowing from that breach.[12]  *McDevitt v. Guenther*, 2007 WL
2121241, at *6 (D. Hawai`i 2007)(citing *Boskoff v. Yano*, 57 F.
Supp. 2d 994, 998 (D. Hawai`i 1998)).

Proof of an attorney's breach of duty does not require an
expert to establish the duty of care.  *Collins v. Greenstein*, 61 Haw.
26, 40, 595 P.2d 275, 283 (1979).  While the application of the
standard of care to a specific fact situation is normally for the jury,
*id.*, summary judgment is appropriate when the facts are

---

[12] As mentioned in the Motion, this Motion does not address
the fourth element - causation and damages.  These issues are
reserved.  *See Avianca, Inc. v. Corriea*, 705 F. Supp. 666, 679
(plaintiffs sought only a determination as a matter of law that the
defendant attorney breached certain duties; they did not seek a
determination on every alleged improper act or damages).

undisputed and the breach is clear.  *See McKnight v. Gingras,*

966 F. Supp. 801, 805 (E.D. Wis. 1997)(Where attorney's breach of

duty is "so obvious," it may be determined as a matter of law);

*RTC Mortgage Trust 1994 N-1 v. Fidelity National Title Ins. Co.*, 58 F.

Supp. 2d 503, 525 (D. N.J. 1999)("In considering a motion for

summary judgment, this Court does not need expert testimony to

conclude as a matter of law that [the attorney] should have

included information in his opinion letter that Fidelity's second

mortgage could affect Home Federal's first lien priority."); *Avianca,*

*Inc. v. Corriea*, 705 F.Supp. 666, 681 (D. D.C. 1989)(finding as a

matter of law that the attorney breached his fiduciary duties).

### 1. An Attorney-Client Relationship Existed Between Mukai And The SS Hawaii Companies, Including SSW.

Mukai served as the attorney for the SS Hawaii

Companies, including SSW.  He first started representing them in

1984.  Ex. "1" at 6.  On August 23, 2000, Mukai drafted a

memorandum to Satoshi, who served as the Vice-President of the

SS Hawaii Companies, stating that his firm would not represent the

management companies (which Mukai formed) because his firm

already represented the "Sports Shinko Group."  Ex. "25".  His firm

drafted a Hotel Management Agreement on behalf of SSW.  Ex. "9"

at 109-110.  He also submitted numerous invoices for services

which he and his firm provided to the SS Hawaii Companies as

their attorneys.  Ex. "21".

> **2.   Mukai Breached His Duty To Warn The Kinoshitas Against Defrauding The RCC And Creditors And To Refrain From Furthering The Scheme.**

"Attorneys are required to follow the [Hawaii Rules of

Professional Conduct ("HRPC")]."  *Finley v. Home Ins. Co.*, 90

Hawai`i 25, 35, 975 P.2d 1145, 1155 (1998).  HRPC, Rule 1.2(d)

prohibits a lawyer, in part, from "counsel[ing] a client to engage, or

assist[ing] a client, in conduct that the lawyer knows is criminal or

fraudulent...".  A violation of the HRPC can result in liability for

professional malpractice.  *Finley*, 90 Hawai`i at 35, 975 P.2d at

1155.

Mukai violated Rule 1.2(d) by assisting the Kinoshitas in

their efforts to defraud creditors.  Mukai knew that SSJ might be

involved in a bankruptcy.  Ex. "26".  He made Toshio happy by

forming RMS and trying to burden the properties with the RMS Agreements to make it difficult for the RCC to attach the properties. Ex. "6" at 152; Ex. "11". *See* HRPC, Rule 1.2, Comment 6 (distinguishing between presenting a legal analysis of questionable conduct versus "recommending the means by which a crime or fraud might be committed with impunity.").

Mukai also assisted in forming the original management companies and RMS, drafting the management agreements, and preparing the Option. Ex. "4", "8", "9" at 114, 206-07. In November 2001, Satoshi specifically asked Mukai for his assistance in "protecting" the Hawaii Properties from the RCC and creditors. Ex. "13" at "K-C". Satoshi enclosed the plan which expressly stated that the goal was to "protect[ ] Hawaii Properties from RCC and Japanese Banks." *Id.* at 2. Rather than refusing and counseling against such an obvious plan to hinder, delay, or defraud creditors, Mukai aided the Kinoshitas and asked GT to investigate the tax consequences of the plan. Ex. "14". *See* HRPC, Rule 1.2(d), Comment 7 ("[T]he lawyer is required to avoid furthering the [client's criminal or fraudulent] purpose."

In truth, Mukai knew that the Kinoshitas' plans and actions raised fraudulent conveyance issues. He and his partner, Eric Kawatani, wrote an August 31, 2000 letter to Fukuda, expressly referencing fraudulent conveyances. Ex. "26". Furthermore, Mukai was also told that Toshio specifically wanted to protect the Hawaii properties from the RCC. Ex. "13" at "K-C".

However, Mukai testified that the August 31st letter was simply a "general warning, be careful, don't do anything that's illegal." Ex. "26" at 1 & 133. Rather than excusing Mukai, his testimony establishes liability by demonstrating that he: (1) had some generalized concerns about the legality of the Kinoshitas' plan; (2) failed to provide specific advice against proceeding; and (3) instead of trying to halt the scheme, he implemented it. As such, Mukai violated Rule 1.2(d) and breached his duty of care. *See* HRPC, Rule 1.2(d); *Finley, supra. See also Camarda v. Danziger, Bangser & Weiss*, 167 A.D. 2d 152, 561 N.Y.S. 2d 233 (1990)(failing to advise client that leveraged buy-out could be viewed as a fraudulent conveyance in violation of law stated a claim for legal malpractice).

## III.  CONCLUSION

Based on the foregoing, this Court should determine as a matter of law that Mukai breached his duties as a director and attorney for SSW.

DATED:   Honolulu, Hawai`i, January 11, 2008.


_____/s/ Glenn T. Melchinger_____
PAUL ALSTON
BRUCE H. WAKUZAWA
GLENN T. MELCHINGER
JASON H. KIM

Attorneys for Plaintiffs
and Third-Party Defendants
the Sports Shinko Companies

22