```
 1        A.    Okay.
 2        Q.    Have you ever seen this document before, marked
 3   Exhibit 3?
 4        A.    Yes.
 5        Q.    Can you tell me what that is?
 6        A.    This document lists some questions that the
 7   president, Takeshi, and Mr. Fukuda had with regard to
 8   the new companies that had been created pursuant to the
 9   instructions of the president.
10        Q.    And the new companies that this is talking
11   about are the management companies; is that correct?
12        A.    Yes.
13        Q.    And Mr. Fukuda says that he discussed these
14   matters with the president and with Takeshi; is that
15   correct, at the top?
16        A.    Yes.
17        Q.    So there was -- according to number two, there
18   was a question about or a concern that your name was in
19   the public record for the management companies; is that
20   correct?
21        A.    Yes.
22        Q.    And it says something about wanting to avoid
23   having the Kinoshita name in the public record; is that
24   right?
25        A.    Yes.
```

EXHIBIT 

***ATTORNEY-CLIENT PRIVILEGE*** 131

1  properties of which we had no plans to sell.
2      Q.  For all six properties, I think for Diamond
3  Head Beach Hotel, Queen Kapiolani, Ocean Resort and then
4  the three golf courses, do you remember what the total
5  for the termination fees was if, for example, you had to
6  pay them all, or Sports Shinko had to pay them all, do
7  you remember the grand total?
8      A.  I believe it was either 3.5 million or
9  4.5 million.
10     Q.  I think it's 3.5.  I think that's right.  So
11 Mr. Fukuda when he said he was going to, if the other
12 listed properties were sold, move those termination fees
13 to Mililani and Queen Kapiolani, what he meant by that,
14 as you understood it, was that that 3.5 million in
15 termination fees would be on only those two properties
16 or shifted into those two agreements with RMS; is that
17 right?
18     A.  Well, I suppose so, however, looking at the big
19 picture, this was all hypothetical and was my
20 understanding that no matter what anybody else said, it
21 would ultimately be the president who would make the
22 call.
23     Q.  As a hypothetical, even as a hypothetical, did
24 you think that seemed reasonable at that time to shift
25 all the termination fees for the other contracts to just

***ATTORNEY-CLIENT PRIVILEGE***                            145

```
 1   BY MR. MELCHINGER:
 2        Q.   So do you know if Mr. Fukuda or Mr. Kinoshita
 3   asked Mr. Nishida to sign these contracts for RMS as
 4   they were, without negotiation, for example?
 5        A.   I do not.
 6        Q.   Mr. Nishida had been an officer at some of the
 7   Sports Shinko entities; is that right?
 8        A.   Yes.
 9        Q.   What was his relationship like, Mr. Nishida's
10   relationship, with the president?
11        A.   Until the time that Mr. Nishida went off on his
12   own, their relationship was one of president/employee.
13        Q.   Did Mr. Nishida ever do work specifically for
14   the president, either in Hawaii or in Japan, sort of as
15   a special executive assistant, for example?
16        A.   A long time ago he used to be the secretary to
17   the president over in Japan.
18        Q.   Do you know when that was, about?
19        A.   Well, let's see, that was when I was still a
20   university student, so between, say, 1980 and 1985.
21        Q.   So, I'm sorry, is that how long or that is
22   that -- well, do you mean for five years he was acting
23   as secretary; is that right?
24        A.   I don't recall exactly as I sit here today, but
25   he did serve as secretary to the president for a few
```

