| | | |
|---|---|---|
| 14:24:05 | 1 | MR. BORDNER: I'm going to object. We've already been |
| :24:10 | 2 | over this drafting issue. And for you to suggest that he |
| 14:24:12 | 3 | drafted it in the context of his earlier answer is misstating |
| 14:24:16 | 4 | his prior testimony. |
| 14:24:19 | 5 | Q.   You can answer. |
| 14:24:23 | 6 | A.   Repeat the question, please. |
| 14:24:35 | 7 | (Record read by the reporter.) |
| 14:24:35 | 8 | A.   No, he just -- well, I'm not sure whether he spoke to |
| 14:24:42 | 9 | me directly or spoke to other people in the firm. I can't |
| 14:24:49 | 10 | recall, other than what we had discussed about separating the |
| 14:25:02 | 11 | ownership and management. |
| 14:25:06 | 12 | Q.   Just so I'm clear; with respect to Exhibit 7, you |
| 14:25:14 | 13 | recall Satoshi Kinoshita telling you that he wanted the |
| :25:15 | 14 | management agreement because they wanted to separate the |
| 14:25:20 | 15 | ownership from the management; is that correct? |
| 14:25:22 | 16 | A.   Well, they were forming the management company to help |
| 14:25:30 | 17 | the employees. |
| 14:25:35 | 18 | Q.   Anything else that you can recall Satoshi Kinoshita or |
| 14:25:38 | 19 | anyone from Sports Shinko telling you as to why they wanted you |
| 14:25:44 | 20 | to draft Exhibit 7? |
| 14:25:46 | 21 | A.   Not to my recollection. |
| 14:25:50 | 22 | Q.   Who were you and your firm drafting this agreement |
| 14:25:56 | 23 | for? On whose behalf? |
| 14:26:02 | 24 | A.   In this particular agreement, it's Queen Kapi`olani |
| 14:26:06 | 25 | Hotel. |

| | | |
|---|---|---|
| 14:26:10 | 1 | Q.   You drafted Exhibit 7 as the attorney for Queen |
| :26:13 | 2 | Kapi`olani Hotel? |
| 14:26:17 | 3 | A.   Our firm did.  And a clarification; of course, we |
| 14:26:26 | 4 | participated in the drafting of the agreement. |
| 14:26:32 | 5 | Q.   On page 26, section 9.6, 9.7, references a Termination |
| 14:26:41 | 6 | Fee.  Do you see that? |
| 14:26:41 | 7 | A.   Yes. |
| 14:26:42 | 8 | Q.   Do you recall any discussions about why there's a |
| 14:26:45 | 9 | termination fee in there? |
| 14:26:48 | 10 | A.   I don't recall at this time. |
| 14:26:55 | 11 | Q.   Do you recall anyone at your firm, including yourself, |
| 14:27:03 | 12 | questioning anyone at Sports Shinko as to why to include a |
| 14:27:09 | 13 | termination fee? |
| :27:15 | 14 | A.   I think that -- I think this agreement was pulled from |
| 14:27:28 | 15 | drafts, and I'm not too sure who discussed the termination fee |
| 14:27:34 | 16 | aspects with Mr. Satoshi Kinoshita. |
| 14:27:41 | 17 | Q.   Can you recall -- |
| 14:27:41 | 18 | A.   -- pertinent to discussions. |
| 14:27:45 | 19 | Q.   Can you recall any discussions? |
| 14:27:47 | 20 | A.   I don't recall any discussions. |
| 14:27:48 | 21 | Q.   Do you remember you or anyone in your firm advising |
| 14:27:53 | 22 | your clients Sports Shinko Waikiki that including the |
| 14:27:59 | 23 | termination fee was not beneficial to it? |
| 14:28:03 | 24 | A.   Not beneficial to? |
| 14:28:06 | 25 | Q.   Your client Sports Shinko Waikiki. |