1  years in or around that time frame. I don't recall how
2  many years it was.
3      Q.   Did you have any discussion with either
4  Mr. Mukai, the president, or Mr. Fukuda about the legal
5  affect the RMS management agreements would have after
6  they were entered?
7      A.   I did receive advice from Mr. Mukai.
8      Q.   What was that advice?
9      A.   I can recall a few things as I sit here today.
10 First of all, with regard to Mr. Nishida, Mr. Mukai
11 advised me that although Mr. Nishida was the president
12 of a small company, he nevertheless was now the
13 president of a separate and independent company and,
14 therefore, he had the full authority that that office
15 carries with it. And so I was told by Mr. Mukai that I
16 would need to forget the relationship that I once had
17 with Mr. Nishida, that of being me as vice president,
18 him as general manager, and I must now interact with him
19 as the president of a company, which he was, similar to
20 the way that Mr. Kinoshita was the president of our
21 company.
22     Q.   Okay. Anything else? I think you said there
23 were a few things.
24     A.   In addition, Mr. Mukai told me that since
25 Resort Management was a separate and independent company

```
 1      A.   Yes.  Another purpose would have been that we
 2   needed to delegate responsibility for the management to
 3   someone because there was a plan for me to return to
 4   Japan to work there.
 5      Q.   Okay.  Anything else?
 6      A.   In addition to that, another purpose would have
 7   been to enable me to focus more closely on the sale of
 8   the business facilities.
 9      Q.   Okay.  Is there any purpose as concerned either
10   Sports Shinko Japan's lenders, their lending banks for
11   RCC?
12      A.   I have no knowledge -- excuse me, I don't know.
13   At all.
14           THE INTERPRETER:  Let me clean that up.  "I
15   don't know at all."
16           MR. MELCHINGER:  What number are we on now?
17           THE REPORTER:  We're on 27.
18           MR. MELCHINGER:  Mark that 27, please.
19           (Exhibit 27 marked for identification.)
20   BY MR. MELCHINGER:
21      Q.   Showing you what's been marked Exhibit 27 to
22   your deposition.  After you've had a chance to look at
23   that, and particularly, the e-mail on the very top of
24   the first page, can you tell me whether you recognize
25   this?
```

```
 1          MR. MELCHINGER:  I'll clarify for the record, I
 2   think this got copied with my star mark on there on the
 3   right-hand column, so that's my mark.
 4          THE WITNESS:  Yes.
 5   BY MR. MELCHINGER:
 6       Q.   So you recognize this e-mail?
 7       A.   Yes.
 8       Q.   Is this an e-mail that you sent to Mr. Fukuda
 9   on or around January 16, 2001?
10       A.   Yes.
11       Q.   And does it report something about Mr. Mukai
12   and the president to Mr. Fukuda there in the second
13   paragraph?
14       A.   Yes.
15       Q.   And what is that?  What did you report to
16   Mr. Fukuda?
17       A.   Mr. Mukai's comments, his comments regarding
18   the affect of having created the management company.
19       Q.   And what was that affect, according to
20   Mr. Mukai?
21       A.   That it had made it extremely difficult for RCC
22   to lien the business facilities in Hawaii.
23       Q.   By lien, you mean attach?
24       A.   I'm not too sure of the technical expression
25   there.
```

```
 1            THE INTERPRETER:  Maybe I should clear this up,
 2   there's many choices of words, right, and lien is an
 3   attachment.
 4            MR. MELCHINGER:  Okay.
 5   BY MR. MELCHINGER:
 6        Q.   And what was, as you understood it and you
 7   reported it to Mr. Fukuda, what was the president's
 8   reaction to Mr. Mukai's comment?
 9        A.   In this e-mail here, I was communicating to
10   Mr. Fukuda regarding the substance of a meeting between
11   Mr. Mukai and the president, things that they were
12   working on.  So it's not that I was communicating this
13   to the president of the company.  Rather, I was
14   reporting to Mr. Fukuda regarding Mr. Mukai and the
15   president.
16        Q.   So the basis for this e-mail is a meeting
17   between Mr. Mukai and the president; is that right,
18   then?
19        A.   Yes.
20        Q.   Were you present at this meeting?
21        A.   No.
22        Q.   So how did you hear about this, afterwards?
23        A.   Looking at this report, yes, that does appear
24   to be the case.  Mr. Mukai and the president had a
25   meeting either in person or on the telephone and then
```

1  subsequent to that, I had a meeting with Mr. Mukai at
2  which time he shared with me what had been discussed
3  between him and the president. And I, in turn here, was
4  reporting that to Mr. Fukuda.
5      Q.  And as you noted, Mr. Mukai made a comment
6  about the affect of establishing the RMS, right, that
7  would make it hard to lien -- hard for RCC to lien the
8  Hawaii properties; is that right?
9      A.  No. Actually, what Mr. Mukai communicated to
10 me was that president Kinoshita was extremely happy that
11 RMS had been established because it had made it
12 difficult for RCC to lien the Hawaii business
13 facilities, and Mr. Kinoshita apparently asked Mr. Mukai
14 to work on establishing some sort of similar arrangement
15 to the RMS arrangement in Japan.
16     Q.  Was one of the purposes for the management
17 contracts and creating the management companies to make
18 it difficult for RCC to place liens on Hawaii
19 properties?
20     THE INTERPRETER:  I'm sorry, can I have that
21 question one more time.
22     THE WITNESS:  I had no idea about that. If you
23 look to the next paragraph under the paragraph that you,
24 Mr. Melchinger, have placed an asterisk next to, I go on
25 to write to Mr. Fukuda that if, in fact, it had become