| | | |
|---|---|---|
| 14:31:53 | 1 | A. The specifics of this agreement? |
| 14:31:54 | 2 | Q. Correct, Exhibit 7, and the ones that are similar to |
| 14:31:58 | 3 | it for the other properties. |
| 14:32:01 | 4 | A. No. It was basically instructions of the client to go |
| 14:32:05 | 5 | ahead and prepare management agreements. You know, we were, |
| 14:32:13 | 6 | throughout this entire relationship, we were attorneys and we |
| 14:32:17 | 7 | were told, basically we were asked to do certain things from a |
| 14:32:22 | 8 | legal standpoint. And we were basically following instructions. |
| 14:32:25 | 9 | And if they wanted to do something, then they'd |
| 14:32:29 | 10 | execute the documents. If they wanted us to draft documents, we |
| 14:32:32 | 11 | draft 'em. If they didn't want to sign this document, they |
| 14:32:37 | 12 | didn't have to sign it. And that's basically what it is. |
| 14:32:38 | 13 | So if we drafted documents, sent to them for |
| 14:32:43 | 14 | execution, they signed it or they didn't sign it. So basically |
| 14:32:43 | 15 | we'd like to think that we explained it to them as to what the |
| 14:32:47 | 16 | transaction was about, what it's all about. But insofar as the |
| 14:32:53 | 17 | business decision to do that, it was basically their decision. |
| 14:32:58 | 18 | Q. So by that answer, I take it your answer is no, you |
| 14:33:01 | 19 | did not independently on your own form an opinion as to whether |
| 14:33:08 | 20 | Sports Shinko's Hawaii entity should enter into management |
| 14:33:13 | 21 | agreements with the terms as set forth in Exhibit 7; is that |
| 14:33:17 | 22 | fair? |
| 14:33:17 | 23 | A. I didn't do an analysis as to why they should and |
| 14:33:23 | 24 | should not. |
| 14:33:23 | 25 | Q. That's fine. I understand that, no analysis. But my |

```
14:33:28  1   question is a little bit different.  I'm asking apart from
  :33:34  2   whether you did any analysis or not, did you ever form an
14:33:36  3   opinion in your own mind as to whether the Sports Shinko
14:33:40  4   entities should enter into management agreements with terms set
14:33:47  5   forth in Exhibit 7?
14:33:50  6        A.   Well, as I sit here, I don't think I gave it any
14:33:53  7   thought.
14:33:56  8             MR. WAKUZAWA:  Why don't we take another break; it's
14:33:59  9   been over an hour.
14:34:02 10             (Recess taken, 2:34 p.m. to 2:41 p.m.)
14:41:40 11                           Deposition Exhibit 8 was
14:47:57 12                           marked for identification.
14:47:57 13        Q.   Mr. Mukai, do you recognize what Exhibit 8 is?
  :48:02 14        A.   Yes.
14:48:02 15        Q.   Can you tell me what it is.
14:48:03 16        A.   It's a First Amended Hotel Management Agreement.
14:48:08 17        Q.   Do you know why there was an amendment made to this
14:48:13 18   agreement, the hotel management agreement?  What prompted the
14:48:20 19   amendment?
14:48:20 20        A.   In the recitals, I think that raised.
14:48:45 21        Q.   Why don't I ask the question this way then.  Apart
14:49:04 22   from what is stated in the recitals, are you aware of what
14:49:08 23   prompted the first amendment to the hotel management agreement,
14:49:12 24   Exhibit 8, to be undertaken?
14:49:19 25             MR. BORDNER:  Asking if there's anything other than
```

1 recall.

2 Q. Are you aware of any comments anyone from your firm
3 gave to Mr. Fukuda about the Stock Option Agreement based
4 upon his request in Exhibit 18?

5 A. There may have been, but I don't recall.

6 Q. Did you or your firm have any role in drafting or
7 revising the Stock Option Agreement attached to Exhibit 18?

8 A. We may have. I'm not sure.

9 Q. Do you have any reason to believe that you did not?

10 A. No.

11 Q. Did you ever formulate an opinion as to whether it
12 was a good or bad idea for Satoshi Kinoshita to be a part of
13 this Stock Option Agreement, Exhibit 18?

14 A. I don't recall.

15 Q. Do you recall anyone in your firm ever coming to the
16 conclusion as to whether it was a good or a bad idea from
17 the perspective of Satoshi Kinoshita to enter into this
18 Stock Option Agreement?

19 A. I don't recall.

20 Q. Do you recall any concerns that you had with this
21 Stock Option Agreement attached to Exhibit 18 at any time?

22 A. We may have prepared the drafts for these agreements
23 at the request of -- of somebody from Sports Shinko and so I
24 can't recall any comments one way or the other whether they
25 should or should not be doing this.