***ATTORNEY-CLIENT PRIVILEGE***                    1

```
 1              IN THE CIRCUIT COURT OF THE FIRST CIRCUIT
 2                          STATE OF HAWAII
 3       ---------------------------------------------
 4       SPORTS SHINKO (USA) CO., LTD., a Delaware
 5       Corporation; SPORTS SHINKO (MILILANI)
 6       CO., LTD., a Hawaii corporation, et al.,
 7              Plaintiff,
 8         vs.              Case No. 02-1-2766-11 (EEH)
 9       RESORT MANAGEMENT SERVICES
10       (HAWAII), INC., a Hawaii corporation,
11       YASUO NISHIDA, SATOSHI KINOSHITA, et al.
12              Defendants.
13       ---------------------------------------------
14
15                 DEPOSITION OF SATOSHI KINOSHITA
16                          (Volume I)
17
18       Taken on behalf of the Plaintiff at Alston Hunt Floyd &
19       Ing, 1001 Bishop St., ASB Tower, 18th Floor, Honolulu,
20       Hawaii 96813, commencing at 9:08 a.m., Tuesday, April
21       19, 2005, pursuant to Notice.
22
23       BEFORE:   BARBARA ACOBA, CSR No. 412, RPR
24                 Notary Public, State of Hawaii
25
```

***ATTORNEY-CLIENT PRIvILEGE***                         96

```
 1            IN THE CIRCUIT COURT OF THE FIRST CIRCUIT
 2                          STATE OF HAWAII
 3    ------------------------------------------
 4    SPORTS SHINKO (USA) CO., LTD., a Delaware
 5    Corporation; SPORTS SHINKO (MILILANI)
 6    CO., LTD., a Hawaii corporation, et al.,
 7              Plaintiff,
 8         vs.              Case No. 02-1-2766-11 (EEH)
 9    RESORT MANAGEMENT SERVICES
10    (HAWAII), INC., a Hawaii corporation,
11    YASUO NISHIDA, SATOSHI KINOSHITA, et al.
12              Defendants.
13    ------------------------------------------
14
15             DEPOSITION OF SATOSHI KINOSHITA
16                         (Volume II)
17
18    Taken on behalf of the Plaintiff at Alston Hunt Floyd &
19    Ing, 1001 Bishop St., ASB Tower, 18th Floor, Honolulu,
20    Hawaii 96813, commencing at 9:04 a.m., Wednesday, April
21    20, 2005, pursuant to Notice.
22
23    BEFORE:   BARBARA ACOBA, CSR No. 412, RPR
24              Notary Public, State of Hawaii
25
```

***ATTORNEY-CLIENT PRIVILEGE***                              97

```
 1   APPEARANCES:
 2   For Plaintiff:        GLENN MELCHINGER, Esq.
 3                         ALSTON HUNT FLOYD & ING
 4                         ASB Tower
 5                         1001 Bishop St., 18th Floor
 6                         Honolulu, Hawaii 96813
 7
 8   For Defendant SATOSHI KINOSHITA:
 9                         JOHN KOMEIJI, Esq.
10                         WATANABE ING KAWASHIMA & KOMEIJI
11                         First Hawaiian Center
12                         999 Bishop St., 23rd Floor
13                         Honolulu, Hawaii 96813
14
15
16   Also Present:         STEVEN SILVER - Interpreter
17
18
19
20
21
22
23
24
25
```

***ATTORNEY-CLIENT PRIVILEGE***                     195

```
                    C E R T I F I C A T E
STATE OF HAWAII                )
CITY AND COUNTY OF HONOLULU    )
```

I, BARBARA ACOBA, Certified Shorthand Reporter and Notary Public, State of Hawaii, do hereby certify:

That on Wednesday, April 20, 2005, at 9:04 a.m., appeared before me SATOSHI KINOSHITA, the witness whose deposition is contained herein; that prior to being examined he was by me duly sworn;

That the deposition was taken down by me in machine shorthand and was thereafter reduced to typewriting under my supervision; that the foregoing represents, to the best of my ability, a true and correct transcript of the proceedings had in the foregoing matter.

I further certify that I am not an attorney for any of the parties hereto, nor in any way concerned with the cause.

Dated this 30th day of April, 2005, in Honolulu, Hawaii.

BARBARA ACOBA, CSR NO. 412
Notary Public, State of Hawaii
My Commission Exp: 10-22-2008

RALPH ROSENBERG COURT REPORTERS
Honolulu, Hawaii   (808) 524-2090