1    Q.    I'm asking a slightly different question.  Did you
2 ever formulate any concerns in your own mind about this
3 Stock Option Agreement attached to Exhibit 18 at any time?
4    A.    I don't recall.
5    Q.    Do you recall anyone at your firm ever formulating
6 concerns about the Stock Option Agreement attached to
7 Exhibit 18 at any time?
8    A.    I don't recall.
9    Q.    Do you recall who at Sports Shinko requested that
10 you prepare drafts of the Stock Option Agreement?
11    A.    I can't recall.
12    Q.    Was it Satoshi Kinoshita?
13    A.    Could be.
14    Q.    Is that your best recollection as to who it was?
15    A.    I want to move the -- this deposition along, so I'm
16 speculating again, and -- but I would suspect that it was
17 Satoshi.  Suspect.
18    Q.    When you prepared the drafts of the Stock Option
19 Agreement, you were preparing the drafts as an attorney for
20 the Sports Shinko Hawaii entities?
21    A.    I don't -- I don't know if there's any definitive
22 client that -- that we were doing it for.  We were doing it
23 at the request of Satoshi so we drafted -- as I say, I
24 suspect it was Satoshi, and we just drafted it pursuant to
25 his request.

1  Q.  When you and your firm were preparing the drafts of
2  the Stock Option Agreement attached to Exhibit 18, who in
3  your mind did you think you were representing in drafting
4  the Stock Option Agreements?
5  A.  There was really -- there was really no thoughts.  I
6  -- personally, I guess.  I'm not sure about Mr. Kawatani.
7  You have to ask him.
8  Q.  Did you have any understanding as to why Mr. Nishida
9  was giving Satoshi, Takeshi, and Toshiya Kinoshita an option
10 to purchase the shares of Resort Management Services Hawaii,
11 Inc.?
12     MR. BORDNER:  I'm going to object to the extent your
13 question assumes that this agreement was ever executed.  And
14 the question seems to implicate or suggest that, and I
15 object to that without foundation.
16     MR. WAKUZAWA:  You can answer.
17     THE WITNESS:  Okay.  You know, I think I've
18 mentioned that before that, I've never seen it executed so I
19 think what you've got to do is you have to ask Mr. Nishida
20 and the other parties involved.  I have no personal
21 knowledge as to why.
22 BY MR. WAKUZAWA:
23 Q.  Let me just follow up so that we're clear.  Did you
24 ever have an understanding as to why you were drafting a
25 document in which Mr. Nishida was giving Satoshi, Takeshi,

1    A.    I think that's my interpretation of what Eric was
2  doing.
3    Q.    That's correct, what I said?
4    MR. BORDNER:  I believe he answered your question.
5    THE WITNESS:  Yes.
6  BY MR. WAKUZAWA:
7    Q.    So apart from the general warning to do things above
8  board reflected in Exhibit 11, at any time did you have any
9  concern that a plan of action or action taken by the
10 Kinoshitas or any Sports Shinko company raised fraudulent
11 conveyance issues?
12   A.    I don't have a recollection.
13   Q.    Apart from Exhibit 11, do you recall anyone at your
14 firm having a concern that a plan of action or action taken
15 by the Kinoshitas or any Sports Shinko company raised
16 fraudulent conveyance issues?
17   A.    I don't have a recollection.
18   Q.    Did you ever investigate or look into whether any
19 plan of action or action taken by the Kinoshitas or any
20 Sports Shinko company raised fraudulent conveyance issues?
21   A.    I have no recollection.
22   Q.    Do you recall anyone at your firm ever investigating
23 or looking into whether a plan of action or action taken by
24 the Kinoshitas or any Sports Shinko company raised
25 fraudulent conveyance issues?

1  A.   I have no recollection.

2  Q.   Did Satoshi Kinoshita ever tell you that Sports
3  Shinko Japan or any of its subsidiaries was in a pinch
4  financially?

5  A.   You got to redefine what you mean by pinch.  I mean,
6  if you're -- if you're saying you need money, everybody
7  needs money so I'm not -- I'm not -- I'm not clear as to
8  what you're saying.

9       If you're saying yeah, they -- they're not -- they
10 didn't make money this month, he probably said that.  I'm --
11 I can't recall.

12 Q.   Do you recall him ever using that specific term "in
13 a pinch financially?"

14 A.   I don't recall.

15 Q.   I believe in response to the prior question you said
16 that Satoshi probably said we didn't make money in a certain
17 month, is that correct?

18      MR. BORDNER:  I'm going to object.  You're
19 misstating his testimony.  He's already answered the
20 question you posed previously, and your attempt to
21 recharacterize it, I think, is unfair to the witness.  I
22 object.

23      THE WITNESS:  Your -- could you repeat the question?
24 BY MR. WAKUZAWA:
25 Q.   Well, I can ask a different question.  Did Satoshi

1  A. I believe so.
2  Q. You are listed as the attorney at the top left-hand
3  corner. Is that because you were considered the responsible
4  attorney for this matter?
5  A. I really don't know. I guess so.
6  Q. Do you know of any other reason that you were listed
7  at the top of the invoice on the left-hand side of the page?
8  A. Do I know any reason? I don't know.
9  Q. December 4, 2001, your time entry says "Review
10 structure, review memo."
11    Do you see that?
12 A. Mm-hmm.
13 Q. Yes?
14 A. Yes.
15 Q. What did you mean by review structure?
16 A. I don't have a recollection.
17 Q. Do you have any idea of what you were referring to?
18 A. Yeah, there were -- there were different things that
19 was going on at the time. I can't -- I don't have a
20 specific recollection -- I have no recollection as to what
21 it might specifically pertain to.
22 Q. Do you have a list of possibilities of what that
23 might refer to, based upon the various things that you are
24 aware of that was going on at that time?
25 A. There were some transactions involving various

1   A.   No.

2   Q.   Did you or anyone from your firm to your knowledge
3   ever tell Satoshi or Toshio after November 26th, 2001, that
4   it would not be a good idea to proceed with either plan A or
5   B, as referenced in Exhibit 31?

6   A.   I don't believe so.

7   Q.   Did you or anyone from your firm to your knowledge
8   ever tell Satoshi or Toshio that it was not a good idea to
9   proceed with either plan A or B, as referenced in
10  Exhibit 31?

11  A.   I think what happened is we sent this over to Grant
12  Thornton for analysis.

13  Q.   "This" is Exhibit 31?

14  A.   Or they had it, and I think that's probably the
15  reference.

16  Q.   But you're talking about Exhibit 31?

17  A.   That's correct.  That's probably the reference in
18  that.

19  Q.   You're talking about the reference to the plan in
20  Grant Thornton's memo, Exhibit 29?

21  A.   Yeah, I would -- I would surmise.

22  Q.   The answer is yes?

23  A.   Yes.  So I think it was -- I think it was Grant
24  Thornton doing the analysis.

25  Q.   Just so I'm clear, though, do you recall yourself or

```
 1                IN THE UNITED STATES DISTRICT COURT

 2                      FOR THE DISTRICT OF HAWAII

 3

 4   SPORTS SHINKO CO., LTD.,           ) CV 04-00124 ACK-BMK
                                        ) CV 04-00127 ACK-BMK
 5              Plaintiff,              )
                                        ) CONSOLIDATED CASES
 6         vs.                          )
                                        )
 7   QK HOTEL, LLC., et al.,            )
                                        )
 8              Defendants,             )
                                        )
 9         and                          )
                                        )
10   FRANKLIN K. MUKAI, et al.,         )
                                        )
11              Third-Party             )
                Plaintiffs,             ) DEPOSITION OF
12                                      ) FRANKLIN K. MUKAI
           vs.                          )
13                                      ) Volume I
     SPORTS SHINKO (USA) CO.,           ) (Pages 1 - 150)
14   LTD., et al.,                      ) (Exhibits 1 - 11)
                                        )
15              Third-Party             )
                Defendants,             )
16                                      )
           and                          )
17                                      )
     SPORTS SHINKO (HAWAII) CO.,        )
18   LTD., et al.,                      )
                                        )
19              Third-Party             )
                Defendants/             )
20              Counterclaimants,       )
                                        )
21         vs.                          )
                                        )
22   QK HOTEL, LLC, et al.,             )
                                        )
23              Third-Party             )
                Counterclaim            )
24              Defendants.             )
                                        )
25   AND CONSOLIDATED CASES             )
                                        )
```

Case 1:04-cv-00124-BMK   Document 361-15   Filed 01/11/2008   Page 13 of 17
151

```
         IN THE UNITED STATES DISTRICT COURT

              FOR THE DISTRICT OF HAWAI'I


SPORTS SHINKO CO., LTD.,           )
                                   )
               Plaintiff,          ) CV 04-00124 ACK-BMK
                                   ) CV 04-00127 ACK-BMK
         vs.                       )
                                   )
QK HOTEL, LLC, et al.,             )
                                   )
               Defendants,         )   DEPOSITION OF
                                   )
                                   )   FRANKLIN MUKAI
         and                       )   VOLUME II
                                   )
FRANKLIN K. MUKAI, et al.,         )
                                   )
               Third-Party         )
Plaintiffs,                        )
                                   )
         vs.                       )
                                   )
SPORTS SHINKO (USA) CO., LTD.,     )
et al.,                            )
                                   )
               Third-Party         )
               Defendants,         )
_____)
         and                       )
```

RALPH ROSENBERG COURT REPORTERS, INC.
HONOLULU, HI   (808) 524-2090

```
 1   SPORTS SHINKO (HAWAII) CO.,        )
 2   LTD., et al.,                      )
 3          Third-Party Defendants/     )
 4          Counterclaimants,           )
 5                                      )
 6               vs.                    )
 7                                      )
 8   QK HOTEL, LLC, et al.,             )
 9          Third-Party Counterclaim    )
10          Defendants.                 )
11                                      )
12   AND CONSOLIDATED CASES             )
```

DEPOSITION OF FRANKLIN MUKAI

VOLUME II

Taken on behalf of the Plaintiffs and Third-Party Defendants at the law offices of Alston Hunt Floyd & Ing, located at 1001 Bishop Street, American Savings Bank Tower, Suite 1800, Honolulu, Hawaii 96813, commencing at 9:00 a.m. on Friday, December 21, 2007, pursuant to notice.

BEFORE:

   WENDY M. WATANABE, Notary Public, State of Hawaii
   Hawaii Certified Court Reporter, CSR 401

```
 1              DEPOSITION OF FRANKLIN MUKAI
 2
 3  APPEARANCES:
 4  For the Plaintiffs and Third-Party Defendants the Sports
 5  Shinko Companies:
 6           BRUCE WAKUZAWA, ESQ.
 7           Alston Hunt Floyd & Ing
 8           1001 Bishop Street
 9           American Saving Bank Tower, Suite 1800
10           Honolulu, Hawaii  96813
11
12  For the Defendant and Third-Party Plaintiff, Franklin Mukai:
13           WILLIAM BORDNER, ESQ.
14           Burke Sakai McPheeters Bordner Iwanaga & Estes
15           Pacific Guardian Center, Mauka Tower
16           737 Bishop Street, Suite 3100
17           Honolulu, Hawaii  96813
18
19           JOHN YAMANO, ESQ.
20           McCorriston Miller Mukai MacKinnon
21           Five Waterfront Plaza, 4th Floor
22           500 Ala Moana Boulevard
23           Honolulu, Hawaii  96813
24
25
```

```
 1                  DEPOSITION OF FRANKLIN MUKAI
 2
 3   APPEARANCES:
 4   For the Defendants, Counterclaimants, and Third-Party
 5   Plaintiffs KG Holdings, LLC, Kiahuna Golf Club, LLC, KG
 6   Kauai Development, LLC, Pukalani Golf Club, LLC, KG Maui
 7   Development, LLC, Mililani Golf Club, LLC, QK Hotel, LLC,
 8   and OR Hotel, LLC:
 9            ROBERT MARKS, ESQ.
10            Price Okamoto Himeno & Lum
11            Ocean View Center, Suite 728
12            707 Richards Street
13            Honolulu, Hawaii  96813
14
15
16
17
18
19
20
21
22
23
24
25   ALSO PRESENT:  WAYNE TANIGAWA
```

```
 1   STATE OF HAWAII                    )
 2                                      )  ss.
 3   CITY AND COUNTY OF HONOLULU        )
 4
 5        I, WENDY M. WATANABE, CSR 401, Notary Public, State
 6   of Hawaii, hereby certify:
 7        That on Friday, December 21, 2007, at 9:00 a.m.
 8   appeared before me FRANKLIN MUKAI, the witness whose
 9   deposition is contained herein; that prior to being
10   examined, the witness was previously duly sworn;
11        That the deposition was taken by me in machine
12   shorthand and was thereafter reduced to typewriting by
13   computer-aided transcription; that the foregoing represents,
14   to the best of my ability, a full, true, and correct
15   transcript of said deposition.
16        I further certify that I am not an attorney for any
17   of the parties hereto, nor in any way concerned with the
18   cause.
19
20
21                     Dated:  December 27, 2007
22
23                     _____
24                     Notary Public, State of Hawaii
25                     My Commission expires: 04/07/2010
```